## THE UNITED STATES v. THE PRESIDENT, DIRECTORS AND COMPANY OF THE BANK OF THE UNITED STATES.

It was not the object of the English statute of 13th Eliz. ch. 5, to invalidate fair and *bona fide* transactions; nor is every conveyance which has the effect of delaying or hindering creditors, in itself fraudulent. It must be devised " of malice, fraud, covin, collusion or guile," to bring it within the statute.

Conveyances or assignments to one or more creditors for the security or satisfaction of a debt due by the grantor, are, *prima facie*, good, within the stat. of 13th Eliz. ch. 5.

By the laws of Pennsylvania, a debtor, whether insolvent or not, may make either a partial or general assignment of property, either in possession or in action, for the benefit of his creditors, and may prefer one to another.

An assignment of property, real or personal, to trustees for the benefit of the creditors of the assignor, legal and valid by the laws of the State in which it was made, and accompanied by delivery, will be respected in this State. Such contracts must be governed by the law of the place where they were executed. C. C. 10. C. P. 13.

By the laws of Pennsylvania, a corporation is as competent as a natural person to make an assignment for the benefit of creditors, and to give a preference to one or more creditors, even after insolvency.

The statute of Pennsylvania, of the 4th May, 1841, authorized the president, directors and company of the Bank of the United States, to dispense with the inventory and bond and surety required by the statute of 1836, in the case of a partial, as well as in that of a general assignment of its property for the benefit of its creditors. Ss. 19, 20.

The assignments made by the Bank of the United States, for the benefit of certain of its creditors, on the 7th June, and 4th and 6th September, 1841, are valid under the laws of that State, and sufficient to transfer the property of the bank in this State.

It is no objection to the validity of an assignment for the benefit of creditors, under the laws of Pennsylvania, that it has not been expressly accepted by them. Acceptance will be presumed where it is shown that the assignment was for their benefit, and there is no stipulation for a release of the debts, nor any thing calculated to delay the creditors unreasonably.

Delivery of the evidence of a debt is a sufficient delivery of the possession of it. Notice to the debtor is necessary in some cases; but not in transfers of bills of exchange or notes payable to order previous to maturity, nor afterwards, but to prevent the parties bound from acquiring equities against the holder, to which they might be entitled if not notified.

Personal property has no locality, and the law of the owner's domicil will, in all cases, determine the validity of its transfer or alienation, unless there be some positive or customary law of the country in which it is situated to the contrary.

To entitle the United States under the act of Congress of 3 March, 1797, s. 5, to have any debt due to them first satisfied out of the property of an insolvent, where the latter has made a voluntary assignment for the benefit of his creditors, there

must be an actual insolvency though not a declared one, and the assignment must have been a general one ; but a party cannot, by assigning all his property by different acts, defeat the priority of the United States, under the pretext of the assignments being partial.

APPEAL from the Commercial Court of New Orleans, *Watts*, J.

The facts of this case are stated in detail in the opinion pronounced by

GARLAND, J. In the month of January, 1842, the United States, by their attorney for the Eastern District of Louisiana, filed their petition claiming of the Bank of the United States, chartered by the State of Pennsylvania, the sum of $1,986,589 04, with interest at the rate of six per centum per annum, from the 3d of March, 1835, until paid. The foundation of this claim was a bond given by the bank, in part payment to the United States, of the stock held by them in the bank chartered by Congress in 1816, and purchased by the state institution. An attachment was taken out, and property seized, and garnishments levied in the hands of different debtors to the bank, to the amount of upwards of $2,000,000, under the laws of this State. About two months after this petition was filed, a supplemental petition was presented, in which it was stated, that the bank was only indebted to the plaintiffs in the sum of $365,756 80, with interest on various portions thereof, from different dates. The amount claimed on the bond, was reduced to $89,606 01, with six per cent. interest from the 27th day of November, 1840, until paid. The remainder of the last amount was made up of certain sums claimed as being due from different branches of the old bank, the officers of which had acted as pension agents for the government, previous to the expiration of its charter, and the amount of a judgment for $251,243 54, obtained by the plaintiffs in the Circuit Court of the United States, held in Philadelphia, against the defendants ; it being for debts alleged to be owing by the old bank.

In this supplemental petition it is alleged, that the bank established by Congress, on the 2d of March, 1836, made a transfer of all its property, debts, rights and interests, to the State bank, with a condition and upon trust, that the new institution should pay all the debts and liabilities of the old one, arising out of any of its transactions, which transfer and assignment were accepted

upon that express trust and condition.  A continuance of the attachment was prayed for, a great number of garnishees were cited and interrogated as to their indebtedness, and a judgment asked as before stated.

The court appointed attorneys to represent the absent defendants, and they filed an answer, which contains a qualified denial of the claims presented.  They say, that as to the judgment obtained in Pennsylvania in the Circuit Court of the United States, a writ of error has been sued out by the bank, upon which the case is pending in the Supreme Court of the United States ; wherefore they ask for a suitable delay, until the result of said appeal shall be ascertained, so that the defendants may have the benefit of a reversal of said judgment, should such reversal be made.

The answer then proceeds to claim various amounts in compensation, which it is not necessary to state in detail, as from the judgment rendered against the bank there is no appeal.

Before the answer of the defendants was filed, John Bacon, A. Symington and Thomas Robins, of Philadelphia, presented their petition of intervention, in which they represent, that proceedings had been commenced, as before stated, by the plaintiffs against the defendants, in which an attachment was unlawfully issued, under color of which the plaintiffs had caused the sheriff to seize, attach, and take into possession, certain bills, promissory notes, securities, evidences of debt and property to a great amount, to wit, of the value of more than $1,500,000, all of which were at the time, in the lawful possession of W. W. Frazier then in New Orleans, who then was and is the agent of said intervenors.  They say, that the possession of the sheriff was obtained by force, under the pretence of said writ of attachment.  They say, that they cannot accurately describe said bills, notes and assets, as they are all in the hands of the sheriff, and access to them refused, until a complete inventory can be made.  They allege, that all of said property, assets, notes, bills receivable, &c., are their property, by virtue of a good and valid assignment, for a valuable consideration, for just and lawful purposes and uses, from the said Bank of the United States, which they will in due time produce and exhibit.  They say that, at the time of the aforesaid unlawful

seizure, the said effects were not liable to be attached or seized in any action against the bank, as that institution had no interest nor right of property in them.

These petitioners therefore pray, that they may intervene and claim all the property and evidence of debts so attached, and taken from their agent or sub-agents, and that, after due proceedings had, it be so decreed, and restored to their lawful possession ; and that until further orders, the sheriff be directed to keep possession of the same.   They further pray, by way of reconvention, for damages against the sheriff, and all parties concerned.

About two months after this petition was received, the same intervenors presented a supplemental petition, in which they specially set forth the deed of assignment made to them by the bank on the 7th of June, 1841, in Philadelphia, of all the property mentioned therein, and in a schedule annexed, for particular and lawful uses and trusts, therein stated.   They say, that said deed of transfer and assignment is good and valid according to the laws of Pennsylvania, where it was executed, and is so according to the laws of this State ; and that all of said property and assets were delivered to them, long anterior to the institution of this suit.   The petition then repeats the allegations in relation to the illegal proceedings of the parties and sheriff, and specifies, by reference to the inventory, the items and property claimed, also the fact of its all being in the possession of their agent or sub-agents.   They specially aver the illegality of the proceedings under the second attachment, which was levied on all the property claimed by them, after their first petition was filed, and say, that it was informal, illegal and null, and was wrongfully and illegally levied on said property.

The petition concludes with a prayer, that the assignment may be declared good and valid, and that all the property designated be decreed to belong to them, and that the proceedings as to them may be dismissed with damages.

The attorney representing the United States filed several exceptions to the proceedings of the intervenors, which were overruled ; and as, in this court, they have not been mentioned, we presume they are abandoned.  He then answered by a general denial, and an averment, that the several deeds of trust or assignment, executed by the

Bank of the United States to the aforesaid intervenors, on the 7th day of June, 1841, or at any other time, were, and are null and void. That, on the 1st of May, 1841, and at all other times since, the defendants have not had sufficient property to pay their debts, whereby the United States, who were creditors at that date, as set forth in their petition, have acquired a right of preference and priority over all other persons, upon all the property seized, the said assignment being voluntary and general. He further avers, that said transfer and assignment was not made for the benefit of the United States, one of the creditors of the bank, but for the purpose of evading the laws, and to deprive the United States of their priority and preference as aforesaid.

The answer then sets forth, that at the time the aforesaid deed of assignment was made and executed, the Bank of the United States was insolvent, and, that not having property to pay their debts, said deed of assignment was made to give illegal advantages and preferences to some creditors and to deprive others of their rights, wherefore, the same is illegal, fraudulent and null, being made in violation of the laws of the United States, and of the States of Pennsylvania and of Louisiana. It is, therefore, prayed, that said deed of trust or assignment may be declared null and void, and that the petition of intervention may be dismissed.

A few days after the filing of this answer, James Robertson, James S. Newbold, Herman Cope and Thomas S. Taylor, all residents of the city of Philadelphia, presented their petition of intervention in which they say, that they are the assignees of the Bank of the United States, by legal assignments, dated on the 4th and 6th of September, 1841, made in the State of Pennsylvania, by which said bank assigned, transferred and delivered to them certain bills, notes, assets and other property, seized by the sheriff, which are designated on the inventory made by him, by the letter S in red ink, which are not included in the assignment to Bacon, Symington and Robins, the other intervenors. The petition then proceeds, with a change of names and dates, to aver, in terms nearly similar to that of Bacon and others, that the assignment to Robertson and others was made for a good and legal consideration, for certain uses and trusts therein contained, to wit, the payment of various creditors of the bank ; that it is valid, according to law ; and that the property attached belongs to them as such

trustees, and has been illegally and wrongfully seized and attached, it having been really delivered to, and in possession of the agents of petitioners, at the ;time of seizure.    They further allege, that the attachment, which issued on the 25th of March, 1842, was illegally and informally issued, as well as executed. They therefore pray, that the deeds and assignments to them be declared legal and valid, and that a judgment be rendered ordering the property to be restored, and the demand of plaintiffs to be dismissed.

To this petition the attorney of the United States, after certain exceptions similar to those heretofore mentioned were overruled, filed an answer, in which he repeats the same objections to the assignments and deeds under which these intervenors claim, as he had set up against that under which Bacon and others claim, re-asserting his allegations of fraud and illegality in strong terms, also the charges of the insolvency of the bank, and the intention to defeat its creditors, and particularly the United States.    He, therefore, prays, that the said assignments may be declared null and void, and that a judgment may be rendered in favor of the plaintiffs, with a priority and preference according to law.

As between the bank and the United States, the cause was tried in February, 1843, and a judgment rendered in favor of the latter, for three hundred and sixty-six thousand, eight hundred and two dollars and sixty-two cents, with interest at six per cent per annum, on various portions thereof, from various dates therein mentioned; reserving to the intervenors all their rights, to be subsequently investigated and tried; neither party to be prejudiced by the judgment.    From this judgment the bank does not appear to have appealed.

Upon the issues thus stated, the United States and the whole of the intervenors went to trial.

The evidence shows, that when the charter of the Bank of the United States chartered by Congress, was about to expire in 1836, a new charter for the same institution was obtained from the Legislature of Pennsylvania, in the month of February of that year.  The provisions of the old charter were retained, except in those particulars necessary to accommodate the new institution to the change of circumstances; and some additional provisions were made, so as

to give greater efficiency to the new bank. See the charter of the Bank of United States, 6th Vol. Laws U. S. pp. 35 to 50, and the charter granted by the State of Pennsylvania in 1836.

The old charter says, that the corporation shall be " able and capable, in law, to have, purchase, receive, possess, enjoy and retain, to them and their successors, lands, rents, tenements, hereditaments, goods, chattels and effects, of whatsoever kind, nature and quality, to an amount not exceeding, in the whole fifty-five millions of dollars, including the amount of the capital stock aforesaid ; and the same to sell, grant, demise, alien, or dispose of; and generally to do and execute all and singular the acts, matters and things which to them it shall or may appertain to do," subject only to the laws of the United States and the provisions of the charter. The second section of the State charter is very nearly in the same words, and confers full power in relation to the purchase, alienation, and disposition of the property of the corporation.

The stockholders of the old bank met, soon after the new charter was granted, and accepted it. They also directed the directors of the old bank to convey to the new corporation, all the property and assets belonging to it, for the purpose of paying the debts of the old corporation ; and the new one took said property and assets, subject to that condition. In the resolutions passed, it is designated as a trust for those purposes ; and the United States are especially mentioned as a creditor to be paid. The new bank, with the old name, transacted business for several years, not only in Pennsylvania, but elsewhere, and particularly in Louisiana, to a very large amount. A contract was made with the United States government, for the purchase of its stock in the old bank, a part of the price of which constitutes a portion of the present demand, and the remainder of it consists of items of indebtedness by the old bank.

In the latter part of the year 1840, or in the commencement of the year 1841, the Bank of the United States wishing to resume specie payments with the other banks in Philadelphia, agreed to give them post-notes, payable at a future period, for the balances owing to them, with a promise of security if required, to insure their payment. It resumed on the 15th of January, 1841, but at

the expiration of fifteen days had to stop again. This suspension seems to have given a severe blow to the credit of the bank, and various meetings of the stockholders were held, to examine into its condition, the causes of its suspension, and for other purposes not necessary to be now stated. On the 8th of April, 1841, a meeting of the stockholders was held, and it was resolved, " that a part of the assets of the bank be placed in the hands of trustees, as a pledge for securing the ultimate payment of its post-notes, circulation and deposits, in the event of an arrangement being made with the other city and county banks to receive its notes in payment and on deposit; and, in case such arrangements should fail to be made, then in trust for the security of the present circulation and deposits."

At a meeting of the stockholders held on the 4th of May, 1841, Mr. Drayton, the president of the bank, reported to them, that a committee of the directors had been appointed, to carry into effect the resolution above mentioned, " and had succeeded so far as it regards the post-notes held by the Philadelphia banks; but for want of legislative action to grant power for creating the trust, without securities now required by law, they had not yet succeeded in complying with the wishes of the stockholders in reference to the circulation and deposits." This report led to a long discussion, and a preamble and resolution were offered stating that, in the opinion of the stockholders, the assignment so made was in derogation of the authority of the stockholders, and therefore not approved by them. The preamble and resolution were finally rejected. Mr. Josiah Randall, a gentleman who is much relied on, as a witness in this case by the plaintiffs, then offered a resolution directing the board of directors, "forthwith to pledge funds to protect the circulation of, and deposits in, the bank." After various attempts to amend this resolution, and much discussion, it was finally adopted.

The assignment reported by the president, was one of assets to the value of $7,772,250 33, dated May 1st, 1841, conveyed to James Dundas and others, as trustees for the purpose of securing the payment of the post-notes given to the Philadelphia city and county banks, before mentioned: It is not material to state the purposes of this assignment and trust, further than to say, that

its object was as above stated. The trustees were to collect the debts transferred to them, and to apply the proceeds to the purpose stated. The trust was to expire at the end of two years, unless extended by consent. The validity of this deed is not before us, as none of the property mentioned in it is in this State, nor any of the parties before the court. It is only mentioned as a part of the series of transfers, and to be noticed in reference to a point which comes up for consideration. We shall only remark, *en passant*, that this deed of assignment has been held valid and good by the Supreme Court of Pennsylvania, in the case of *Dana* v. *The Bank of the United States, Dundas, &c. Garnishees*, recently decided.

To procure the legislative action, reported by Mr. Drayton to be necessary, to pledge or assign the assets to secure the circulation and deposits of the bank, a committee of the board of directors was appointed to wait on the legislature, then in ,session, to procure the passage of a law, relieving the assignees or trustees from the obligation of giving bond and security, in double the amount of the appraised value of the property assigned; and for some other facilities, to enable the corporation to carry out the wishes of the stockholders. For a better understanding of this case copious extracts from the laws of Pennsylvania relative to assignees and trustees are inserted herein, which are as follows:—

*An Act relating to assignees for the benefit of creditors, and other trustees, approved 14th June, 1836.*

Sect. 1. In every case in which any person shall make a voluntary assignment of his estate, real or personal, or of any part thereof, to any other person or persons, in trust for his creditors, or some of them, it shall be the duty of the assignee or assignees, within thirty days after the execution thereof, to file in the office of the prothonotary of the court of Common Pleas of the county in which the assignor shall reside, an inventory or schedule of the estate or effects so assigned, accompanied with an affidavit by such assignees, that the same is a full and complete inventory of all such estate and effects, so far as the same has come to their knowledge.

Sect. 2. It shall be lawful for the court of Common Pleas of such county, or for any judge thereof, in vacation, to appoint

two or more disinterested and competent persons, to appraise the estate and effects so assigned.

Sect. 3. The appraisers so appointed, or any two of them, having first taken an oath or affirmation, before some person having authority to administer oaths, to discharge their duties with fidelity, shall forthwith proceed to make an appraisement of the estates and effects assigned, according to the best of their judgment, and having completed the same shall return the inventory and appraisement to the court, where it shall be filed of record.

Sect. 4. The appraisers aforesaid shall receive the same compensation as is now allowed by law to appraisers of the estate of a decedent.

Sect. 5. The assignee or assignees as aforesaid, shall, as soon as such inventory and appraisement shall have been filed, give a bond or bonds, with at least two sufficient sureties, to be approved of by one of the judges of the said court, in double the amount of the appraised value of the estate so assigned.

Sect. 6. The bond so to be given, shall be taken in the name of the commonwealth of Pennsylvania, and the condition thereof shall be as follows, viz:

The condition of this obligation is such, that if the above bounden A. B. and C. D. assignees of E. F., shall, in all things, comply with the provisions of the acts of assembly in such case made, and shall faithfully execute the trust confided to them, then the above obligation to be void, otherwise to be and remain in full force and virtue.

And such bond shall be filed in the office of the prothonotary of the said court, and shall by him be entered of record, and shall enure to *the use of all persons interested in the property assigned.*

Sect. 7. It shall be lawful for the court of Common Pleas of the proper county, on the application of any person interested, " *co-trustee or co-assignee,*" to issue a citation to any assignee or trustee for the benefit of creditors, whether appointed by any voluntary assignment, or in pursuance of the laws relating to insolvent debtors and domestic attachments, requiring such assignee or trustee to appear and exhibit, under oath or affirmation, the accounts of the trust in the said court, within a certain time, to be named in such citation.

Sect. 8. *Provided,* That no such citation shall be issued, until after the expiration of one year from the date of the assignment to, or appointment of such assignees or trustees.

Sect. 9. The several courts of Common Pleas shall, by a general order, or by such order as the circumstances of any particular case may require, direct the prothonotary of the same court to

give notice of the exhibition and filing of every account as afore-said, during such time, and in such public newspapers as they shall appoint, setting forth in such notice, that the accounts will be allowed by the courts, at a certain time, to be stated in such notice, unless cause be shown why such account should not be allowed.

Sect. 10. The expense of advertising as aforesaid, shall be paid by the assignees or trustees, at the time of exhibiting their ac-counts as aforesaid, and shall be passed to their credit in such ac-count.

Sect. 11. Whenever it shall be made to appear in (to) a court of Common Pleas having jurisdiction as aforesaid, that an as-signee or trustee as aforesaid, has neglected or refused, when re-quired by law, to file a true and complete inventory, or to give bond with surety, when so required by law, or to file the ac-counts of his trust, or that such assignee or trustee is wasting, neglecting, or mismanaging the trust estate, or is in failing cir-cumstances, or about to remove out of the jurisdiction of the court, in any such case, it shall be lawful for such court to issue a cita-tion to such assignee or trustee, to appear before the court, at a time to be therein named, to show cause why he should not be dismissed from his trust.

Sect. 12. On the return of such citation, the court may require such security, or such other and further security, from such as-signee or trustee, as they may think reasonable, or may proceed at once to dismiss such assignee or trustee from the trust.

Sect. 13. The like proceedings may be had, whenever it shall be made to appear to such court, that any person who shall have become surety for any assignee or trustee as aforesaid, in any bond, given for the due execution of the trust, is in failing circum-stances, or has removed out of this commonwealth, or signified his intention so to do.

Sect. 14. An assignee or trustee as aforesaid, may, with the leave of the court having jurisdiction as aforesaid, make a volun-tary settlement of his accounts, so far as he may have executed the trust, and the same being filed in the office of the prothono-tary of the court, the like proceedings shall be had thereon as in the case of a settlement of such accounts after citation.

Sect. 20. When any assignee or trustee shall have been duly declared to be a lunatic or habitual drunkard, or shall have re-moved from the State, or ceased to have a known place of resi-dence therein, during the period of a year or more, it shall be lawful for the court having jurisdiction, on due proof thereof, to dismiss such assignee or trustee.

Sect. 21. When any assignee or trustee shall be dismissed from the trust, it shall be lawful for the court to order and direct all

books, papers, moneys, and effects in the hands of such dismissed assignee or trustee, to be forthwith delivered or transferred to such other person or persons, as the court may appoint to receive the same, upon security being given by such receiver, according to the order of the court.

Sect. 22. The court having jurisdiction as aforesaid, shall have power, upon the application by bill or petition of any assignee or trustee, setting forth such facts as in equity would entitle him to relief, to discharge him from the trust : *Provided*, That no such discharge shall take place, unless the accounts of such assignee or trustee shall have been duly settled or confirmed as aforesaid, so far as he shall have acted in the trust, nor unless notice of such application shall have been given to all parties interested, either personally, or by advertisement, in such public newspapers as may be directed by the court, nor until such assignee or trustee, shall have surrendered the trust estate remaining in his hands, to some other assignee or trustee, or other person appointed by the court to receive the same, and shall have performed all such other matters as may be required in equity.

Sect. 23. The several courts having jurisdiction as aforesaid, shall have power to appoint assignees or trustees as aforesaid, in the following cases, viz:

1. When any sole assignee or trustee shall renounce the trust, or refuse to act under, or fully execute the same :

2. When any such assignee or trustee shall die, or be dismissed by the court from the trust, or shall be discharged by the court therefrom :

3. When one or more of several assignees or trustees, shall renounce or refuse as aforesaid, or shall die, or be dismissed or discharged as aforesaid, and the duties of the trust require the joint act of the trustees :

4. In any case in which a trust shall have been created, and no person appointed, either by name or by description, to execute the same.

Sect. 24. The power of appointment as aforesaid, may be exercised on the application by bill or petition, of any person interested in the estate, or property which is the subject of the trust, and not otherwise, and after due notice to all parties concerned.

Sect. 25. Every assignee and trustee appointed by the court as aforesaid, shall be liable to the same duties, shall have the same powers and authorities in relation to the trust, or to the further execution of the same, as the case may be, and shall be subject to the jurisdiction and control of the court, in the same manner, to all intents and purposes, as his predecessor or predecessors, in the trust.

Sect. 26. Upon the appointment by the court of any assignee

or trustee as aforesaid, and upon his giving security, if he shall be so required by the authority of the law, all the trust estate, and effects whatsoever, shall forthwith, and without any act or deed, pass to and be vested in such succeeding assignee or trustee.

Sect. 27. When any assignee or trustee shall have been discharged by the court as aforesaid, from the further execution of the trust, it shall be lawful for the court to make an order that the sureties of such assignee or trustee in any bond, which may have been given by him, for the due execution of the trust, shall, upon compliance by such assignee or trustee, with all orders of the court in the premises, be discharged from liability for any acts of such trustee after the date of such order.

Sect. 28. It shall be lawful for the court having jurisdiction as aforesaid, to make such orders and decrees from time to time, for carrying into effect any trusts as aforesaid, either for distribution of moneys in the hands of assignees, or trustees for the benefit of creditors, or for the payment or transfer of funds or effects in the hands of other trustees, or otherwise, as shall be according to law, or the terms or intent of the trust.

Sect. 29. It shall be lawful for any court having jurisdiction as aforesaid, whenever compensation shall not have been otherwise provided, to allow such compensation to assignees, and other trustees, out of the effects in their hands, for their services, as shall be reasonable and just.

Sect. 30. The several courts aforesaid, shall have power, on the application of the party interested, to compel the conveyance by trustees, of the legal estate, when the trust has been executed, or has expired.

Sect. 31. It shall be lawful for the court in which the accounts of any assignee or trustee as aforesaid, may be exhibited, to refer the same to an auditor or auditors, who shall be sworn or affirmed, well and truly to audit and adjust the same, and make a true report thereof, according to the evidence.

Sect. 32. The several courts of Common Pleas, and all auditors appointed by them for the purpose of examining the accounts of assignees and trustees aforesaid, shall have power to examine such assignees and trustees, upon oath or affirmation, touching the execution of the trust, and the said courts shall have power to compel the production of any books, papers or other documents necessary to a just decision of any question before them, or before auditors, as aforesaid.

Sect. 33. The several courts of Common Pleas shall have the same powers and authorities; and the manner of proceeding to obtain the appearance of persons amenable to their jurisdiction, in cases of trusts, and to compel obedience to their orders and decrees, and enforce execution thereof, shall be the same as are now

by law vested in and provided for the several Orphans' courts of this commonwealth.

Sect. 34. It shall be lawful for any judge issuing a citation to any assignee or trustee, as herein before provided, if the circumstances of the case shall appear to him to require it, to order such citation to be returned to a special court, to be convened for the purpose, in the manner allowed by the laws relating to the Orphans' courts.

Sect. 35. When any assignee or trustee shall remove out of the county in which he resided at the time of his appointment, or of the commencement of the trust, as the case may be, or shall not possess real or personal estate in such county, sufficient to satisfy any order or decree of the court of Common Pleas of such county, it shall be lawful for such court to issue process to the county in which such assignee or trustee may be, or in which he may have any real or personal estate amenable to such process, and such process shall be executed by the sheriff or coroner, as the case may require, of the county in which such assignee or trustee may be, or may have any real or personal estate, as aforesaid.

Sect. 36. Any person aggrieved by a definite (definitive) decree or judgment of any court of Common Pleas, in any case relating to assignees or trustees as aforesaid, may appeal from the same to the Supreme Court in the proper district: *Provided,* Such appeal be entered within one year after such decree or judgment, in cases relating to assignees or trustees, for the benefit of creditors, as aforesaid, and within three years of other cases of trust: *And provided also,* That in all cases, the party appealing shall first give security, in such sum as the said court of Common Pleas shall direct, conditioned to prosecute such appeal with effect, and shall also make oath of affirmation, that such appeal is not intended for delay.

Sect. 37. " Nothing in this act shall be so construed, as to impair or affect the powers and jurisdiction conferred by act of assembly on any district court of this commonwealth."

The efforts of the committee appointed by the board of directors to procure legislative action, were so far successful as to obtain the passage of two acts very similar in their provisions. One of them was passed on the 4th of May, 1841, by a majority of two-thirds, notwithstanding the veto of the governor. The other was passed on the 5th of May, 1841, and received the assent of that functionary. It is not necessary to the decision of this case, that a history should be given of the parliamentary tactics that placed two laws, so similar in their provisions, on

the statute book. It is enough for us that they are there, and it is our duty to give such effect to them as we can.

*Extract from an Act of the Legislature of Pennsylvania, of 4 May, 1841.*

Sect. 17. That to enable the banks of this commonwealth to comply with the provisions of this act, and to relieve the community, it is further enacted that, no banking institution in this state shall be subject, by way of penalty, or otherwise, to any greater rate of interest than six per cent per annum, any thing in any act of assembly to the contrary notwithstanding; and the resolution entitled " a resolution providing for the resumption of specie payments by the banks and for other purposes," passed the third of April, eighteen hundred and forty be and the same is hereby repealed; and that all provisions of any other act of assembly heretofore passed, or of any act of incorporation providing for the forfeiture of any charter for or by reason of the non-payment of any of its liabilities on demand, be and the same are hereby suspended until further legislative action, and until the legislature shall provide for the repayment of the loan authorized by the first section of this act; and so much of any act of assembly as prohibits the banks of this commonwealth from making loans and discounts, issuing their own notes, or declaring dividends during the suspension of specie payments, be and the same is hereby suspended as aforesaid; but no bank, during such suspension, shall declare dividends to an amount exceeding five per centum per annum. *Provided*, That before the Bank of the United States shall be entitled to the benefits of this section, the stockholders of said bank shall, by a resolution adopted by any general or adjourned meeting, held in pursuance of the charter of said bank, and duly certified to the Governor, under their corporate seal consent to be subject to any general laws to be hereafter passed for the regulation of the banks of this commonwealth.

Sect. 18. That if the stockholders of the Bank of the United States, at an adjourned general meeting, to be held at their banking house, on the fourth day of May, eighteen hundred and forty-one, or any other day to which the said meeting shall be adjourned, or at any other general meeting held in pursuance of their charter, shall decide by a majority of the votes then and there present or represented, according to the scale of votes allowed at elections of directors, that it is expedient for the Bank of the United States to make a general assignment of the real and personal estate, goods, chattels, rights and credits whatsoever and wheresoever, of the said corporation, to trustees, for the payment or securing the payment of the debts of the same, and shall, moreover, by a

like vote, elect five or more persons as trustees for that purpose, then, and in such case, it shall be the duty of the directors of the said bank, in the corporate name and under the corporate seal of the president, directors and company of the Bank of the United States, forthwith to make and execute such an assignment, and to do all such acts as shall be necessary to give full possession of the assigned estate and effects to the trustees, so elected upon the trusts of the said assignment.

Sect. 19. That the said assignment, so made as aforesaid, shall be deemed and taken to vest immediately in the said trustees and their successors, all the estate, real and personal, goods and chattels, rights and credits whatsoever and wheresoever, in like manner, and to the same extent, as they were previously vested in the in the said corporation, but upon the trusts of the said assignment, and that so much of any law or laws of this commonwealth as requires security from trustees or assignees, or an inventory or appraisement of the property assigned or conveyed, in trust, be and the same is hereby dispensed with in the case of any assignment or deed of trust, or other conveyance, which may be made by the president, directors and company of the Bank of the United States for securing the payment of any portion of its liabilities; *Provided, however*, That the said stockholders may at any general meeting, at which said assignment may be authorized, require an inventory of the property assigned; and if they deem it expedient to do so, security, in such sum as they may deem expedient, from the trustees aforesaid, for the faithful performance of their duty.

Sect. 20. It shall be lawful for the said stockholders at such meeting, and by such vote as aforesaid, to give the said trustees such powers over the assigned estate and effects as they may deem expedient, not inconsistent with the said trust, for the payment, or securing the payment, of the debts of the corporation, in manner aforesaid; and also to impose such regulations upon them in regard to the manner of executing the said trusts, keeping and rendering accounts of the same, and making dividends among the creditors, and in regard to the responsibilities of the said trustees, and their compensation and allowance, and also in regard to the expenses of the trust, as they may deem right; all which powers, regulations, and provisions, shall be introduced into the said assignment: *Provided*, That the said trustees, or any trustees or assignees appointed for the payment, or securing the payment, of all or any portion of the debts of the said bank, shall receive in payment of debts due to the said bank to them, at par, the notes or other evidences of debt issued or created by said bank.

Sect. 21. That the trustees so elected shall hold their appoint-

ment until the first Monday in January next, and until other trustees shall be elected in their place; and it shall be lawful for the said stockholders, on the said day, by a like vote, to choose the same, or other persons, to act as trustees aforesaid for another year, and until others shall be chosen in their place; and so on from year to year, so long as the said trust shall continue; and until it be completely executed, the said stockholders, on the first Monday in January in each year, shall be authorized in manner aforesaid, to choose new trustees in the place of any or all the existing trustees, and it shall be the duty of the trustees whose place shall be supplied in the trust, together with any trustee continuing in the same, to execute such instrument as shall vest the trust estate, and effects, in all the trustees who are to act in trust for the ensuing year.

Sect. 22. That the corporate powers of the said corporation, after the said assignment shall be make and executed as aforesaid, shall cease and determine, except so far as the same may be necessary for the following purposes, that is to say:

First, for the purpose of suing and being sued, and for continuing all suits and proceedings at law, or in equity, now pending for or against said corporation.

Second, for the purpose of making such assurances, conveyances and transfers, and doing all such acts, matters, and things as may be necessary or expedient to make the said assignment on the trust thereof effectual.

Third, for the purpose of citing the said trustees to account, and compelling them to execute the said trusts.

Fourth, for the choosing of directors, for the purpose of receiving and distributing amongst the stockholders of the said bank such surplus as shall remain after discharging the debts of the said corporation.

Sect. 23. That the courts of this commonwealth shall have jurisdiction of the said trust and of the affairs thereof in like manner as if the same were created under any general law of the State; and it shall moreover be lawful for the legislature, and the power is hereby expressly reserved, at any time or times, with the consent of the said stockholders at a general meeting, for that purpose convened according to the charter, to change and alter the provisions of this act, in such manner as to the legislature may seem expedient.

Sect. 24. That from and after such general assignment, it shall not be lawful for the said corporation to exercise the banking privileges of loaning money and issuing notes or bills, but it shall be confined to the exercise of its other corporate powers and privileges, for the purpose of the final settlement of its affairs,

and for the sale and disposition of its estate, real, personal, and mixed.

*Extract from the Act of the Pennsylvania Legislature of May 5th,* 1841.

Sect. 4. That if the stockholders of the Bank of the United States, at an adjourned general meeting to be held at their banking house, on the fourth day of May, one thousand eight hundred and forty-one, or on any other day to which the said meeting shall be adjourned, or at any other general meeting held in pursuance of their charter, shall decide by a majority of the votes then and there present or represented, according to the scale of votes allowed at elections of directors, that it is expedient for the Bank of the United States to make a general assignment of the real and personal estate, goods, chattels, rights and credits whatsoever and wheresoever, of the said corporation, to trustees, for the payment or securing the payment of the debts of the same ; and shall moreover, by a like vote, elect five or more persons as trustees for that purpose, then, and in such case, it shall be the duty of the directors of the said bank, in the corporate name and under the corporate seal of the president, directors and company of the Bank of the United States, forthwith to make and execute such an assignment, and to do all such acts as shall be necessary to give full possession of the assigned estate and effects to the trustees so elected, upon the trusts of the said assignment.

Sect. 5. That the said assignment so made as aforesaid, shall be deemed and taken to vest immediately in the said trustees and their successors, all the estate, real and personal, goods, chattels, rights and credits whatsoever and wheresoever, in like manner and to the same extent as they were previously vested in the said corporation, but upon the trusts of the said assignment; and that so much of any law or laws of this commonwealth, as requires security from trustees or assignees, or an inventory or appraisement of the property assigned or conveyed in trust, be and the same is hereby dispensed with, in the case of any assignment, or deed of trust, or other conveyance which may be made by the president, directors and company of the Bank of the United States, for securing the payment of all or any portion of its liabilities: *Provided, however,* That the said stockholders may at any general meeting, require an inventory of the property assigned, and, if they deem it expedient to do so, security in such sum as they may deem expedient from the trustees aforesaid for the faithful performance of their duty : *Provided further,* That it shall and may be lawful for the Court of Common Pleas of Philadelphia County, upon the petition of any person or persons interested, to require the said trustees to file an inventory and appraisement of the as-

signed estate and effects, and to give such security severally as the said court may deem sufficient to secure the faithful execution of the said trust.

Sect. 6. It shall be lawful for the said stockholders at such meeting and by such vote as aforesaid, to give to the said trustees such powers over the assigned estate and effects as they may deem expedient, not inconsistent with the said trust, for the payment or securing the payment of the debts of the corporation in manner aforesaid, and also to impose such regulations upon them in regard to the manner of executing the said trusts, keeping and rendering accounts of the same, and making dividends among the creditors, and in regard to the responsibilities of the said trustees and their compensation or allowance, and also in regard to the expenses of the trust as they may deem right; all of which power, regulations aud provisions shall be introduced into the said assignment : *Provided,* That the said trustees or any trustees or assignees appointed in pursuance of the provisions of this act, for the payment or securing the payment of all or any portion of the debts of said bank, shall receive in payment of debts due to the said bank, or to them, at par, the notes or other evidences of debt issued or created by said bank.

At the very moment that proceedings were going on at Harrisburg, to procure the passage of some law, to dispense the trustees or assignees proposed to be appointed, from giving bond and security according to the general law, and from making an inventory or schedule of the property and assets assigned, the stockholders were in session at Philadelphia; and it appears, that the president of the bank was in almost daily communication with the committee of the directors, and reporting to the stockholders what was going on in the legislature. On the very day that the first law was passed, Mr. Randall's resolution to *pledge forthwith* the funds of the bank was passed. It would appear from this, that the stockholders intended to act on the assumption of what would be done by the legislature. In fact they were informed on the 4th of May of what the legislature had done, but at the same time were told, that the governor had not yet acted on the bill, which he on that day vetoed.

On the 18th of May, 1841, another meeting of the stockholders was held, when the acts of the legislature were laid before them. They were examined by a committee, a report was made, and the 17th section of the act of May 4th, 1841, was accepted

by a special resolution. At the same meeting, Mr. Drayton, the president of the bank, informed the stockholders that, " the directors had found it difficult to carry into effect a resolution of the stockholders, authorizing an assignment in favor of the bill holders and depositors, as trustees could not be found to labor without compensation, which had not been provided for." After some explanation, Mr. Randall offered the following resolution ; " *Resolved*, that the board of directors be, and they are hereby authorized to exercise their own discretion as to the expediency, as well as to the time and manner of carrying into effect the resolution adopted at the last meeting, for pledging certain assets in trust, for the payment of the circulation of, and deposits in, the bank." After an ineffectual effort to amend this resolution, it was adopted. Thus having three distinct resolutions of the stockholders, passed at different meetings, authorizing them to proceed, also two acts of the legislature which they presumed gave them authority to act, and backed by the advice and opinions of such legal advisers as John Sergeant and Horace Binney Esquires, and other able counsel, the president of the bank, William Drayton, (himself a distinguished jurist, a well known citizen and representative in former times in the national councils,) acting under a resolution of the board of directors, signed the deed of the 7th of June, 1841, whereby was conveyed, assigned, transferred and delivered to John Bacon, Alexander Symington, and Thomas Robins, the intervenors in this suit, property and assets amounting to $12,473,800 60, " for the purpose of securing the payment of the circulation, deposits and bank balances." And this is the instrument charged here to be fraudulent, collusive and null, as being made to cheat the creditors of the bank. That the full force and effect of the instrument may be seen, as well as the objections to it discovered, it is set forth at length.

### Assignment to secure the Payment of Notes and Deposits.

This indenture, made the seventh day of June, in the year of our Lord, one thousand eight hundred and forty-one, by and between the President, Directors and Company of the Bank of the United States, of the one part, and John Bacon, Alexander Sym-

ington and Thomas Robins, of the other part; whereas the said party of the first part are indebted to sundry persons, depositors in the said bank, and the branches or offices thereof; and also to sundry persons, holders of notes of the late Bank of the United States, incorporated by Congress; and to sundry persons, holders of notes of the present bank, being notes of the ordinary kind, payable on demand, and commonly used in circulation; and also to sundry persons, holders of notes of the said bank, commonly called post-notes, (other than post-notes held by or issued to certain banks in the city and county of Philadelphia, for which security was provided and given by an indenture bearing date the first day of May, in the present year, and which are not intended to be provided for and embraced in the present indenture:) and whereas, the said party of the first part has resolved and agreed to provide an adequate security for the payment of the said deposits, and of the said notes, and of the said post-notes, (save and except the said post-notes heretofore provided for, as above said,) and of the interest to accrue upon them:

Now this indenture witnesseth, that the said party of the first part, as well for the consideration aforesaid, as for and in consideration of the sum of one dollar, to them in hand well and truly paid by the said party of the second part, at or before the sealing and delivery of these presents, the receipt whereof they do hereby acknowledge, have given, granted, bargained, sold, aliened, enfeoffed and delivered, assigned, transferred and set over, and by these presents do give, grant, bargain, sell, alien, enfeoff and deliver, assign, transfer and set over, to the said party of the second part, all and singular the lands, tenements, and hereditaments, goods, chattels, moneys, rights, credits and effects of the said party of the first part, contained, described and set forth in a certain schedule hereto annexed, sealed with the seal of the said party of the first part, and bearing even date herewith, together with all deeds, papers and evidences belonging or relating thereto; to have and to hold all and singular the premises hereby given or granted, or intended so to be, to the said party of the second part, and the survivors and survivor of them, and the heirs, executors, administrators and assigns of the survivor, to and for their and his own use and benefit forever, as joint tenants, and not as tenants in common. In trust, nevertheless, to and for the following uses, purposes and trusts, and to and for no other use or purpose whatsoever, that is to say, in trust, in the first place to enter upon the said real estate hereby granted, and to sell and dispose of and convey the same in fee simple, or for any less estate by public or private sale, for cash or on credit, for the best price that can be had for the same, as may seem to them most expedient, and to give receipts for the purchase money, so that the purchaser or purchasers shall not be

accountable for the application of the same ; and in the meantime and until a sale shall be made, to receive the rents, issues and income of the said real estate, and to pay the charges thereon ; and in the next place, in trust, to collect, receive and get in all and singular the moneys due and owing to the said party of the first part, and hereby assigned, and the same, as well as the proceeds of the said estate, safely to keep to and for the uses and purposes hereinafter declared, that is to say :

*Firstly*, To pay and discharge all reasonable and necessary expenses, costs and charges attending the execution of this trust, in which, however, it is expressly understood and agreed, that the commission charged by or allowed to the trustees shall not exceed one per centum upon the amount collected, nor amount to more than two thousand dollars in any one year to each trustee.

*Secondly*, From time to time, as often as they shall have moneys on hand of sufficient amount for a dividend, to divide and distribute the same rateably and equally, in and towards the payment of the said deposits, notes and post-notes, (except the post-notes hereinbefore excepted,) and the interest accrued thereon, so that all and each may participate rateably and alike in every such dividend, until the said deposits, notes and post-notes shall be fully paid off and discharged.

And in further trust, from and after the payment and discharge of the said deposits, notes and post-notes, and interest in full, to re-transfer, convey and pay over to the said party of the first part, their successors and assigns, whatever may remain of the premises hereby granted, and all moneys, credits and effects which may have been raised therefrom, or from any part thereof, and not applied to the purposes of the trusts herein and hereby created, together with all debts, papers, evidences and securities relating thereto.

Provided always, nevertheless, and it is hereby expressly declared, understood and agreed, as the condition of this indenture, and of the trusts therein and thereby created, that before the said trustees, their successors or assigns, shall proceed to make or declare any dividend of the moneys raised or collected as aforesaid, they shall give thirty days notice of their intention to do so in two or more daily newspapers of the city of Philadelphia, at least twice a week during the same period of thirty days, calling upon the claimants to come forward and prove their debts ; and such dividend shall be declared and made only on the amounts so brought forward and proved ; and no creditor shall be entitled to claim or receive such dividend who shall not have brought forward and proved his debt before the time appointed for making and declaring the dividend. But if any dividend or dividends shall thereafter be made, such neglecting or defaulting creditor

or creditors bringing forward and proving his or their claim or claims in time therefor, as aforesaid, shall be entitled to receive in addition to such dividend an amount equal to the rate of dividend or dividends which shall have been before made and paid ; and so on from time to time, until a final dividend shall be declared and made; which final dividend the said trustees, their successors and assigns, are hereby authorized and required to declare and make, whenever the moneys arising from the premises hereby granted and assigned, shall by the payment of the said final dividend be disposed of and exhausted, or when all the creditors who have brought forward and proved their claims, be paid in full, principal and interest; it being understood, however, that no interest shall be paid until the final dividend; and from and after such final dividend, no creditor shall have any claim upon the remaining fund, if any there be, nor upon the said trustees, their successors or assigns, for or by reason of these presents, or of the trusts herein and hereby created; but the same except the trust for re-conveying the surplus to the said party of the first part, their successors or assigns, shall thenceforth cease and be determined, and at an end. Provided also, and it is expressly understood and agreed, that if the said party of the first part, their successors or assigns, shall at any time pay off and discharge the said deposits, notes and post-notes, (the said notes and post-notes being surrendered and cancelled,) then and from thenceforth the trusts herein and hereby created, or so much of them as shall then remain unexecuted, shall cease and be determined; and the whole of the trust property then remaining be conveyed, transferred and delivered to the said party of the first part, their successors or assigns. And it is hereby expressly agreed by and between the parties to these presents, as a condition or part thereof, that the said trustees, their successors or assigns, shall not be answerable for the acts, omissions or defaults of each other, but only each for his own acts, omissions or defaults; and that they shall not be answerable for the misconduct, omissions or default of any agent or agents they may find it necessary to employ ; being accountable only for the exercise of fair and reasonable skill and judgment, as well in the appointment of such agent or agents, as in the general management of the trust hereby created, if the same be conducted in good faith and intention.

And, the better to enable the said party of the second part, and the survivors and survivor of them, and the executors and administrators of the survivor of them, to execute the said trusts, the said party of the first part do hereby constitute, make and appoint them their true and lawful attorneys and attorney, irrevocable in the premises, for them and in their name, but to and for the uses and purposes of this trust, and at the cost of the same,

to ask, demand, sue for, and recover and receive all and every sums or sum of money, due or to become due by reason of any matter or thing herein granted and assigned, or intended so to be, to give receipts and acquittances for the same, and generally to act and do as fully and effectually in the premises as they themselves might or could do, and substitute or substitutes one or more under them to nominate and appoint, and again at pleasure to revoke; hereby ratifying and confirming whatsoever they or their said substitutes or substitute may lawfully do in the premises.

It is understood, that the foregoing indenture, or any thing therein contained, is not in any manner to impair or affect the liabilities of the Bank of the United States, nor the rights of depositors or of the holders of the said notes and post-notes.

In witness whereof, the said parties have hereunto interchangeably set their hands and seals, the President, Directors and Company of the Bank of the United States of the first part acting by their president, William Drayton, Esq., at Philadelphia, the day and year first above written.

Signed,      W. DRAYTON, *President.*   [B. U. S. Seal.]

     Attest:

         Signed,        T. S. TAYLOR, *Cashier.*

Signed, sealed and delivered ⎞
   in the presence of us,     ⎠
     T. S. TAYLOR,
     G. W. FAIRMAN.

We accept the trust created by the above indenture of assignment.

Signed,     JOHN BACON,        [L. S.]
   "       A. SYMINGTON,      [L. S.]
   "       THOMAS ROBINS,     [L. S.]

The following provision was engrossed on the schedule:

The annexed paper writings, paged from 1 to 29, inclusive, and subscribed on the last page with the names of the president of the Bank of the United States, and John Bacon, Alexander Symington, and Thomas Robins, trustees, are the schedules referred to in the annexed indenture of assignment, dated the seventh day of June, A. D. 1841, by and between the President, Directors and Company of the Bank of the United States of the one part, and John Bacon, Alexander Symington and Thomas Robins, of the other part; and it is hereby understood and agreed to by the parties, that if any of the assigned estate, debts and effects herein described shall have been, before the execution and

delivery of the assignment to which this schedule is annexed, sold, assigned, recovered or extinguished in part or in whole, and other obligations, notes, bills or security for the same shall have been received, given or taken in lieu or on account thereof, such obligations, notes, bills or security so given, taken or received, shall be deemed to be included in this schedule, with the same effect as if the same were hereby particularly and at large described.

In witness whereof, the President, Directors and Company of the Bank of the United States, by their president, William Drayton, Esq., and by an order of the board of directors, have caused their common seal to be affixed this 7th day of June, A. D. 1841.

Signed,  W. DRAYTON, *President.*  [U. S. B. Seal.]

Attest:

Signed,  T. S. TAYLOR, *Cashier.*

Signed,  JOHN BACON,  }
A. SYMINGTON,  } *Trustees.*
THOMAS ROBINS,  }

Recorded in Deed Book G. S. No. 28, page 412, &c.

*State of Pennsylvania, City of Philadelphia :*

Before me, the subscriber, mayor of the said city, appeared the above named William Drayton, Esq., personally known to me as the president of the corporation above named, The President, Directors and Company of the Bank of the United States, who being duly sworn according to law, did depose and say, that he executed the above instrument of conveyance as president of the said corporation, and that the above impression is the common seal of said corporation, thereto duly affixed by authority of the board of directors, and that the above deed of conveyance is sealed and delivered as the proper act and deed of the said The President, Directors and Company of the Bank of the United States, for the uses and purposes therein set forth ; and also Thomas S. Taylor, cashier of the said bank, and attesting witness above, who being duly sworn, declares that he was present and did see the said president, William Drayton, Esq., sign the said deed, affix thereto the common seal of the said corporation, and deliver the said deed as the act and deed of the said corporation ; he the said president being the authorized officer of the said corporation, so to sign, seal and deliver. Witness my hand, and the common seal of the said city, the day and year aforesaid.

Signed,  JNO. SWIFT,  [ Seal of the City ]
Mayor.  [ of Philadelphia. ]

The depositions of several distinguished lawyers in Philadelphia have been taken, and among them, that of Mr. Randall himself, who testify that this deed is legal and valid according to the laws of Pennsylvania. The evidence further shows, that at the time this deed was executed, and previously, the bank was very much embarrassed, and owed large debts both in the United States and Europe. It could not pay specie for its notes or deposits, and the former were at a heavy discount. Some suits had been brought against it, and others were threatened for large sums. The object and expectation was, when this assignment was made, that the bill holders and depositors would be satisfied, and the suits be stopped, as the security was considered ample; but in this the directors were disappointed. The number of suits increased; the bank endeavored to delay them by giving security and thus to postpone the issuing of executions. Thus passed the summer of the year 1841, the condition of things getting worse; and it becoming apparent, that the bank must be ruined by costs of suits, and the sacrifice of property at forced sales, the directors after much deliberation, acting under the authority already given, unanimously came to the conclusion, on the 2d of September, 1841, to make an assignment of the most valuable assets of the bank for the security of the creditors generally, it being the only means of saving them from destruction, and from being wasted by being sold at ruinous sacrifices. The advice of counsel of high standing was again taken; and, on the 4th of September, 1841, a deed of assignment was made to Robertson, Newbold, Cope and Taylor, the intervenors herein; and on the 6th of the same month, a supplement thereto, by which instruments the corporation transferred and assigned all its property and assets of whatever description, not previously conveyed or pledged, for the purpose of paying its debts generally. A quantity of rail road, turnpike, bridge and canal stocks was excepted out of this conveyance, not worth more than one thousand dollars, if so much, with the avowed intention of preserving the existence of the corporation, which it seems from one of the resolutions passed in the meeting of the 8th of April, 1841, was considered of great importance by the stockholders. These assignments are also set forth.

The United States v. The Bank of the United States.

*Assignment of the 4th of September, 1841.*

This indenture, made the fourth day of September, in the year of our Lord one thousand eight hundred and forty-one, by and between the President, Directors and Company of the Bank of the United States of the one part, and James Robertson, of the city of Philadelphia and State of Pennsylvania, Esq.; Richard H. Bayard, of the city of Wilmington and State of Delaware, Esq. ; James S. Newbold, Herman Cope and Thomas S. Taylor, all of the city of Philadelphia and State of Pennsylvania, Esqs. of the other part : Whereas, the party of the first part are indebted to sundry persons and bodies corporate, in divers sums of money, which from various causes the said party of the first part are unable at present fully to pay and satisfy, but are desirous of providing an adequate security for the payment and satisfaction of the same in a just and equitable manner—

Now, this indenture witnesseth, That the said party of the first part, as well for the consideration aforesaid, as for and in consideration of the sum of one dollar to them in hand paid by the party of the second part, at and before the sealing and delivery of these presents, the receipt whereof they do hereby acknowledge, have granted, bargained, sold, aliened, enfeoffed, released, confirmed, assigned, delivered, transferred and set over, and, by these presents, do grant, bargain, sell, alien, enfeoff, release, confirm, assign, deliver, transfer, and set over unto the said party of the second part, all and singular, the lands, tenements, hereditaments, stocks, goods, chattels, rights, credits, moneys, property and effects of the said party of the first part, whatsoever and wheresoever, saving and excepting only the estate, property and effects contained, described and set forth in a certain schedule hereunto annexed, sealed with the seal of the said party of the first part, and bearing even date herewith ; and excepting also all the right, title, interest, property, claim and demand of the said party of the first part, whether present, resulting or eventual, of, in and to any and all the lands, tenements and hereditaments, goods, chattels, moneys, stocks, debts, effects and property whatsoever and wheresoever, heretofore granted, assigned, transferred, mortgaged, hypothecated, pledged or delivered by the said party of the first part, to any person or persons, or bodies corporate whatsoever, for the use, security or indemnity of any creditor or creditors, surety or sureties, or other persons or bodies corporate whatsoever, together with all deeds, papers, muniments of titles and evidences belonging or relating thereto. To have and to hold all and singular the premises hereby given, granted, assigned and transferred, or intended so to be, to the said party of the second part, and to the survivor of them, and the heirs, executors, administrators and assigns of such survivor, to and for

their and his own use, benefit and behoof, forever, as joint tenants, and not as tenants in common. In trust, nevertheless, to and for the following uses, intents, purposes and trusts, and to and for none other whatsoever. That is to say, in trust in the first place, to enter upon the real estate hereby granted, and to sell, dispose of and convey the same in fee simple, or for any less estate, by public or private sale, for the best price that can be obtained for the same, for cash or on credit, as to them may seem most expedient, and to give receipts for the purchase money, so that the purchaser or purchasers shall not be accountable for the same; and in the meantime, and until sales shall be made, to receive the rents, issue and income of the said real estate, and pay the charges thereon; and to sell, dispose of, assign and transfer all the personal estate, property and effects hereby assigned, transferred and set over by the party of the first part to the party of the second part, for the best price that can be obtained for the same, for cash or on credit, as to them shall seem most expedient; and to receive in payment for the same, and in payment of the real estate so as aforesaid sold and conveyed, the notes of the party of the first part, if the said party of the second part shall deem it expedient so to do; and in the next place, in trust to ask, demand, sue for, recover, receive, collect and get in all and singular the debts and moneys due and owing to the said party of the first part and hereby assigned; and, at their discretion, to compromise and compound for the same; and the moneys so collected, received and got in, as well as the proceeds of the said real and personal estate, safely to keep and apply to and for the uses and purposes herein declared, that is to say,

In the first place, to pay and discharge all reasonable and necessary expenses, costs and charges attending the execution of this trust; in which it is expressly understood and agreed, that there shall be included to be charged by, and allowed to the said James Robertson, Richard H. Bayard, and James S. Newbold, the three assignees first above mentioned, so long as they shall respectively continue in the execution of this trust, the annual sum of fifteen hundred dollars each; and to be charged by, and allowed to the said Herman Cope and Thomas S. Taylor, the two assignees last above mentioned, respectively, so long as they shall respectively devote their whole time and attention to the business and concerns of this trust, so far as the same shall be requisite, the annual sum of four thousand dollars each, being an amount equal to the salaries which the said Herman Cope and Thomas S. Taylor respectively receive as superintendent of suspended debt, and cashier of the Bank of the United States, which salaries are now to cease and determine: Provided always, that if at any time hereafter, any creditor or creditors of the said party of the

first part, interested in this trust to the amount together of five hundred thousand dollars or more, shall require the parties of the second part, to call a meeting of all the creditors so interested, for the purposes of diminishing, enlarging, or revoking such allowances to the assignees above mentioned, or any of them, that it shall then be the duty of the said party of the second part, to call such meeting, to be held at some convenient place, to be by them appointed, of which thirty days notice shall be published in two or more of the daily newspapers of the city of Philadelphia, at least twice a week during said period of thirty days; and at such meeting a majority in number and value of said creditors shall then and there have power to diminish, increase, or revoke the said allowance accordingly, and in case of such diminution or revocation, then the trust of this indenture in regard to such allowance, shall thereafter conform to such order of the creditors aforesaid, saving, nevertheless, in that event, to the parties of the second part, and each of them, their right to such compensation as a competent tribunal shall in this behalf hold them to be respectively entitled to for their services in the execution of this trust. And in the second place, to pay off, discharge, and satisfy all the judgments heretofore entered and obtained against the said party of the first part in any court or before any magistrate in the State of Pennsylvania, together with the interest, costs, and charges accruing thereon. And in the third place, fully and completely to indemnify, and save harmless, the legal representatives of the estate of Charles H. Phelps, deceased, from any loss or damage which the said estate has sustained, or may sustain, for or by reason of any suretyship, engagement or responsibility of any kind whatsoever, which the said Charles H. Phelps, or the legal representatives of his estate, may have entered into for, or on behalf of the party of the first part to these presents; and especially to make good, and carry into full effect to the said legal representatives, a certain agreement or engagement made to the said Charles H. Phelps, and contained in a letter addressed to him by Joseph Cowperthwait, Esq. acting on behalf of the party of the first part, together with Wm. D. Lewis, Esq., acting on behalf of the Girard Bank, and bearing date the seventh day of November, A. D. one thousand eight hundred and thirty-nine. And in the fourth place, fully to indemnify and save harmless, all other sureties from any loss or damage, which they or any of them have sustained or may sustain, for or by reason of any suretyship, engagement or responsibility of any kind whatsoever, which they respectively have entered into for, or on behalf of the said party of the first part to these presents. And in the fifth place, from time to time, as often as they shall have moneys in hand of sufficient amount for a dividend, to divide and distri-

bute the same rateably and equally in and towards the payment of all and every the debts of the said party of the first part, and the interest accrued thereon, so that each creditor may participate rateably and alike in such dividend, until all the said debts and the interest accrued thereon shall be fully paid off and discharged; except post-notes issued to or held by certain banks in the city and county of Philadelphia, for which security was provided and given by an indenture bearing date the first day of May in the present year, and which are not intended to be provided for and embraced in the present indenture. And in further trust from and after the payment and discharge of the debts intended to be secured and provided for by this indenture, in full with interest, then to re-transfer convey and pay over to the said party of the first part, their successors and assigns, whatever may remain of the premises hereby granted or assigned, and all moneys, credits and effects which may have been raised therefrom, or from any part thereof, and not applied to the purposes of the trusts herein and hereby created; together with all deeds, papers, muniments of title, evidences and securities relating thereto. Provided always, nevertheless, and it is hereby expressly declared, understood and agreed, as the condition of this indenture and the trusts therein and thereby created, that before the said trustees, their successors or assigns, shall proceed to make or declare any dividend of the moneys raised or collected as aforesaid, they shall give thirty days notice of their intention so to do, in two or more of the daily newspapers published in the city of Philadelphia, at least twice a week during the said period of thirty days, calling upon the claimants to come forward and prove their debts; and such dividend shall be declared and made only on the amounts so brought forward and proved; and no creditor shall be entitled to claim or receive such dividend who shall not have brought forward and proved his, her or their debt or debts, before the time appointed for making and declaring such dividends. But, if any further dividends shall thereafter be made, such neglecting or defaulting creditor, bringing forward and proving his, her, or their claim or claims in time therefor as aforesaid, shall be entitled to receive, in addition to such dividend, an amount equal to the rate of dividend or dividends which shall have been before made and paid, and so on from time to time until a final dividend shall be declared and made; which final dividend the said trustees, their successors and assigns, are hereby authorized and required to declare and make, whenever the moneys arising from the premises hereby granted and assigned, shall by the payment of the said final dividend be disposed of and exhausted, or when all the creditors who have brought forward and proved their claims shall be paid in full, principal and interest; it being understood, how-

ever, that no interest shall be paid until the final dividend; and from and after such final dividend, no creditor shall have any claim upon the remaining fund if any there be, nor upon the said trustees, their successors or assigns, for or by reason of these presents, or the trusts herein or hereby created; but the same, except the trust for reconveying the surplus to the said party of the first part, their successors or assigns, shall from thenceforth cease, determine, and be at an end. Provided also, and it is expressly understood and agreed that if the said party of the first part, their successors or assigns, shall at any time pay off and discharge the said debts, then and from thenceforth the trusts herein and hereby created, or so much thereof as shall then remain unexecuted, shall cease and be determined; and the whole of the trust property then remaining shall be conveyed, transferred and be delivered to the said party of the first part, their successors or assigns.—And it is hereby expressly agreed by and between the parties to these presents, as a condition and part thereof, that the said trustees, their successors and assigns, shall not be answerable for the acts, omissions, or defaults of each other, but only each for his own acts, omissions or defaults; and that they shall not be answerable for the misconduct, omission, or default of any agent or agents they may find it necessary to employ; but that they shall be accountable only for the exercise of fair and reasonable skill and judgment, as well in the appointment of such agent or agents, as in the general management of the trust hereby created, if the same be executed in good faith and intention.—And it is hereby further understood and agreed, that the compensation above agreed to be charged by and allowed to the parties of the second part for their services in executing this trust, shall be at the rate of fifteen hundred dollars per annum to each of the three assignees first above named, and at the rate of four thousand dollars per annum to each of the two assignees last above named, and that the said compensation shall be apportionable according to the time the said assignees shall respectively continue in the performance of the duties of the trusts hereby created: and the better to enable the said party of the second part, their successors and assigns, to execute the said trusts, the said party of the first part do hereby make, constitute and appoint them their true and lawful attorneys and attorney irrevocable in the premises, for them, and in their name, but to and for the uses, intents and purposes of this trust, and at the cost and charges of the same, to ask, demand, sue for, and recover and receive all and every sum or sums of money due or to become due by reason of any matter or thing herein and hereby granted and assigned, or intended so to be, and to give receipts and acquittances for the same; and generally to act and do as fully and effectually in the premises, as

they themselves might or could do; and substitute or substitutes one or more under them to nominate and appoint, and again at pleasure to revoke such nominations or appointments; hereby ratifying and confirming whatever they or their said substitute or substitutes may lawfully do in the premises.

In witness whereof, the said parties have hereunto interchangeably set their hands and seals, the said The President, Directors and Company of the Bank of the United States, party of the first part, acting by their president, James Robertson, Esq., at Philadelphia, the day and year first above written.

J. ROBERTSON, <i>President.</i>   [L. S.]

We accept the trusts created by the above indenture of assignment.

| | |
|---|---|
| J. ROBERTSON, | [L. S.] |
| JAMES S. NEWBOLD, | [L. S.] |
| HERMAN COPE, | [L. S.] |
| THOS. S. TAYLOR, | [L. S.] |

*Signed, sealed and delivered in the presence of us,*
JNO. PENNINGTON,
G. W. FAIRMAN.

*State of Pennsylvania, City of Philadelphia:*

Before me, the subscriber, mayor of the city of Philadelphia, appeared the above named James Robertson, Esquire, to me personally known as the president of the corporation above named, The President, Directors and Company of the Bank of the United States, who being duly sworn according to law, did depose and say, that he executed the above written indenture, as president of the said corporation, and that the above impression is the common seal of the said corporation, thereto duly affixed by authority of the board of directors, and that the said indenture is sealed and delivered as the proper act and deed of the said The President, Directors and Company of the Bank of the United States, for the uses and purposes therein set forth. And John Pennington and George W. Fairman, the subscribing witnesses to the said indenture, being duly sworn, do declare, that they were present and did see the said president, James Robertson, Esquire, sign the said indenture, affix thereto the common seal of the said corporation, and deliver the said indenture as the act and deed of the said corporation.

Witness my hand, and the common seal of the said city, this fourth day of September, in the year of our Lord one thousand eight hundred and forty-one.

[L. S.]                            JNO. SWIFT, *Mayor.*

*Supplement to the Assignment of the 4th of September*, 1841.

This indenture, made the sixth day of September, in the year of our Lord one thousand eight hundred and forty-one, by and between the President, Directors and Company of the Bank of the United States, of the one part, and James Robertson, of the city of Philadelphia and State of Pennsylvania, Esquire; Richard H. Bayard, of the city of Wilmington and State of Delaware, Esquire; James S. Newbold, Herman Cope and Thomas S. Taylor, all of the said city of Philadelphia, Esquires, of the other part, witnesseth, that the said party of the first part, for divers good, sufficient and valuable considerations, them thereunto moving, and also for and in consideration of the sum of one dollar, to them in hand paid by the said party of the second part, at or before the sealing and delivery of these presents, the receipt whereof they do hereby acknowledge, have granted, bargained, sold, aliened, enfeoffed, released, confirmed, assigned, *transferred, delivered and set over,* and by these presents do grant, bargain, sell, alien, enfeoff, release, confirm, assign, transfer, deliver and set over, unto the said party of the second part, all the right, title, interest, property, claims and demand of the said party of the first part, whether present, resulting or eventual, of, in and to any and all the lands, tenements, hereditaments, goods, chattels, moneys, stocks, debts, effects and property, whatsoever and wheresoever granted, mortgaged, assigned, *transferred, hypothecated, pledged or delivered* by the said party of the first part, to any person or persons, body or bodies corporate whatsoever, for the use, security, payment or indemnity of any creditor or creditors, surety or sureties, or other persons or bodies corporate whatsoever, prior to the 4th day of September, in the year of our Lord one thousand eight hundred and forty-one, saving and excepting *only all the right, title, interest, property, claim and demand* of the said party of the first part, whether present, resulting or eventual, of, in and to all the goods, chattels, moneys, stocks, debts, effects and property whatsoever, heretofore assigned, transferred, hypothecated, pledged or delivered by the said party of the first part, to any person or persons, or bodies corporate, whatsoever, for the use, security, payment or indemnity of any creditor or creditors, surety or sureties, or other persons or bodies corporate in Europe; together with all deeds, papers, muniments of title, and evidence relating thereto: To have and to hold, all and singular the premises hereby given, granted, assigned, transferred and set over, or intended so to be, to the said party of the second part, and the survivor of them, and the heirs, executors, administrators and assigns of such survivor, to and for their and his own use, benefit and behoof forever. In trust, nevertheless, to and for the same uses, intents and purpo-

ses, and upon the same trusts, and under and subject to the same terms, conditions, provisos, limitations, restrictions and qualifications, as are mentioned, set forth and declared, in and by a certain deed of assignment made and executed by and between the parties to these presents, bearing date the said fourth day of September, in the year of our Lord one thousand eight hundred and forty-one, and to which this deed of assignment is intended to be a supplement.

In witness whereof, the said parties have hereunto interchangeably set their hands and seals, the said The President, Directors and Company of the Bank of the United States, acting by their president, James Robertson, Esq., at Philadelphia, the day and year first above written.

J. ROBERTSON, *President.* [L. S.]

Signed, sealed and delivered }
    in the presence of us, }
      JNO. PENNINGTON,
      G. W. FAIRMAN.

We accept the trust created by the above indenture of assignment.

J. ROBERTSON, [L. S.]
JAS. S. NEWBOLD, [L. S.]
HERMAN COPE, [L. S.]
THOS. S. TAYLOR, [L. S.]

Acknowledged before the mayor of the city of Philadelphia, on the 6th of Sept. 1841.

Recorded Sept. 7th, 1841, in the office for recording of deeds, &c., for the city and county of Philadelphia, in Deed Book G. S. No. 30, page 395, &c.

Mr. Bayard, one of the trustees named in these deeds, never accepted the trusts, and is no party to this suit. It is clearly shown, that at the term of the court which commenced in Philadelphia, on the 6th of September, 1841, it was expected that a number of judgments would be entered up against the bank, and it was to prevent the property and assets from being seized and sold under them, and those previously obtained, that these deeds were made. Mr. Jaudon, formerly cashier of the bank, testifies, that he considered, and so did others, that this assignment was general and final, and that the unavailable stocks retained were merely to save the charter.

The whole of the property transferred was delivered to the

different assignees or trustees, before the attachment was taken out. As to that in this State, public notice was given through the newspapers of the transfer and assignment. Notices were personally served on many debtors, whose debts had been assigned; letters were sent through the post office to many others, who resided at a distance; and not one garnishee has denied having notice, so far as their answers have been examined. In truth, many urged the assignment, as a reason why judgments should not be rendered against them; and several were examined on the trial who admitted, without exception, that they were notified of the transfer to the intervenors, previous to being cited as garnishees. The fact of notice to the debtors of the transfer has been made out, so far as to induce a reasonable belief that it was generally given. It is further shown that, with the exception of a small number of notes, falling due in the course of the summer of 1841, all the evidences of debt in this State were in Pennsylvania when the assignments were made, and that they were actually delivered to the trustees, or their agent, Frazier. It is not denied that, the object of carrying the notes and other assets to Philadelphia, was, to prevent attachments being levied on them in this State; and that the purpose, among others, for selling the Merchants Bank in New Orleans, was, that "apprehensions were entertained, that the property might be attached by some of the creditors of the bank, as it was believed that the laws of Louisiana afforded greater facilities for such proceedings than those of other States."

At a meeting of the stockholders, held on the 3d of January, 1842, a very full statement of the administration of the affairs of the bank was presented to them by the president. In this, he informed them of the assignments and deeds made on the 7th of June, 1841, and on the 4th, and 6th of September in the same year, of the amount assigned, the names of the trustees, and finally the purposes and objects of the trusts. At this meeting Mr. Randall offered two resolutions, declaring that, in the judgment of the stockholders, the assignments made by the board of directors on the 7th of June, and the 4th of September, 1841, were executed in violation of the true intent and spirit of the acts of Assembly incorporating the bank, and the supplements

thereto, passed on the 4th, and 5th days of May, 1841, and that so far as they, (the stockholders,) have power to act in the premises and to assert their opinion, they do declare said assignments null and void. These resolutions were adopted, subject to the approval, or disapproval, of a meeting to be held on the third Monday of February following ; or, in other words, they were postponed until that time. Resolutions were then offered by the same person who introduced those previously mentioned, declaring it expedient, for the bank to make a general assignment of all the real and personal estate, goods, chattels, rights and credits belonging to the corporation, to five persons, to secure the payment of the debts, agreeably to the acts of assembly of the 4th, and 5th of May, 1841, and that the stockholders should assemble on the third Monday of February following, to elect said five persons. These resolutions were adopted, and the board of directors requested to call a meeting on the day designated. On the 21st of February, 1842, the stockholders met ; and after reading the proceedings of the previous meeting, a motion was made by the same Mr. Randall, to approve of them. This motion was decided not to be in order unless some amendment to them was offered ; and, on an appeal taken from the decision of the chairman, it was sustained by a large majority. It was then announced, that the first business was the consideration of the resolutions postponed from the January meeting, to the one then assembled, and they were read. During the discussion of them, a substitute was offered, stating, that to quiet all doubts on the subject of all the assignments, it was best to direct the board of directors to take measures to have the validity of them submitted to the judicial tribunals of the State for their decision. Before any question was taken on this substitute, a motion was made to strike out the whole of it and of the original resolutions, and after the word *resolved*, to insert, " that the assignments made by the President and Directors of the Bank of the United States, on the 7th of June, and the 4th, and 6th of September, 1841, were made in pursuance of authority vested in them, were for the best interests of the bank, and are hereby ratified and confirmed by this meeting." After a long and violent discussion, this resolution was adopted by a vote of 205 to 109 ;

the votes being given *per capita*, and not according to the scale adopted in voting for directors.   Mr. Randall again presented his resolution, before mentioned, as adopted, that it was expedient to make a general assignment, agreeably to the acts of the 4th, and 5th of May, 1841 ; during the discussion of which, the meeting adjourned, without coming to a conclusion.

The evidence shows, that this meeting of the stockholders was very large, tumultuous and disorderly; that no questions were asked how much stock was held by each individual, how many votes he had according to the charter, or whether he voted as a stockholder or proxy.   The voting was *per capita*, as was the case in previous meetings of the kind.   The minority of the stockholders subsequently assembled at some other place, and it is said protested against the proceedings of the majority ; but for what particular reasons, or how much stock they represented, the record does not inform us.   Since that period, no proceedings have been had by the stockholders in relation to these assignments.

The judge below gave a judgment in favor of the intervenors, declaring the assignments legal and valid, and that the property and funds attached belonged to them ; at the same time, he declared that, as the assignment was general and the corporation insolvent, the United States, under the acts of Congress, had a preference and priority upon every thing in the hands of the assignees; and he decreed that the judgment in their favor should be paid in full.   From this part of the judgment the assignees have appealed ; and the United States have prayed that the judgment may be amended, so as to declare all the assignments null and void.

*Peyton,* District Attorney, and *I. W. Smith,* for the plaintiffs. This cause presents two questions.   One, whether the attachment of the plaintiffs should prevail as to the property attached, over the assignments made by the bank for the benefit of its creditors. The other, whether the right of priority given by the act of Congress to the United States for the payment of debts, exists as to the property attached.

In considering the validity of the deeds as to the attachment, the first inquiry is, whether they are valid by the laws of the state where they were made; for, if not valid there, they cannot be valid elsewhere.   The next is, whether, considering them valid by the laws of Pennsylvania, they should not also be tested

by the laws of Louisiana. We maintain, that the deeds are invalid according to the law of Pennsylvania, on three grounds: first, because they were executed by the president of the bank, without authority; secondly, because they are fraudulent for matter apparent on their face; and thirdly, because they are fraudulent for matter *dehors* the instruments.

I. *The trusts of the 7th June and 4th September are invalid for want of power on the part of the president to execute them.*

It is unnecessary to inquire what would be the power of the president and board of directors by the common law, as it is believed that the acts of the Legislature of the 4th and 5th May, control the subject. If such an inquiry were necessary, it is believed that it would result in the conclusion to which Judge Story arrived in the case of *Beaston* v. *Farmers Bank of Delaware*, 12 Peters, 138. "I must say, that independent of some *special and positive law* or provision in its charter to such an effect, I do exceedingly doubt if any corporation, at least without the express assent of all the corporators, can rightfully dispose of all its property by such a general assignment, so as to render itself incapable in future of performing any of its corporate functions." It may be well to look at the situation of the bank at the time the acts of May were passed. The state of the bank at that time was the evil, and the acts were intended to be the remedy. The bank had resumed specie payments about four months previously, and the resumption continued a few days only, when the final suspension took place. Its insolvency was notorious. Even the stockholders were compelled to admit it.

The great question was, how should the bank be liquidated. There was no insolvent law for corporations. In devising expedients to protect their own interest, the stockholders and directors had been led to the subject of voluntary assignments. By the act of 1836 it was necessary to furnish bond and security in double the amount of the appraised value of the estate assigned. See Purdon's Digest, 82. This could not be furnished. At a meeting of the stockholders on the 4th May, 1841, the president reported, that a committee of directors had succeeded in accomplishing the wishes of the stockholders so far as concerned the post-notes in the hands of the Philadelphia banks, "but for want of legislative action to grant power for creating the trust without the securities *now required by law*, they had not yet succeeded in complying with the wishes of the stockholders in reference to the *circulation and deposits.*" For this reason they had applied to the Legislature for relief. The acts of the 4th and 5th May were passed. By these laws, the legislature intended to supply the *hiatus* which existed in their legislation, by providing an insolvent law for the bank. The stockholders regarded

these laws as controlling the assignments which the bank might make.

No general assignment could be made by the bank after the passage of these laws, without following their requirements. They were duly accepted by the bank before the second assignment was executed. From that period, they pointed out a particular course to be pursued, and that course precluded any other from being adopted. This view of the law is fortified by reference to an act of the Legislature of Pennsylvania, of the 21st of March, 1806, quoted in Purdon's Digest, 51, as follows:

"Sect. 13. *In all cases where a remedy is provided* or duty enjoined, or anything directed to be done by any act or acts of Assembly of this commonwealth, *the directions of the said act shall be strictly pursued,* and no penalty shall be inflicted *or any thing done, agreeably to the provisions of the common law in such cases, further than shall be necessary for carrying such act or acts into effect.*"

By the acts of May, 1841, we infer, that before any general assignment could be made by the president and board of directors, it was required: First; that there should previously be a general meeting of the stockholders, held in pursuance of the charter. Second; that the stockholders should elect five trustees, and prescribe their powers and duties. Third; that the votes should be according to the scale allowed at the election of directors. Fourth; that it should be the duty of the president and board to conform to the votes of the stockholders.

The next inquiry is, whether any such proceedings on the part of the stockholders have taken place.

The first resolution which may be supposed to refer to the assignment afterwards made, was passed at the meeting of the 4th May, 1841. That resolution, offered by Josiah Randall, Esq. and passed by the stockholders, is as follows:

" Resolved, That the board of directors be directed forthwith to pledge funds *to protect the circulation of, and the deposits in the bank.*"

On the 18th of the same month, on motion of Mr. Randall, they ·

" Resolved, That the board of directors be and they are hereby authorized to exercise their own discretion as to the expediency, as well as to the time and manner of carrying into effect the resolution adopted at the last meeting, for pledging certain assets in trust, for the payment of *the circulation of, and deposits in the bank.*"

Nothing is said in these resolutions of the notes of the bank chartered by Congress, nor of the post-notes of the bank. Yet we find in the deed of 7th June, that there are four classes of debts:

First, deposits; second, the notes of the bank chartered by Congress; third, the notes used in circulation, or demand notes; and fourth, the post-notes.

On the 3d January, 1842, at the annual meeting of the stockholders, on motion of Mr. Randall, they adopted the following resolutions.

"Resolved, That in the judgment of this meeting, the assignment by the board of directors of the Bank of the United States, dated the 7th day of June, and the 4th day of September, 1841, were executed *in violation of the true intent and spirit of the acts of Assembly incorporating the bank, and the supplements thereto, passed the 4th and 5th day of May last.*

"Resolved, So far as the stockholders have the power to act in the premises, and to assert their opinion, they do hereby declare, that the said assignments are utterly null and void: subject to the approval or disapproval of the meeting to be held on the third Monday in February next.

"Resolved, That it is expedient for the Bank of the United States to make a general assignment of the real and personal estate, goods, chattels, rights and credits, whatsoever and wheresoever, of the said corporation, to five persons, for the payment or securing the debts of the same, agreeably to the provisions of the acts of Assembly of this commonwealth, passed the 4th and 5th days of May, 1841.

"Resolved, That the stockholders of this bank will adjourn to meet the third Monday in February next, at 10 o'clock, A. M., at the banking-house, to elect five persons as trustees, for the purpose stated in the last resolution." And on motion of Mr. Kennedy:

"Resolved, That a committee of three stockholders be appointed to report to the adjourned meeting on the third Monday in February, how the assignment of the property of the bank may be made, so as to give no undue advantage to the judgment creditors."

Seventeen days after this meeting, and thirty-one days before the next meeting was to be held, the United States levied their attachment in this case; and within a few days afterwards, other attachments were issued against the bank.

On the third Monday in February the meeting was called to order, and the chairman stated, that Mr. Randall's resolutions were the first business before it. Previous to putting the question, a motion was made that the votes should be taken according to the scale prescribed in the charter, and not *per capita*, but this was lost. No inquiry was made as to the qualification of the voter, the number of shares he held, or whether he appeared to represent himself or as a proxy for another. The proceed-

ings of the meeting were tumultuous and disorderly. Earnest efforts were made by many of the largest stockholders to have the qualifications of the persons inquired into. These efforts were successfully resisted by the chairman and a majority of the persons present.

An amendment was offered, declaring that the assignments of June and September were made in pursuance of authority vested in the president and directors, and were for the best interests of the bank; and they were ratified and confirmed by that meeting. On putting the question, it was difficult to decide, but on a division there were 204 ayes and 109 nays. So the amendment was adopted. A resolution to propose a general assignment was then offered, but it was defeated by a motion to adjourn—ayes 178, and nays 119. These are all the proceedings of the stockholders on the subject of the second and third assignments.

It might be well doubted, if the president and directors had not so far exceeded the expressed wishes of the stockholders, as to prevent the June trust from deriving any support from their proceedings. In regard to the third deed, the stockholders were not consulted. The only meeting of the stockholders prior to the levying of the attachment in this case, repudiated the second, third and fourth deeds. The proceedings of the last meeting were of such a nature as to be entitled to little consideration, even had they occurred prior to the attachments of the United States. Having taken place subsequently, they could not divest the plaintiffs of the rights which they had acquired in the meantime by the attachment. At all events, it must be admitted, that none of these proceedings confer on the president and directors the authority which the acts of May require should be conferred by the stockholders to execute a general assignment.

II. *The deeds under which the intervenors claim, are to be construed together with that of the 6th of September, and form a general assignment of all the property of the bank.*

It is first necessary to inquire, what is the nature of a general assignment, and whether it does not preserve its proper character, though executed by one or several deeds, and though on their face each deed bears the outward form of a partial assignment. The correct rule appears to be, that no matter how many instruments are employed to effect the same result, they all partake of the same character, and all should be considered as parts of the same whole. If the same causes which led to the execution of one of the instruments, partial when considered alone, continue to operate until every particle of the debtor's property is divested, the first instrument is to be coupled with those that follow, and the whole should be construed together.

This question was presented to the Supreme Court of Penn-

sylvania, in the case of *Downing* v. *Kintzing*, (2 Serg. & Rawle, 335,) in relation to two assignments made to different persons by an insolvent debtor, at an interval of thirty-one days between them ; and it was contended, that the two deeds were to be construed each by itself. But the court said, through Chief Justice Tilghman : " Now here has been a voluntary assignment of the whole estate for the benefit of creditors, and the only objection is, that it was not *done at one time*. The counsel for the plaintiff concede that assignments of the whole to several persons, by several deeds at the same time, would be within the law," (which was the act of Congress giving priority to the United States,) " and I can perceive no substantial distinction between that and the case before us. When the first assignment was made, it was in contemplation to assign the whole residue, which was done in thirty-one days afterwards. The law cannot be evaded by contrivance." That view of the law was enforced by a reference to the decided cases.

As to the property conveyed, it must be all which belongs to the debtor at the time of the conveyance. But if *a trifling portion* of the estate be reserved, and especially if that be done *with a view to evade the law*, such a reservation does not make the assignment a partial one. Thus in the cause of the *United States* v. *Hooe*, (3 Cranch, 91,) Chief Justice Marshall, in defining the word " property," under the priority act of 1799, says, that " if a trivial portion of an estate should be left out *for the purpose of evading* the act, it would be considered as *a fraud upon the law*, and the parties would not be enabled to *avail themselves of such a contrivance*."

Whether we regard the causes which induced the execution of the second and third deeds, or the results which were to be attained through their means—whether we look at the affairs of the bank in June or September, we are forced to consider, that the causes which, in the opinion of the directors, rendered one of them necessary, must have equally operated to render the other necessary. The benefits to be obtained, and the evils to be averted were the same in both. The situation of the bank had not changed from the 7th of June to the 4th of September, excepting in that natural and necessary increase of embarrassments from causes which existed on the 7th June, and continued to operate until the 4th of September. The execution of the second deed rendered the third a necessary consequence. Though they differ in the interval of time, yet in reality, the third deed is as much a sequel and supplement to the second, as the fourth is a sequel and supplement to the third. These show evidence of a common intention and design, which was, to reap all the advantages of the

law for a general assignment, without bearing any of the burdens it imposed.

The reservation of a trivial portion of the assets to evade the law, by the deed of September, shows the secret design that had been acted on in the deed of June, and which had continued up to that moment.

By the deed of the 7th June, no property was conveyed but what was included in the schedules annexed to the deed. By the deed of the 4th of September, all the property of the bank was assigned, excepting only the property contained in a schedule annexed to the deed, and the residuary interest of the bank in the property which had been previously pledged or assigned in trust. This last reservation included the stocks pledged in Europe and the assets assigned in May and June. By the deed of the 6th September, the residuary interest of the bank in the assets assigned in May and June was also assigned. So there remained after the last deed, only the stocks in the schedule of the third deed, and the stocks pledged in Europe.

The testimony adduced, shows the nature and value of the porperty excepted, and the motive for the exception. Mr. S. Jaudon, who had been at first the cashier of the bank, and afterwards its agent, and who cannot be supposed to have any bias *against* the bank, testifies, " that it was the intention of said bank, in making said third trust, to assign to said trustees *all the property*, rights and credits of said bank, *which were of any value*, and which had not been assigned in the other trusts. The exception of the property and effects mentioned in the schedule annexed thereto, consisted of stocks which had *only a nominal value, and were reserved for the express purpose of preventing the corporation from becoming extinct.* The *intention* of said bank in making said last assignment *was certainly to make a general assignment of all its property*, and the witness u ged upon the president the necessity of making such an assignment, and *it was agreed that such an assignment should be made.* There had been *a great many judgments* obtained against the said bank before the last deed was made. *The second trust was made with this view—that the bill holders and depositors would be so well satisfied with the securities assigned for their protection, that no suit would be brought by any of them against the bank,* and that the bank could then continue to manage the business without molestation. As to all the other creditors, it was thought the bank could make satisfactory arrangements with them. But, *instead of these views being carried out, the various creditors proceeded, notwithstanding the second trust, to recover judgment* against the bank, and to seize other property ; so that a general assignment, to include *every thing that was liable to*

*seizure* became necessary:—and the third trust was made to *prevent the payment of those creditors who might get judgment against the bank and sell the property of the bank to satisfy them;* and with the view of throwing *all the property* of the the bank into a *common fund,* for the common benefit of all the creditors."

We admit, that under the law of Pennsylvania, an assignment by the debtor of his property to a trustee to pay his debts is valid; that such a deed may contain preferences; and that it is not avoided by the actual insolvency of the debtor; and that the debtor may appoint his own trustee. We believe it to be the established law of that State, that no one, or even all of these ingredients, is condemned by itself, but that the deed is to stand or fall according as these clauses are considered innocent or fraudulent from the other provisions of the deed, and the circumstances under which the deed was made.

While this right of giving preferences, and even of appointing a trustee, is recognized, the greatest jealousy is manifested in the construction of such deeds in case the grantor is in an insolvent condition. See *Burd* v. *Smith,* 4 Dallas, 79. *Wilt* v. *Franklin,* 1 Binney, 526.

One of the rules applied by the courts *to* voluntary assignments is, that fraud in any part of the deed vitiates the whole. It makes no difference whether the fraud be a moral, or merely a legal fraud. In the case of *M'Clurg* v. *Leckey,* 3 Pennsylvania Reports, 94, the Supreme Court say: " When the assignment is tainted with either moral or legal fraud, the property does not pass, but remains in the debtor, liable to the execution of those creditors who have not assented to the assignment.

In the case of *Thomas* v. *Jenks,* 5 Rawle's Reports, 225, the Supreme Court of Pennsylvania say, that nothing is clearer than that a contract fraudulent in part by the provisions of a statute, whatever be the abstract effect of fraud in other cases, is void in the whole. The principle has since been applied in *Hyslop* v. *Clark,* 14 Johnson's Rep. 465, to the very case of assignment in trust for the payment of debts.

In the case of *Irvin* v. *Kean,* 3 Wharton's Rep. 355, the Supreme Court of Pennsylvania say: " When the assignment is affected, either with moral or legal fraud, the property does not pass; it remains in the debtor, liable to the execution of creditors." The case of *M'Clurg* v. *Leckey,* is referred to and affirmed.

III. *The second and third deeds are void for the uncertainties on their face, as to the cestuis que trust, and the amounts due to them ; and for want of specific provisions for the final settlement of the trust.*

In making an assignment for the benefit of creditors, the insolvent is bound to give such information to the creditors, as will enable them to know how far their interests are to be affected by the deed; whether they should accept of its conditions; or whether they should repudiate it, and look to other remedies. He is bound to insert their names, or give such other reference to them as renders it possible to ascertain who they are. It is no answer to say, that it was impossible to furnish the names of the creditors of the bank. If it is impossible, from the nature of the business, to furnish that information, it shows the impropriety of resorting to the assignments.

Before the deeds can be sustained by the court, it must appear that they are free from fraud. The omissions in a deed of trust are often as fatal to the deed as the clauses expressly inserted. See the case of *Burd* v. *Smith*, before referred to.

IV. *The second and third trusts are void by reason of the clause excluding all creditors, who should not make proof of their debts within thirty days after advertisement in the Philadelphia newspapers, and giving the surplus to the bank.*

There is some conflict in the decisions, on the subject of conditions attached by the debtor to his assignment; but the better opinion appears to be, that any condition not introduced for the benefit of the creditors, but intended to operate either directly or indirectly for the benefit of the debtor, is null, and avoids the deed.

The general rule is no where better stated than by Senator Tracy, in the case of *Grover* v. *Wakeman*, 11 Wendell's Rep. 222. " The only safe rule," he says, " is to regard every assignment which operates to delay creditors for any purpose whatever, not distinctly calculated to promote their interest, as contrary to the policy of the statute of frauds." See also *Austin* v. *Bell,* 20 Johnson's Rep. 442, and *Graves* v. *Roy*, 13 La. Rep. 457. *Lippincott* v. *Barker,* 2 Binney's Rep. 190.

The second and third deed, each contains the following condition : " and provided always, nevertheless, and it is hereby expressly declared, understood and agreed, as the *condition* of this indenture, and of the trust therein and thereby created, that before the said trustees, their successors or assigns, shall proceed to make or declare any dividend of the moneys raised or collected as aforesaid, they shall give *thirty days notice* of their intention to do so, in two or more daily newspapers of the city of Philadelphia, at least twice a week, during the same period of thirty days, calling upon the claimants to come forward and *prove their debts :* and such dividends shall be declared and made, *only on the amounts so brought forward and proved ;* and *no creditor shall*

*be entitled to claim* or receive *such dividend, who shall not have brought forward and proved his debt, before the time appointed* for making and declaring the dividend. But, if any dividend or dividends, shall thereafter be made, such neglecting or defaulting creditor or creditors, bringing forward and proving his or their claim, or claims, in time therefor, as aforesaid, shall be entitled to receive in addition to such dividend, an amount equal to the rate of dividend or dividends, which shall have been before made and paid ; and so on, from time to time, until a final dividend shall be declared and made, which final dividend, the said trustees, their successors and assigns, are hereby authorized and required to declare and make, *whenever* moneys arising from the premises hereby granted and assigned, shall by the payment of the said final dividend be *disposed* of and *exhausted,* or when all the creditors *who have brought forward* and proved their claims, be paid in full, principal and interest ; it being understood, however, that no interest shall be paid until the final dividend ; and from and after such final dividend, *no creditor shall have any claim upon the remaining fund,* if any there be, nor upon the said trustees, their successors or assigns, for or by reason of these presents, or of the trusts herein and hereby created ; but the same, except the trusts for *reconveying the surplus* to the *said party* of the *first part,* their successor or assigns shall henceforth cease, and be determined and at an end."

By this proviso, it appears, that whenever the assignees choose to advertise in two daily papers in Philadelphia, all the creditors who do not come forward and prove their claims, within the period, cannot share in the dividend, and are not to be considered as creditors of the bank. Should they prove their claims before the final dividend, they are placed on an equality with such creditors as have duly proved their claims. But those who, from absence, sickness, distance, or any other cause, do not " come forward" and prove their debts, before the final dividend is declared, have no recourse on the surplus.

If, as it will probably be contended, the board of directors, when the June trust was made, expected to be able to pay the debts provided for in trust—then they calculated on a surplus to accrue to the bank from that trust. If their object was to make the deed *for the benefit* of the creditors, they would have declared that the balance remaining after the final dividend, should be applied to pay the remaining creditors of the classes specified in the deed, and who had failed to comply with the condition of " coming forward" and making the proof, as required by the deed.

If the board of directors had desired to hinder and delay the creditors in the prosecution of their legal remedies by compelling them to accept such terms as it was thought best to offer, would

not the board have inserted this very clause? Its effect is to dic-
tate terms to the creditors, and was introduced with a view to
enforce the acceptance of the trust. If such is the just construc-
tion of the clause, then it clearly was made with intent to defraud,
hinder and delay the creditors.

This clause is objectionable in another point of view. It leaves
the time to be employed in winding up the affairs of the bank
entirely to the discretion of the trustees.

The clear intention of the bank, in introducing this clause,
was to place the trustees beyond the control of the courts as to
the time allowed for settlement of the trust.

It is easy to perceive what would be the fate of the trusts con-
taining these clauses in the courts of the State of New York. In
the case of *Wakeman* v. *Grover*, 3 Paige's Chancery Rep. 40,
the Chancellor, in deciding the cause, says: "There are however
two other provisions in this assignment, which render it *still
more objectionable* than the simple clause excluding those credi-
tors who should not come in within a limited time, and give their
debtors a general discharge.

" In the first place, no time is limited within which the credi-
tors of the second class are to come in to entitle themselves to a
share of the surplus; but each is to come in *within three months*
after the assignees may think proper to give them a written no-
tice to accept or decline the offer held out to them by the as-
signment.

" Again; the question is not, whether there is not a remedy for
the creditors, but whether the debtor has not deprived them of
any remedy for the recovery of their debts, unless they resort to
a court of equity, to counteract the illegal effect of the arrange-
ment which has been made. In the case of *Pierpont & Lord* v.
*Graham*, Judge Washington admits that if no time is fixed by
the assignment within which the creditors may come in, or a
very distant period named, the assignment must be considered as
fraudulent. And certainly, it cannot be better, when it is left en-
tirely in the power of debtors or trustees of their own choosing, *to
fix that time for themselves, without the consent of the creditors.*"

In *Hyslop* v. *Clark*, 14 Johnson's Rep. 446, the Supreme
Court say: "An insolvent debtor has no right to place his pro-
perty in such a situation, as to prevent his creditors from taking
it under the process of a court of law and to drive them into a
court of equity, where they must encounter great expense and
delay, *unless it be under very special circumstances*, and for the
purpose of honestly giving a preference to some of his credi-
tors, or to cause a just distribution of his estate to be made amongst
them."

V. Besides the objections common to the second deed, the third

is liable to others, apparent on its face, viz. : to the want of schedules of the property assigned; the power to compromise conferred on the trustees, and the option permitted to them to receive or not the notes of the bank in payment of its property sold.

The absence of any schedule of the property assigned is evidence of fraud.

In *Pierpont* v. *Graham*, 4 Washington, C. C. Rep. 237, Judge Washington held, that " as to the want of a schedule, it may be admitted, that an assignment of all the debtor's effects, without a specification of property, is generally speaking, an *indicium* of fraud, but nothing more. In Twine's case, it was an item in the list of circumstances to establish the fraudulent intent."

In the case of *Van Nest* v. *Yoe*, decided in April, 1843, (1 Sand. Ch. Rep. 4, 7,) Assistant Vice-Chancellor Sandford says— " The next objection to the assignment is the absence of an inventory of the property and effects assigned. This is not of itself a strong badge of fraud, *but frequently becomes one in connexion with other circumstances.*

The trust of the 4th September, contains a general description of the different classes of creditors, but there are no words tending in the least to describe or point out the property intended to be assigned. It remains to this day a secret to the creditors of the bank, what property was included. Under such circumstances, how is it possible for the creditors ever to enforce the execution of the trust ?

It is quite true, that there are decisions which declare that the absence of schedules when properly explained affords no presumption of fraud. But they refer to cases where every thing else was fair and equitable, and where the property was on the face of the deed, all devoted to creditors. Considered, *per se*, the absence of the schedules, though an *indicium* of fraud, would not be conclusive; and if the presumption were repelled by every thing apparent on the deed, and by every thing proved *aliunde,* the deed would unquestionably be sustained. But, when considered in connexion with the other objectionable clauses of this deed, the absence of the schedules of the property is of great importance. It is no longer an isolated fact, but in connexion with other facts, goes far to furnish a clear and cogent presumption that the deed of the 4th of September was made with the intent to hinder, defraud and delay the creditors of the bank.

In fact, there was no excuse for not annexing schedules of the property as had been done in making the previous trusts. The bank possessed the means of making those schedules, for at the next annual meeting of the stockholders, the president of the bank, and at the same time, principal trustee, laid before the stockholders "a statement of the assets of the bank, containing

an account of all the property passed under the several assignments and other assets." If the stockholders were entitled to that information, were not the creditors? If those who had a residuary interest only in the property assigned, had the right to know what that property was, and where it was situated, had not the creditors, in whom the directors attempted to vest the present interest in the property, a much stronger right?

The power to compromise for the debts, and the power to receive the notes of the bank in' payment of the property sold, is illegal. The deed authorizes the trustees to sell all the real estate, and then all the personal estate; " and to receive in payment *for the same, and in payment for the real estate,* so as aforesaid sold and conveyed, *the notes of the party of the first part, if the said party of the second part shall deem it expedient so to do :* and in the next place, in trust to ask, demand, sue for, recover, receive, collect and get in all and singular the debts and moneys due and owing to the said party of the first part, and hereby assigned ; and *at their discretion, to compromise and compound the same."*

A fair criterion to test the legality of the clauses in question is, whether, if either the bank or the trustees were to make any future preferences, could it be done, under the provisions of the deed, in such a manner that either the creditors could have no means of ascertaining the facts, or if the facts were ascertained, could the trustees be held responsible for their acts, under the wide range of power conferred on them by the deed? Let us look at the practical operation of the clauses of the deed, and see whether they will bear the test.

The trustees appointed by the bank, take possession of the estate. No schedule is made out, nor can any one ascertain of what the property consists, or where it is situated. They wish to favor the creditor. They may give him any property of the bank they think proper, or they may transfer to him any of the debts due to the bank. If he be a debtor to the bank, they may allow him to pay in the notes of the bank, or they may refuse it. They may require payment in full, or they may give him a discharge for one cent in the dollar. With such clauses of the deed, their power is practically limited only by their own will.

VI. *The deeds are void for want of acceptance by the creditors.*

Assignments are of two classes ; those where the acceptance of the creditors is presumed, and those where the acceptance of the creditors is not presumed, and where, until acceptance, the deed is inchoate, and insufficient to defeat an attachment.

The rule appears to be, that where the deed is such as to be clearly for the interest of the creditors, the law presumes their as-

sent. On the other hand, where a question as to their interest may arise, so that the discretion of the creditors may be exercised, the law requires the deed to be completed by the acts of the parties.

The rule is well laid down in *Jewett* v. *Barnard,* 6 Maine Rep. 383. The court say; " It is true, that deeds of trust where made for the undoubted benefit of persons who are absent, have been considered as vesting the legal estate in the trustee, without any expression of the assent of the person for whose benefit such deeds are made. The assent of the *cestui que trust* has been presumed, inasmuch as the conveyance was made entirely for his benefit."

This court has maintained the same doctrine in the late case of *Fellows* v. *The Vicksburg Rail-Road and Banking Company,* 6 Rob. 246. " It appears also to be settled, that the assent of creditors will be presumed in the case of an assignment to a trustee for the benefit of *all* the creditors, when no release *or other condition* is stipulated for, or on behalf of the debtor, but the property is to be distributed among all the creditors *pro rata.* This assent is said to be *inferred upon the general* principles of law, *because the trust* must be for their benefit and cannot be for their injury." See also 2 Kent's Com. 552–3.

Is this such a deed as to authorize the court to presume its acceptance by the creditors? It contains several provisions which are wholly irreconcilable with the idea of a presumed acceptance. At the time of the execution of these deeds, the bank had a vast amount of property scattered over the different states of the Union. Its creditors also, resided in all parts of this country and in Europe. Is it to be supposed that those creditors would agree to abstain from legal proceedings against the property of a bank, which in many cases could be found at the places of their residence, and agree that all the assets should remain in the hands of the officers of the bank under the name of trustees, and that they should be shut out from any dividend, unless they should within thirty days after the first publication in any two of the daily newspapers of the city of Philadelphia, proceed to that city or wherever else the trustees should think proper to be, and adduce proof of their claims?

The trustees have been receiving the notes and obligations of the bank, in payment of debts due it—and they say they are bound to do so under the law of the 4th May, above quoted. So they consider this law as in effect forming a part of the assignment. What is the operation of this law upon the interest of the *cestui que trusts* of the June deed? It improves the market value of the circulation, deposits and post-notes, because debtors of the bank can use them in payment of debts to the bank. The hol-

der of these obligations who has already lost fifty per cent by their depreciation, inquires of himself—"Shall I accept this trust? If I do, I have to wait until all the solvent debtors to the bank have purchased its obligations to pay their debts to the bank, and then unless these exceed $5,000,000, not a dollar in specie will have been received to furnish a dividend on the debt due to me. At the same time, the best debtors to the bank are discharged and the most valuable property of the bank is in effect taken to pay debts at par, while I am unable to obtain any thing on mine. But, instead of accepting this deed, I can refuse its provisions and resort to legal remedies, or I can sell the obligations of the bank held by me to the debtors of the bank to pay debts." He would not accept the provisions of the trust.

The clause of the September trust above quoted, authorizes the trustees, if they think proper, to receive the notes of the bank in payment of property sold. Let us examine the effect of that clause, taken in connexion with the law above quoted, upon the different classes of creditors, under the September trust.

The first class in the September trust, after the payment of the expenses of the trust, is the judgment creditors. This clause is injurious to their interest, because it enables the holders of the notes of the bank to obtain more than their value, by selling them to the purchasers of the property of the bank to be used by them to pay the price of property bought, or by selling them to the debtors of the bank to pay their debts. This clause places the holder of the bank notes on better ground than the judgment creditor of the bank. The bank notes are available to sell to purchasers of property and to the debtors of the bank, while his judgment debt cannot be used for either of these purposes. As many of the judgments were obtained upon bank notes, the judgment creditor finds himself in a worse situation by having his debt on the notes merged in the judgment. Thus, while the note holder receives more than the real value of the notes he holds, without a compliance with any of the conditions of the deed, the judgment creditor sees himself compelled to wait until all the "evidences of debt issued or created by said bank" shall be taken up. For, until that event shall take place, it is uncertain if any money will be received by the trustees, further than may be necessary to defray expenses and pay their own salaries; and consequently, no payments can be made by them. Can it be supposed the judgment creditor would assent to such a deed, when if it were out of his way, he could issue an execution, and seize and sell sufficient property to satisfy his judgment? Is his interest so clear, that the law would presume his acceptance of the deed as being clearly for his further benefit?

If then, the creditors under the September trust who, are the

most highly favored, might well hesitate before accepting the deed—is it necessary to pursue the inquiry?

If we look at the next class of favored creditors, we perceive that they are the sureties of the bank, and the testimony shows, that to a great extent they are the judicial sureties. They, by summary proceedings, are entitled to judgment against the bank, and they may thus place themselves in the same position occupied by the judgment creditors. The interest then of the sureties is adverse to the trusts.

The other creditors form the remaining class. While the holders of the obligations covered by the June trust, have it in their power to obtain more than the real value of those obligations, the remaining creditors would be postponed until all the other demands against the bank are satisfied or its property exhausted. Surely, they would not accept deeds which if carried out, would probably exhaust the property of their insolvent debtor, and thus deprive them of the smallest share in its proceeds.

But if the doctrine of presumed assent be admitted to its fullest extent, presumption of acceptance may be rebutted by the evidence, that the *cestui que trusts* have disclaimed the advantages offered by the deed; and the court will be bound to set aside the deed made for persons who refuse to accept its provisions. See the case of *Brooks* v. *Marbury*, 11 Wheaton, 96.

If the proof discloses the fact that the *cestui que trusts* have refused to avail themselves of each deed, then the court will not sustain them. The trust of June purports, on its face, to have been made to redeem the circulation, the deposits and post-notes. Mr. Jaudon, the former cashier, states, that the second trust was made with this view—that the bill holders and depositors would be so well satisfied with the securities assigned for their protection, that no suits would be brought by any of them against the bank.

Thus, the *cestui que trusts* were called on, by that deed, to say if they considered it a deed for their benefit, or whether it was a deed made to hinder, obstruct and delay them. Their answer is too explicit to be misunderstood. It is found in the testimony of Mr. Jaudon. "Instead of these views being carried out, the various creditors proceeded to recover judgments against the bank." Their answer is also found in the great number of judgments obtained against the bank before the third deed was executed. More than forty of those judgments were paid before the United States interfered in Pennsylvania, with the view of subjecting all the assets to their right of priority and preference. The record does not disclose how many judgments were obtained in the interval. That they were very numerous, there cannot be the slightest doubt. That they were for large amounts, and were most vigorously prosecuted, is evidenced by the sweeping nature

of the third assignment, embracing in its terms, *all* the property of the bank, excepting the turnpike road and other stocks of a nominal value. To defeat the judgments already obtained, and to evade the judgments to be obtained on the first Monday of September, the directors, on the 2d of September, arranged the details, and on the 4th of September carried them into execution. Can proof be clearer, than that the *cestui que trusts* of the deed of June have refused to accept it ? If they had accepted it, the September trust would, perhaps, never have been required.

The creditors having refused to accept the provisions of that deed, is there any well founded reason why the court should permit the assets of the bank to remain in the hands of its agents, locked-up from its creditors ?

If the trust of September be subjected to the same test, it will be found to warrant the same conclusion. The judgments that have been had since that time evidence, that the creditors, for whose benefit it purports to be made, refuse its proffered advantages, and prefer to rely on their legal remedies. The amount of the judgments against the bank in this State, since the September trust, and in evidence in this case, is about $400,000 ; what the amount is elsewhere the record does not inform us.

If we look at the proceedings of the trustees under both trusts, they afford conclusive proof that the creditors have only regarded their interest in refusing the trusts professedly made for their *benefit*.

VII. *The trusts are void, because made with the intent to prevent the sacrifice of the property of the bank, and otherwise defraud and delay the creditors.*

The law regards with great distrust any attempt on the part of the debtor, to obstruct the remedies of the creditor. If by voluntary assignments or any other contrivance he seek to preserve his property until better times—if he seek to avoid the sacrifice of sheriffs' sales and to withdraw it from legal process, in order to sell it afterwards at higher prices, he violates the spirit of the law and seeks to hinder and delay his creditors.

In the case of *Van Nest* v. *Yoe* above cited, the court say : " The law provides, that the debtor shall fulfil his obligations, and on his default, it gives to the creditor ' his lawful suit,' for the recovery of his demand, and the sale of the property of the debtor for its payment. This is a strict right. And the debtor, who believing himself more than solvent, places his property beyond the reach of the process of the law, whatever may be the pretence under which he cloaks the act, in the language of the statute of frauds, ' hinders' and ' delays' and ultimately ' defrauds' his creditors. It is no answer to this argument to say, that the debtor provides an ample fund for the payment of the debt, and

that the creditor is ultimately to be paid in full. The law gives to the creditor the right to determine, whether his debtor shall have further indulgence, or whether he will pursue his remedy for the collection of the debt." Citing *Ward* v. *Trotter*, 3 Monroe, 1. *Vernon* v. *Morton*, 8 Dana, 247–63.

The point of view the most favorable to the bank is, that these deeds were executed in order to prevent the sacrifice of its property at a time of the greatest commercial embarrassment. Even that is a motive the law condemns, as an unjust restraint imposed on the creditors of the bank.

VIII. *The trust of September is invalid for want of proper parties.*

The first fact disclosed by the deed and the accompanying circumstances is, that the president of the bank, Mr. Robertson, signs the deed and affixes the seal on behalf of the bank, as the party of the first part, to himself and others as the party of the second part. Thus he acts in the capacity of representor of the grantor and as the grantee.

The acknowledgment of the deed recites, that it was " delivered," and delivery is necessary to its validity. It was delivered, then, we are to suppose, by Robertson taking it into one hand and passing it into the other.

The next person on the list of the trustees who accepted the trust is J. S. Newbold. He was a director of the bank at the time of the execution of the deeds. The next trustee is H. Cope. He was then the superintendent of the suspended debt, and assistant cashier of the bank. The last trustee is J. S. Taylor. He was the chief cashier of the bank. These persons were the most important officers of the bank; viz.: the president, who also was a director; another director; the cashier and the assistant cashier of the bank, all then representatives of the bank, and employed in carrying on its affairs. The only person who was not an officer of the bank, is R. H. Bayard, who was absent, and a resident of another state; and who, from the evidence, does not appear to have accepted the trust, or taken any part in the proceedings with the other trustees. Perhaps, if the other persons were qualified to be trustees, their acceptance of the trust might make the deed valid as to parties; but even that would be matter of doubt, as the trust is granted to the whole five jointly.

The trustees who were to manage the property assigned, were the chief cashier and assistant cashier, who already had the charge of the property, as the officers of the bank. When a delivery of the property was to be made to the trustees the same formality which was followed in the delivery of the deed must have taken place. Messrs. Taylor and Cope, as officers of the bank, were to deliver to themselves as trustees, all the property conveyed,

Can these proceedings be considered in any other light than a change in name only of the officers of the bank? If any doubt should exist as to the answer to this question, it will be removed by considering the subsequent conduct of the officers of the bank.

The president and cashier have continued up to the present time, to act in their double capacity as representatives of the bank and as the trustees. It does not appear that Newbold has ceased to act as a director. The same salary received by the cashier and his assistant is continued to them under the trust, viz: $4000 for each per year.

If we look at the persons who managed the details of the trusts, we perceive they also have merely changed names, Messrs. Fairman and Goddard, the clerks of the trustees, were also the clerks of the bank. Instead of being called clerks of the bank, they now style themselves clerks of the trustees. Mr. Frazier was the agent of the bank, and is the agent of the trustees.

This want of parties is to be considered in two points of view; first, whether it is such as renders the deed legally insufficient for want of consent, and secondly, should the deed be considered a perfect instrument in form, whether it does not create a presumption of fraud in the assignment. See *Beal* v. *McKiernan*, 8 La. 569; *Fellows* v. *Commercial R. R. Bank of Vicksburg*, above referred to. *Reinhard* v. *Keenbartz*, 6 Watts' Rep. 95. See also, *McClurg* v. *Lecky*, 3 Pennsylvania Rep. 93.

IX. *The second and third assignments are void, as to the attachment of the plaintiffs, for non-compliance with the laws of this State.*

1. *The assignments made in Pennsylvania, cannot transfer, so as to affect creditors, any property within the jurisdiction of this State, except in the manner and subject to the restrictions prescribed by the laws of this State.*

If the property attached was at the respective dates of the assignments, subject to the jurisdiction of Louisiana, then it is clear that the laws of this State must control its transfer. Or, if the assignments made in the State of Pennsylvania cannot take effect, without a violation of the rights of the creditors secured to them by the laws of this State, or without the performance of all the conditions affixed by our laws to such transfers, then the assignments must conform to the law of this State, or they are void as to the creditors.

But if the property attached was at the dates of the assignments respectively, beyond the jurisdiction of this State, and within that of the State of Pennsylvania, and if the transfer there was complete and perfect in every particular, while the property attached remained within its jurisdiction, and if the assign-

ments may be carried into execution without violating the rights of creditors acquired under our laws, it may be admitted that the assignments are valid as to all the world.

What then is the law of Louisiana, in relation to the transfer of debts due by persons in this State, so far as the rights of creditors are concerned.

By the 9th article of the Louisiana Code, the principle is declared, that the law of this State regulates the property within its limits, whether it belongs to the inhabitants of the State or to strangers. This rule is general in its terms and applicable to every species of property, whether real or personal, corporeal or incorporeal.

The following article relates more particularly to contracts made in other States, as to property within this State. It declares, that the effect of acts passed in one country, to be executed in another, is governed by the law of the country where they are to be executed. By this article it is declared, that the law of Louisiana shall determine the effect of all contracts to be carried into execution in this State, without reference to the place where such contracts are made, or where the parties are domiciled.

Art. 2613 of the Louisiana Code, prescribes that the transferree of a debt is only possessed of it in relation to third persons by notice of the transfer given to the debtor.

By art. 1963, it is declared, that the property of the debtor is liable for all the consequences attending the non-performance of his obligations. The next article declares, that every act, done by him with the intention to defraud his creditor of the eventual rights the latter has upon his property, is illegal, and may be avoided by the creditor as a fraud upon his rights. Art. 3150 declares, that the property of the debtor, is the common pledge of his creditors, and its proceeds must be distributed among them rateably, except for lawful causes of preference.

Art. 2628 declares, that the debtor being insolvent, may sell his property for a price paid to him, but it forbids him giving any thing in payment but money, to one creditor to the prejudice of another.

By the 239th and the following articles of the Code of Practice, it is provided, that the creditor, by virtue of his attachment, can seize all the property, rights, credits or actions of his debtor, in whatsoever hands they are found. If any person within the jurisdiction of the court, has property belonging to the debtor, or be indebted to him, he can be made a garnishee. The sheriff shall take into his custody all the property attached, with the exception of the debts due to the defendant by the garnishees.

The only difference between debts due by persons within the jurisdiction of the court, and other property is, that the garnishee

cannot be compelled to pay the debt he owes to the defendant until the decision of the suit, while all other property may be taken by the sheriff into his custody.    The debt is as much here when the garnishee can be cited, as any other species of property, real or personal.

By combining these articles of the code, the following inferences may be drawn :

1. The property situated in this State cannot be legally transferred by the debtor, with intent to defraud his creditors.

2. That a transfer which operates a distribution of an insolvent debtor's property in this State, otherwise than *pro rata*, or for some preference recognized by the laws of this State, is a fraud upon the rights of the creditors, who may avoid such contract, so far as it operates to their prejudice.

3. That a debt due by a person residing in this State is within its jurisdiction, and the transfer of such a debt cannot be valid as to creditors, unless the laws of this State have been complied with.

4. That the transfer of a debt due by a resident of this State, cannot take effect so as to deprive the vendor's creditors of the right they had acquired under our law, to a distribution of the proceeds of the debt, *pro rata*, or for legal preference.

These inferences are equally just, whether the contracts are made here or elsewhere, and whether the parties to them reside here or elsewhere.    The only inquiry is, whether our law considers the property within this State?    If it does, the law of this State attaches, and protects the right of the creditors to share equally in its proceeds, or according to the preferences it has created.

The residence of the debtor is the place where the debt is situated.    Whatever may be the opinions of jurists elsewhere, in Louisiana this principle must be considered as firmly established. Our laws authorize the issuing of an attachment in case the defendant is about to depart or resides elsewhere, and has property in this State.    It is the presence of the property, and the subjecting it to the control of the court, which supplies the place of personal citation.    The property stands in place of the person. A debt due to the defendant is situated in the place of residence of the debtor, or rather it follows him wherever he goes.    The presence of the debtor of the defendant authorizes the issuing of the process of attachment against the latter, and the service of it upon his debtor, brings him before the court.    Upon that principle the United States have been enabled to bring the present action.    If debts followed no other locality but that of the creditor, it could not be said that the bank had any property within the jurisdiction of the court,

By the common law of England, adopted by the other States, the transfer of a debt is complete, even as to the third persons, without notice to the debtor.

By the law of Louisiana, France and Scotland, and indeed wherever the Roman law forms the basis of their legal system, notice is necessary.

This is not purely arbitrary. It is part of that general rule which, as to third persons, requires possession of the property to accompany the title. Notice to the debtor operates as the delivery of the possession of the debt. The moment notice is given, possession of the debt passes to the transferee. The transfer of possession is, taking a thing from the control and power of one person and placing it under the control and power of another. When the debtor contracted the debt, he placed it under the control of his creditor. The latter, in his turn, divests himself of the possession by an agreement to that effect, made known to the debtor. The debtor is of right a necessary party to a contract to transfer a debt due by him.

Our laws mete out the same measure of justice to citizens of other states as to our own. Whoever invokes the protection of our laws, is entitled to it against the fraudulent contrivances of his debtor, even though the local customs and laws of another State stand in the way. It is a matter of boast in favor of our system of law, that it has never lent itself to these contrivances to defraud, hinder and delay creditors.

The decisions of this court will show that the inferences we have drawn are correct. *Durnford* v. *Syndics of Brooks*, 3 Mart. 222. *Norris* v. *Mumford*, 4 Mart. 25. *Ramsay* v. *Stevenson*, 5 ibid. 33. *Fisk* v. *Chandler*, 7 ibid. 29. *Thuret* v. *Jenkins*, 7 ibid. 353. *Price* v. *Morgan*, 7 ibid. 709. *Peabody* v. *Carroll*, 9 ibid. 295. *Badnall* v. *Moore*, 9 ibid. 405. *Oliviet* v. *Townes*, 2 ibid. N. S. 100. *Chartres* v. *Cairnes*, 4 ibid. N. S. 1. (The deed avoided in this last case was subsequently set aside in New York. See *Mackie* v. *Cairns*, Hopkins' Ch. Rep. 393. 5 Cowen, 57.) *Coxe* v. *White*, 2 La. 425. *Andrews* v. *Creditors*, 11 La. 465. *Graves* v. *Roy*, 13 La. 454. *Kimball* v. *Plant*, 14 La. 11, 513. *Adams* v. *Day*, 13 La. 503. *Beirne* v. *Patton*, 17 La. 591. *Buckner* v. *Watt*, 19 La. 218. *Fellowes* v. *Vicksburg Rail-Road and Banking Co.* 6 Rob. 246.

In the case of *Layson* v. *Rowan*, 7 Rob. 1, there was no evidence to show the insolvency of the grantor, or that the property appropriated was more than sufficient to pay the debts provided for in the assignment. All the evidence showed the good faith of the grantor, and that the property was in the possession of the intervenor, in the State of Mississippi, and was by him brought into this State, and was in his possession when the attachment was

levied, and the court sustained the assignment, on the principle decided in *Thuret* v. *Jenkins.* If the property at the time of the assignment, had been within the jurisdiction of this State, the court would doubtless have followed the other class of cases from *Norris* v. *Mumford,* to the present time. The circumstances of this assignment are so different from those attending the assignments now before the court, as to render the decision inapplicable to the present case. We may observe, however, that the assignment in that case was free from the objections which we urge to the assignments now before the court. In that case, the *cestui que trusts* were all named, and the sums due them were specified. The property assigned was fully identified. The creditors were consulted, and one of them was made the trustee. He accepted the trust, and it thus became valid for a greater sum than the value of the cotton attached, and it did not appear that the trustees had received other moneys on account of the trust. The deed does not provide for the payment of the surplus to the debtor, but only to other trustees in a deed which had been accepted by the *cestui que trusts.*

From the decisions in this State, it appears :

1. That this court has had occasion to pronounce its opinion upon seven assignments made in other States, of property in this State, as to the rights of the respective attaching creditors and the trustees created by the assignments, and that no such assignment has ever yet been held valid against creditors, either by the inferior courts or this court.

2. That debts due by persons in this State are placed on the same footing as any other moveable property, and are considered, as to the rights of creditors, to have their *situs* at the domicil of the debtor.

3. That no sale or other transfer of property, within the jurisdiction of this State, has ever been maintained to be valid as to creditors, except the conditions for the validity of such a transfer have been complied with according to the laws of Louisiana.

4. That in setting aside assignments and other contracts, it is sufficient if the law of the foreign State would, if applied here, be contrary to our laws and contrary to the general policy of the State, and the interests of the citizens in general. That the law of this State does not limit its protection to its citizens only, but extends it equally to all the litigants in its courts.

These decisions have been maintained in the other States, whenever similar questions have been presented. See *Milne* v. *Moreton,* 6 Binney's Rep. 359. *Moore* v. *Spackman,* 12 Serg. & Rawle, 289. *Ingraham* v. *Geyer,* 13 Mass. 147. *Lanfear* v. *Sumner,* 17 Mass. 110. *Lamb* v. *Durant,* 12 Mass. 54. *Caldwell* v. *Ball,* 1 Term R. 205. Story's Conf.

Laws, p. 349, § 416 and note. *Varnum* v. *Camp*, decided by the Supreme Court of New Jersey, and *Huth* v. *Bank of United States*, recently dicided by Chancellor Bibb in Kentucky.

The doctrine of moveables being in any way connected with the laws of the domicil of the owner, is rapidly giving way to the more practicable doctrine which subjects them in all cases, to the law of the place where they are actually situated. The following extract shows the view of the subject taken by Marcadé in his work now in the course of publication, entitled, *Elemens du Droit Français*, vol. 1, pp. 82–3 :

"Mais pourquoi donc *réputés n'avoir point de situation*, quand par le fait ils en ont une? C'est, nous repond-on, parce qu'ils sont ambulatoires, parce qu'aujourd'hui en France, ils peuvent être bientôt en Angleterre. Mais le domicile, par la loi duquel vous voulez les regler, n'est-il pas ambulatoire lui-même? Aujourd'hui en Espagne, ne peut-il pas être en Russie dans un mois? Comment donc rejetter la réalite pour admettre une fiction, alors que cette fiction ne se fond sur rien et de plus, ne sert à *rien?* Et non-seulement elle ne sert à *rien*, mais elle est même plus incommode que la réalite même, et elle jette dans impossibilités qui forcent souvent ses partisans de reculer devant elle. Et en effet, comment le souverain du pays du domicile, de la France, par example, fera-t-il respecter les lois sur des meubles qui se trouvent hors des pays soumis à sa puissance, en Perse, par example? Est-ce que, logiquement, un législateur peut commander ce qu'il sait n'avoir pas le pouvoir de faire exécuter? Puisque la soumission des meubles à telle ou telle loi ne peut jamais être que précaire et instable, on doit reconnaître la soumission instable à la loi du pays ou ils sont, plutôt que la soumission, instable également, à la loi du domicile. C'est avec le souverain du pays où ils se trouvent, qu'ils sont *réelement* en relation, c'est a sa puissance que *réellement et par le fait* ils sont soumis ; on ne peut donc pas, à moins des régles formelles posées à cet égard par les divers législateurs, les déclarer soumis, par fiction, à l'autorité d'un autre."

Foelix, *Traité du Droit International*, p. 68, No. 38, in commenting on the maxim, *mobilia sequuntur personam*, states, as a qualification, that this rule has no application, where the ownership of moveables, whether corporeal or incorporeal, are concerned. He says : "La régle est sans application à tous les cas où les meubles n'ont pas un rapport intime avec la personne du propriétaire ; par example, lorsque la propriété de meubles est réclamée et contestée," etc. "Ce que nous venons de dire des meubles s'applique non seulement aux meubles corporels, mais aussi aux meubles incorporels ; il y a identité de raison."

The same author, at page 182, in describing such contracts as are made in one country to be carried into execution in another,

says, they are invalid in the latter, "lorsque le contrat est contraire aux bonnes mœurs, ou aux institutions et prohibitions existant dans le pays·où il doit recevoir son execution."

We have the authority of Merlin, that when the law of the domicil, and that of the situation, are in conflict with each other, if the question regards the disposition of property, the law of the place where it is situate is to govern. Merlin's Répert. Verbo, Statut.

The intervenors appear to place great reliance on the authority of Judge Story. They contend, that inasmuch as the general rule sanctioned by him is, that moveables follow the law of their owner, it follows that the law of Pennsylvania should determine the validity of the assignments.

Is such the opinion of that eminent jurist?

"In regard," he says, in his Conflict of Laws, (p. 357, § 423, b.) "to voluntary assignments for the benefit of creditors, which contain preferences, they must, (as has been already stated) as to their validity and operation, be governed by the *lex loci contractus*. If they are valid there, full operation will ordinarily be given to them in every other country where the matter may come into litigation or discussion. ·But it is a very different question, whether they shall be permitted to operate upon property locally situate in another country, whether moveable or immoveable, by whose laws such a conveyance would be treated as a fraud upon the unpreferred creditors."

From the manner in which he states the question, it is not difficult to perceive that, in his opinion, the assignments should not be permitted to operate on property so situated. He lays down the general principle of the common law, that the validity of contracts is to be decided by the law of the place of contract. He enumerates several exceptions to the general rule. One class comprehends those contracts which are opposed to the national policy and institutions. To illustrate this class of excepted contracts, he quotes the case of *Andrews* v. *His Creditors*. He considers, therefore, that according to that decision, the preferences given to particular creditors is inconsistent with the policy and institutions of this State. The inference naturally is, that this State should not lend its aid to enforce a contract having for its professed object to distribute the property contrary to the requirements of our own laws. See Story's Conflict of Laws, p. 214, § 159, a.

2. *The property attached was situated in this State at the time of the second and third assignments, and has remained here ever since.*

The evidence shows, that all the assets, with trifling exceptions, consist of debts which were created originally either in favor of

the Bank of the United States chartered by Congress, and inherited by the State Bank, or created in favor of the State Bank. The debtors to the bank all resided in Louisiana when the debts were contracted, and have continued to reside in this State ever since. The debts were all contracted in New Orleans, and most of them were made payable here.

Many of them are secured by mortgage upon real estate, situated in Louisiana. The debts were for loans of money, or rather of bank notes make by the bank to the debtors. The debts remained the property of the bank from the time they were created.

But the trustees invoke the benefit of the law of the domicil of the bank to protect the assignments. We think it is already shown that this is not the true law. But testing their right to recover upon the law which they invoke, the operations of the bank in this State will show, that this was the real domicil in relation to the property attached.

There is another point of view in which the assignment may be considered, and which affords a satisfactory answer to the ground taken, that the law of Pennsylvania governs as the law of the place of contract. These assignments were to be carried into execution within this State, and the exception applies as stated by this court, in the case of *Beirne & Burnside* v. *Patton*, above referred to.

The great object professed in the trust was, to collect the debts due to the bank, with the view of paying creditors according to the terms of the deeds. The collection of the debts attached in this suit, could only be made here, and in pursuance of our laws. The assignments as to the debts attached, were made with reference to Louisiana, and the laws of this State apply independently of the place where the debt may be supposed to be situated.

3. *The assignments are void, as to the attachment of the plaintiffs, for want of notice to the debtors, and because the bank was notoriously insolvent, when the assignments were executed.*

Debts due by persons in this State, can be transferred only in the manner prescribed for the transfer of incorporeal rights. The cession takes place as between vendor and purchaser, by delivery of the title, or evidence of debt. As to third persons the sale can only be complete by notice given to the debtor of the transfer, or by the acceptance of the transfer made by the debtor by authentic act. Civil Code, 2613. By article 3522, No. 23, of the Civil Code, it is declared, that " notice is the information given in writing of some act done." If this rule were applied it would require in every instance of notice given, that it should be in writing.

The notice to the debtor operates as a delivery of the property, as in case of sale of corporeal effects.   Troplong, Vente, vol. 2 p. 454, No. 882.

The rule appears to be, that the notice cannot operate the transfer of property to the prejudice of creditors, if such transfer be made in fraud of their rights.   " La signification opére la saisine à l'égard des tiers, *mais elle ne couvre pas la fraude*." 17 Touillier continued by Duvergier, p. 267, No. 214.

X. *The assignments of June and September are to be construed together, and if valid, form a voluntary assignment of the property of the bank within the meaning of the priority act of* 1797.

By the 5th section of the act of March 3, 1797, it is provided, that " where any revenue officer, or *other* person, hereafter becoming indebted to the United States, by bond or otherwise, *shall become insolvent*, the debt due the United States shall be first satisfied ; and the priority hereby established shall be deemed *to* extend, as well to cases in which a debtor, not having sufficient property to pay all his debts, shall make a *voluntary assignment thereof*, as to cases  in which an act of legal bankruptcy shall be committed."

This section has repeatedly been the subject of the decisions of the Supreme and Circuit courts of the United States and occasionally of the State courts.   See the case of *Beaston* v. *The Farmers Bank of Delaware*, 12 Peters, 134.   *United States* v. *State Bank of North Carolina*, 11 Wheaton, 392.   *United States* v. *Hooe et al.* 3 Cranch, 173.   *United States* v. *Mott*, 1 Paine, 195.   *United States* v. *Clark*, 1 ibid. 640.   *United States* v. *Shelton*, 1 Brockenbrough, 518.   *United States* v. *Marshal of North Carolina*, 2 Ibid. 489.   *Harrison* v. *Sterry*, 5 Cranch, 289.   *Downing* v. *Kintzing*, 2 Serg. & Rawle, 335.

The question, as to what assignments of the debtor are sufficient to let in the priority of the United States, has never been decided or alluded to by this Court.

The fifth section of the act of 1797 provides, that the priority shall attach whenever the debtor has committed " an act of legal bankruptcy."   There was, at the passage of this act, no bankrupt law in the United States.   It could hardly be supposed to refer to the various insolvent laws of the States.   Congress intended to refer to such acts as then constituted acts of legal bankruptcy in the country from which the States had been formed.   Unless the clause refers to the bankrupt system of England it is without any meaning whatever.

By the English bankrupt law, as it existed at the time the priority act of 1797 was passed, it was necessary that the assignment should be a general one of the debtor's property, to constitute

an act of bankruptcy. If the deed included part only of the property, so that enough remained to enable him to carry on his business, there was no act of bankruptcy. See 1 Cooke's Bankrupt Laws, 83. *Ex parte Scudamore*, 3 Vez. jun. 85. 1 Burr. R. 674.

In *Gayner's case*, (1 Burr. R. 478, and 1 Cooke's Bankrupt Laws, 86,) there was an assignment of all the debtor's effects, goods, stock in trade, and book debts, *except household goods, watches, plate, bills of exchange, inland bills, promissory notes, and cash then by him*. But the trustees declining to act, the debtor made a second deed, wherein a large parcel of ginger was excepted, as well as the other things excepted in the first deed. Lord Hardwicke decided, that the executing the deed was an act of bankruptcy.

" What assignment of part will or will not be fraudulent," says Cooke, ib. 87, " must depend upon the particular circumstances of the case; but a colorable exception of a small part of his estate or effects will not prevent the deed being declared fraudulent, for the law will never suffer an evasion to prevail, to take a case out of the general rule, which is so essential to justice. Therefore, in Gayner's case, the exception in the deed, of his household goods, watches, plate, bills of exchange, inland bills, promissory notes, and cash by him, and a large parcel of ginger, was considered as colorable, and not suffered to prevail."

In another case (see 1 Cooke's Bankrupt Law, 92,) Lord Mansfield said: "I take it to be clear law, that if *in contemplation of bankruptcy*, a man conveys to the fairest creditor that ever existed, it is not a fraudulent deed as between them; but *it tends to defeat the whole bankrupt laws*, and as such is held to be a fraud upon the rest of the creditors. It is equally clear, that though it be not a conveyance of the whole of his property, and that a part be omitted, yet, if it be made in contemplation of bankruptcy, it is a preference, and, as such, an act of bankruptcy."

From the 5th section of the act of 1797, above quoted, and the opinions above given, we are entitled to draw the following inferences:

1. The priority attaches equally whether the debtor be a natural person or a corporation.

2. It is not necessary that the assignment should be for the benefit of all the creditors.

3. The assignment must be a general one as contradistinguished from a partial assignment, but it is not essential that it transfer every particle of the debtor's property.

4. It is sufficient if the assignment transfer substantially the debtor's property, so that it disables him from carrying on his business or from paying his debts.

5. Or it is sufficient if the debtor assign that fund which should immediately, and by preference, have been applied to pay the debt due to the United States.

6. It is immaterial how many deeds are employed to effect a general assignment; the priority attaches to all the property so conveyed.

If these inferences are correct, it is difficult to perceive on what ground the right to the priority can be well contested in this case.

*T. Slidell*, for the appellants. In the discussion of the intervention of Bacon and his associates, two principal subjects of inquiry are presented :

*First.* Is their title valid against the United States, considered in the light of an ordinary attaching creditor ?

*Second.* Are the United States entitled to a priority of payment at the hands of the trustees, out of the funds conveyed by the assignment ?

*First.* Is the title of Bacon and his associates valid against the United States, considered in the light of an ordinary attaching creditor ?

" At common law," says Chief Justice Parsons, (in the case of *Stevens* v. *Bell*, 6 Mass. 342,) " every man might prefer any creditor, and might pledge his property and convey it in trust, so that no fraud resulted to others."

In the case of *Pearpoint* v. *Graham*, 4 Wash. C. C. Rep. 237, Justice Washington says, " One creditor may legally obtain a preference over the other creditors upon general principles of law."

In the case of *Wilt* v. *Franklin*, 1 Binney, 514, Chief Justice Tilghman says, " The statute of 13 Eliz. c. 5, the provisions of which go no further than the common law as now understood, never had in contemplation to invalidate a *fair* transaction. It was made to avoid fraudulent conveyances, intended for the purpose of defeating, hindering or delaying creditors of their just debts. There is nothing in the statute to hinder a man from giving a *preference* to any creditor he pleases, *before* or even *after* an action brought against him."

In the case of *Lippincott* v. *Baker*, 2 Binney, 186, Yeates, J., says, "Independently of the bankrupt laws, a debtor may prefer one set of creditors to another, and such a measure would be neither illegal nor immoral."

In the case of *Grover* v. *Wakeman*, 11 Wend. 194, Judge Sutherland uses the following emphatic language: "It is perfectly settled, both in England and in this country, that a debtor in failing circumstances has a right to prefer one creditor, or a

set of creditors, to another, in all cases not affected by the operation of a bankrupt system. He may assign the whole of his property, for the benefit of a single creditor, in exclusion of all others, or he may distribute it in unequal proportions, either among a part or the whole of his creditors. No matter how or upon what principle the distribution is made, if the debtor devotes the whole of his property to the payment of just debts; neither law nor equity inquires whether the objects of his preference are more or less meritorious than those for whom he has made no provision." He cites 3 Maule & Selw. 371. 4 Mason, 210. 5 T. R. 235. 6 id. 152. 8 id. 521. 4 East, 1. 1 Atk. R. 95, 154. 2 John. Ch. R. 283. 3 John. R. 71. 5 id. 385. 1 Binn. 502. 10 Mod. 489. 5 T. R. 424. 15 John. R. 583. 5 Cowen, 547.

The principle laid down in Binney has remained unchanged in Pennsylvania. Twenty years after the decision of that case, we find it still cited as authority, and the question is treated as not admitting discussion. "As to the right of a debtor on the point of insolvency to prefer one creditor to another, it cannot be doubted." 13 Serg. & R. 132. See also *Holbred* v. *Anderson*, 5 T. R. 235.

Nor can it be contended, that though an individual has a right so to prefer a portion of his creditors, a corporation has no such power. Such a position is unsustained by authority; on the contrary, the well settled doctrine in this country is, that in this respect, a body corporate stands upon the same footing as a natural person. See the case of *The State of Maryland* v. *The Bank of Maryland*, 6 Gill & John. 371, and of *Catlin* v. *Eagle Bank*, 6 Conn. 233. The last authority I shall cite on this point is the decision of the Supreme Court of the State of Pennsylvania, in the case of *Dana* v. *The Bank of the United States*. In this case, as in the present, a creditor of the bank attached the assignment, and sought to make the fund assigned applicable to his debt. The decision reiterates the principles and reasoning which are presented by the decisions already cited.

Here, then, is a decision of a Pennsylvania court on the laws of Pennsylvania. As such, this court will consider it as dissipating all doubts, and closing all inquiry; it has adopted and will adhere to the example of the Supreme Court of the United States, who, in speaking of the interpretation of State statutes, thus declares the rule in such cases: "This court has uniformly professed its disposition, in cases depending on the laws of a particular State, to adopt the construction which the courts of the State have given to those laws. This course is founded on the principle supposed to be universally recognized, that the judicial department of every government where such department exists, is the appropriate organ for construing the legislative acts of that

government. Thus, no court in the universe, which professed to be governed by principle, would, we presume, undertake to say, that the courts of Great Britain or of France, or of any other nation, had misunderstood their own statutes, and therefore erect itself into a tribunal which should correct such misunderstanding. We receive the construction given by the courts of the nation as the true sense of the law, and feel ourselves no more at liberty to depart from that construction than to depart from the words of the statute. On this principle, the construction given by this court, to the constitution and laws of the United States, is received by all as the true construction; and on the same principle, the construction given by the courts of the several States to the legislative acts of those States, is received as true, unless they come in conflict with the constitution, laws, or treaties of the United States. If, then, this question has been settled in Kentucky, we must suppose it to be rightly settled." *Elmendorf* v. *Taylor,* 10 Wheat. 159.

Apart, however, from all these decisions, this case might safely repose, so far as the question of capacity to assign is involved, upon the acts of the Legislature of Pennsylvania, passed in May, 1841. "That so much of any law or laws of this Commonwealth as requires security from trustees or assignees, or an inventory or appraisement of the property assigned or conveyed in trust, be and the same is hereby dispensed with in the case of any assignment or deed of trust, or other conveyance, made by the President, Directors and Company of the Bank of the United States, for securing the payment of any portion of its liabilities."—Act of May, 1841, sec. 19. Again, "Provided, That the said trustees or *any* trustees or assignees appointed for the payment, or securing the payment, of all or any portion of the debts of the said bank, shall receive in payment of debts due to the said bank, to them at par, the notes or other evidences of debt issued or created by said bank." The same provisions are found in the duplicate act of May, 1841.

Now, bearing in mind, that the assignment which the law authorizes the stockholders, if they so desire, to compel the directors to make, is described as a *general* assignment of *all* the real and personal property of the bank for the payment of *its debts,* and that the expression "the said trustees or *any* assignees," as well as the expression " *all or any portion of the debts,*" cannot possibly consist with the idea of one assignment only, and that too a general one, of *all* the property of the bank, for the protection of *all its debts,* we plainly and unequivocally deduce from this law a recognition of these two principles: first, that the directors had already in law the power to assign a portion of the property of the bank in trust for creditors; and, secondly, that they had in law the pow-

er so to assign in trust for the benefit of a portion of the creditors. The lawgiver thus furnishes a legislative interpretation of the existing law, and this interpretation fully harmonizes with all the decisions which we have cited, as to the capacity of bodies corporate.

And here it is proper to notice an objection raised under the acts of May, 1841.

It is said, that those acts of May, 1841, made the action of the stockholders necessary for the validity of assignments subsequent to their passage.

We may premise, that the stockholders, at their meeting on the 18th of May, 1841, two weeks after the passage of these laws, omitted to order a general assignment, and, on the contrary, did request and authorize the directors to exercise their own discretion as to the expediency, as well as to the time and manner of carrying into effect the resolution passed by them, at their meeting on the 4th of May, 1841, for pledging certain assets in trust for the payment of the circulation and deposits of the bank. In other words, they recommended a *partial* assignment to protect a *portion* of the debts. At the meeting of the stockholders in February, 1842, the stockholders by resolution declared, that the June and September assignments were made in pursuance of authority vested in them; were for the best interests of the bank, and are ratified and confirmed by the meeting. This resolution was passed by a vote of 204 against 109 of the persons present.

The resolutions of the stockholders, antecedent and subsequent to the execution of this assignment, might, if the honesty or the discretion of the directors were impugned, be invoked to establish both; but they were quite unnecessary, either originally to authorize, or subsequently to ratify, the action of the board.

That the directors, under the general principles of law, were competent, *per se*, and unaided by the stockholders, to make this assignment, has been already clearly shown ;—that by the acts of May, 1841, the directors were not shorn of this authority, is equally clear.

Before these statutes, the stockholders would have been incapable of compelling the directors to make a general assignment. "The management of the affairs of the corporation," was, as we have seen, vested by the charter in the board of directors. The stockholders could not directly control the board : they could only control them indirectly, by electing in their stead such a board as would conform to their views. This defect, or, at least, absence of power, the Legislature thought proper to remedy ; and accordingly declared, that if the stockholders should, at a meeting and by a vote designated, so express their will, the board should, in obedience to that will, execute a general assignment.

Again : before these statutes, in case the board should desire

to make an assignment of a portion of their means for the protection of any of their creditors, the trustees would, under the existing statutes, have been bound to file an inventory, and give security. This would have rendered the assignment, or rather its execution, practically impossible. The amounts involved would, from the nature of the case, have been very great, and the corresponding security so enormous, as to exceed the ability of the trustees.

Here, then, were two subjects to be provided for: to vest in the stockholders a capacity to compel a general assignment of all the property for the benefit of all the creditors, should they deem it expedient; and to dispense any trustees in any assignments that the board might think proper to make, from the formality of an inventory, and the impracticable requisition of security. Keeping in view these two points, the construction of the two acts, so far as concerns the present question, is easily intelligible.

The result is, to exonerate the assignees in every case, from the obligation to file an inventory and give security, and to enable the stockholders to compel a general assignment. Partial transfers, "for the payment of any portion of its liabilities," are left upon the same footing as they were before, except as to the question of inventory and security. Of the power to make such transfers, no one, who has considered the decisions already cited, could doubt. But if there had been doubt, it would be removed by these acts, which clearly recognize the authority, and by admitting them to be good, have the effect of giving to them validity, if legislative aid were necessary.

The plaintiffs say, the assignment of June is a partial one, merely to evade the law; that the September assignment was contemplated at that very time; that the latter is a general one, and the June assignment is to be taken with it; that it is part of it, separate in form but not in substance.

This position involves the propositions:

I. That the assignments taken together, conveyed all the property of the bank. This is not so, for the evidence shows that all the property was not conveyed. Although the portion left was but small, still something was left.

II. That a board of directors cannot assign all the property of a bank, without the assent of the stockholders; this proposition is repudiated, by the decisions in the cases already cited, of the *Maryland Bank*, 6 Gill & Johnson, 375, and of the *Bank of Arkansas;* both were assignments of all the property of the bank, and both were made by the directors without any concurrence of the stockholders.

III. That the statutes of May were framed for the purpose of forbidding a general assignment by the directors, alone; whereas,

we have shown, that the object of those statutes was to vest in the stockholders a power not heretofore possessed by them, to wit: the power of compelling the board of directors to execute a general assignment, if they, the stockholders, should think expedient.

Let us suppose, for a moment, these three propositions indisputable; difficulties still remain which are insurmountable.

To connect in law the June assignment with those of September, it is indispensable to establish that when one was executed the other was contemplated. Such was the rule recognized in Downing's case, upon which the plaintiffs rely.

In the case before you, not only is no such *contemplation* and *intention* proved, but there is positive testimony to the contrary, by the plaintiffs' own witness:

*Fault has been found with the nomination of the trustees, who are not themselves creditors, without the intervention of the creditors whose interests were entrusted to them.*

This objection is unsustained by authority. The same point was made in the case of *Wilt* v. *Franklin*, 1 Binney, 516. Tilghman, Chief Justice, remarks, "Although it is most prudent and proper to consult the creditors as to the choice of a trustee, when it can be done without great inconvenience, yet when there is no bankrupt law existing, (which is our present situation,) I know of no law which forbids the debtor to make the choice himself. See Wharton's Dig. title " Debtor and Creditor."

*It is objected that there is no schedule of creditors.*

Now this objection must be weighed according to the circumstances of the particular case. This assignment provides rateably for numerous creditors, whom we may arrange under two classes. The depositors form one of these. The holders of the notes of the Congressional bank, and of the notes and post-notes of the Pennsylvania bank, form the other class. The names of the depositors could have been given, but this would have been but an imperfect schedule. Not so the other class, namely, the holders of the notes and post-notes. To give the names of this class of creditors was an utter impossibility, from the very nature of the case. Many cases might be put, where the withholding of the names of creditors would afford ground for just suspicion.

But on this score every assignment must be judged by its attendant circumstances. In no case, as we shall find from the authorities, does the absence of a schedule create a positive presumption of fraud. It is at most a mere *indicium*, weak or strong, according to the attendant circumstances. See the cases of *Pearpoint* v. *Graham*, 4 Wash. C. C. Rep. 337. *Stevens* v. *Bell*, 6 Mass. 434. *Wilt* v. *Franklin*, 1 Binn. 502. *Lippincott* v. *Barker*, 2 Binn. 189; and see 4 Mason, 219. 17 Serg. & Rawle, 232.

But this objection of the want of a schedule of creditors is urged in another point of view. How, it is asked, can a creditor under the trust, without a knowledge of his associate creditors, compel a dividend? or, how can a creditor of the Bank, not protected by the trust, have an ascertainment of the surplus, and a decree for satisfaction of his debt from the surplus?

Let it be observed in the outset, that it is made the duty of the trustees, from time to time, as often as they have sufficient moneys on hand, to make dividends.—Now the first step towards the accomplishment of this object is, to realize funds. To attain this, the law implies the duty of reasonable diligence and skill; the deed itself expressly imposes it. Suppose the trustees neglect this duty thus doubly imposed by the implication of law, and by their own express contract, what is the remedy? The Court of Common Pleas is invested by the laws of Pennsylvania, with jurisdiction over trustees for the benefit of creditors, and on the application of any person interested, such court may cite the trustees to exhibit an account under oath. Sect. 7, act of 1836. And by sect. 11, whenever it shall be made to appear [and by the clear analogy of the previous section, this may be made to appear by *any person interested*] to a Court of Common Pleas, that a trustee is neglecting or mismanaging the trust estate, such court may issue a citation to such trustee, and may, if the misconduct or neglect is established, dismiss the trustee from office, and by the 23d section, may appoint another in his stead.

It appears also, by the case of *Ingraham* v. *Coxe*, 1 Ashmead, 38, that the Court of Common Pleas has power to make an order requiring the assignees in a voluntary assignment for the benefit of creditors, to produce and submit to the inspection of a creditor, any books, papers or documents, which are in their possession, and which come to them from the assignor.

But, suppose that the first step, the collection of funds, is accomplished; what recourse has a creditor then? By the 7th section, already quoted, any person interested may cite the trustee to file an account. The creditor is not bound to obtain the aid of his co-creditors. But when the account is thus forced from the trustees, how is a distribution to be compelled? The deed of trust requires, that the trustees should give notice of the intention to make a dividend, and restricts this dividend to those who have proved their claims. The names of those who are to participate in this dividend are thus ascertained. If the trustee has neglected to give this notice, the Court of Common Pleas can compel him to do so. It can, in fact, make the publication itself. By the 9th section of the same law, the court may order publication by its prothonotary, either by a general order,

or *by such order as the circumstances of the particular case may require ;* and by the 28th section of the same law, it is declared, " that it shall be lawful for the court having jurisdiction as aforesaid, to make such orders and decrees, from time to time, for carrying into effect any trusts as aforesaid, either for distribution of moneys in the hands of assignees or trustees for the benefit of creditors, or for the payment or transfer of funds or effects in the hands of other trustees, or otherwise, as shall be according to law or the terms or intent of the trust." Besides all this, when the dividend is ascertained, a direct action for his dividend lies by the creditor, against the trustee. 14 Serg. & Rawle, 226; 4 Wheat. 210. With what reason, then, can it be said, that, in order to compel a dividend, a creditor would be driven to the intolerable labor of first discovering and then citing the whole of the bill holders and depositors ?

Again, as to a creditor, who seeks to have the surplus ascertained, so as to make it available in satisfaction of his debt. The *residuum,* after the satisfaction of the trust creditors, is the assigning debtors' property. Against this, a creditor of the assignor has a double remedy. This interest may be sold, in Pennsylvania, under execution. It is true, that on execution, one could not seize the property assigned. This would be a violation of the ownership of the assignee, and of the rights of the *cestuis que trust.* These the assignor could not disturb ; nor could his creditor, the plaintiff in execution claiming under him, disturb them. But the residuary interest could be sold, subject to the trusts. The law of Pennsylvania, in this point, goes as far as our own. See 3 Watts, 259. Watts on Sheriff, 181. Tidd's Practice, 1042.

This, however, is not the only remedy. The law of 1836 gives the right of citation to " any person interested," the terms of the law are of the most general character, and cannot be restricted to those who are creditors under the assignment. A creditor therefore, desiring to avail himself of the residuary interest, might compel the trustees, by the same proceedings as we have indicated in the case of a creditor under the trust, to settle the trust, and could cover the *residuum* in the trustee's hands by a process of garnishment. For under the Pennsylvania laws, as under our own, the debtor's property, in this case the *residuum,* may be garnisheed in the hands of a third person.

The objection that the *cestuis que trust* are necessary parties, and that they must all be sought and brought before the court, is untenable. None but those who have come forward and proved their claims could, under the express terms of the deed, be entitled to any dividend ; besides, the assignee, in a contest with one not a party to the trust, is regarded, like a syndic under our

laws, as the representative of the creditors.    This point was decided in the case of *Irwin* v. *Keen*, 3 Wharton's Reports, 355.

That the May trust contained a schedule of creditors, and the June trust did not, is entirely attributable to the different circumstances of the two cases.  In the one, the creditors were very few and were known :  in the other, they were very numerous and unknown.

Another objection raised is, *that no time is limited in the deed for the settling of the trusts, or for the notice to creditors to come in.*

It is conceded, that if a debtor should assign his property with a restriction that it should not be disposed of, nor its proceeds distributed till a given time, and that time should be a distant and *unreasonable* one, the restriction might operate the nullity of the deed.   But in this deed there is no such restriction—it requires of the trustees reasonable judgment and skill, it directs the sale of the property and the collection of the debts, and commands them, from to time, as often as they shall have moneys of sufficient amount on hand, to distribute them.   The assignors well knew, that in the management of so large an estate, in the collection of a vast amount of debts, scattered over the whole Union, and in the bringing forward of the many millions of claims, much labor would be necessary, much delay unavoidable ; but how much could not be defined by anticipation.   These things were entrusted to the trustees, and in assuming the task thus confided to them, they bound themselves to reasonable diligence and the exercise of a fair and reasonable discretion.   The omission of either would be a violation of duty, which would render them personally responsible to creditors, and amenable, under the statute, to dismissal by the proper tribunal.

" When *no* time is fixed for the grantees to apply the proceeds and render an account, the law requires them to execute the trust in a *reasonable* time." 6 Mass. 343.    So Yeates, J. in *Wilt* v. *Franklin*, 1 Binney, 521, says ; " It has been insisted that no time has been limited, within which the execution of the trust should be completed.   Where the estate of a person, who has failed in trade, is scattered and dispersed in different places, it is next to an impossibility to fix a period of time, within which all his accounts can reasonably be expected to be adjusted ; and in the cases of debtors discharged under the insolvent acts, no period is ever fixed, within which the assignees shall close their trusts."

The law of Pennsylvania on this subject stands on the same footing as our own in the case of syndics.   A syndic is not bound by any given time of settlement.   He must collect with reasonable diligence, and distribute with reasonable dispatch.    For the

omission of either, he is personably responsible, and subject to dismissal.

The case of *Grover* v. *Wakeman*, a decision made in New York, (4 Paige, 40,) has been cited by the plaintiffs. Even if this decision did go to the extent claimed by the plaintiffs, it could not, in the discussion of a Pennsylvania assignment, overrule a decision of the Supreme Court of Pennsylvania. In the case of *Grover* v. *Wakeman*, the assignors " excluded a certain portion of their creditors from any participation in the assigned property, unless such creditors will consent to come in and take their share of the surplus, after paying the preferred creditors, and will *discharge the assignors from all further liability whether their debts are paid or not.*" The case seems to have turned on the point of the coercion of a release, under peculiar stipulations as to the time and manner of it. This is the only point of avoidance stated by the reporter; and when this case went afterwards, by appeal, before the Court of Errors, it was expressly avoided on that ground.

The opinion of Judge Washington, in the case of *Pearpoint* v. *Graham*, 4 Wash. C. C. Rep. 235, is clearly referable to the case where a release is stipulated, and cannot, with any justice, be applied to the present deed.

Another case cited upon this point, by the plaintiffs, is the case of *Hyslop* v. *Clarke*, 14 Johnson's Reports, 458. The facts were as follows : The assignment was made by Barnet & Henry in trust ; *first*, to satisfy a debt due to Hyslop & Co.; *second*, to pay all other creditors, proportionally, on condition of their executing releases of their respective demands ; and in case the creditors, *or any of them*, shall refuse to give such releases, then, it is declared, that the last mentioned trust shall cease and determine, and the trustees are required and directed not to execute it, &c.

In the case of *Austin* v. *Bell*, 20 Johnson, 442, cited by the plaintiffs, there was a stipulation by the assignor for a certain sum for the support of himself and family, for a limited time, and for paying the expenses of suits against the assignor, and also a stipulation that any creditor who should refuse *a release*, should be excluded from the benefit of the assignment, and his share should be paid by the trustees to the assignor himself.

In the case of *Graves* v. *Roy*, 13 La. 458, also cited by the plaintiffs, the trust was to accrue to the benefit of those creditors only, who should release, and the whole property of the debtor was not assigned.

In all the cases on this subject, the intent is sought for, and its honesty or dishonesty is gathered from the attendant circum-

stances, and from the practical operation that the deed, fairly and reasonably considered, might be expected to result in.

The court will, therefore, discard the objection, that no time is limited for the final settlement of the trust, or fixed for the call upon creditors, unless they are clearly convinced, upon a candid consideration of all the circumstances, that the omission was not reasonable and expedient; but, on the contrary, a fraudulent contrivance to delay and defraud the creditors of the bank.

Another objection is based upon *the requisition of proof by the cestuis que trust.*

Now, it will be observed, that the deed does not designate what sort of proof shall be required, and we therefore must consider it as requiring *reasonable* proof. Is there anything onerous or unjust in this? An individual comes forward and professes to be a claimant under the deed for a hundred dollars; is it not just that he should produce the bank notes on which his claim is based, and submit them to the inspection of the trustees, that they may know whether his claim is genuine?

Is it not just, when the party comes forward to take his dividend, that the dividend should be endorsed on the notes?

Suppose the deed had contained no requisition at all upon this subject, certainly, as prudent and honest men, the trustees would have been bound to inquire into the claimant's right, and demand the production and inspection of the evidence of the debt. So, as to deposits; though the trustee might know and was bound to recognize a debt on deposit account, yet, if an executor or an assignee of the depositor claimed a dividend, would there be any hardship in requiring the production of the instrument of assignment, or of the letters testamentary? If the trustees reject proof, reasonable according to the circumstances of the case, they reject it, not under the sanction of the deed, but in violation of it; and a clear, judicial remedy lies in favor of the rejected creditor in the proper tribunal, and under the comprehensive legislation already referred to.

In the case of *Halsey* v. *Whitney*, 4 Mason, 222, there was a requisition, that all persons not named in the schedules should make oath, before a suitable magistrate, of the truth and justice of their claims, if thereto required by the trustee. Justice Story observes of this clause, " It was a useful precaution, not in fraud, but in favor of real creditors." In the case of *Stevenson's Assignees*, 7 Wharton, 480, it was held, that an assignee, under a voluntary assignment for the benefit of creditors, ought not to pay a claim against the assignor without proof, although it is specified in the assignment as an existing debt.

The court will also perceive, that though a creditor neglect to bring in his claim before the declaration of the first dividend, he

is not thereby excluded from the trust. An opportunity is still left to him previous to each subsequent dividend, with the very proper and equitable right of receiving, in addition to the dividend proposed, such an amount as shall be equal to the previous dividends, which, by his inadvertence or misfortune, he had not enjoyed.

And here it may be as well to notice the subject of the reservation by the bank, of the residuary interest; in other words, the covenant by the trustees to re-convey, when the trust is settled and closed.

Such a residuary interest necessarily arises in every case where property is assigned to pay debts, or to satisfy other specified objects; but unless the assignment be merely colorable, and made for the sake of the resulting trust, it is not void.

In the case of *Lippincott* v. *Baker*, already cited, the deed was held valid, though it reserved the overplus to the assignor. So also, in the case of the May assignment made by the defendants, the Supreme Court of Pennsylvania, says; "If no provision of the kind had been inserted in the deed, the law, by its operation, would have given and secured to the bank any such surplus. It would, therefore, be singularly strange, that an express provision, in exact accordance with what the law would have done without it, should be made a fatal objection to the validity of the deed."

Again; it is said, *that though the assignment be valid, it is unavailing against an attaching creditor, where the creditors are neither parties to the assignment in its inception, nor have subsequently signified their assent and acceptance, prior to the attachment.* This doctrine certainly finds support in numerous decisions in the courts of Massachusetts. But those decisions spring from the local law.

In Massachusetts, the courts do not possess equity powers. The *cestui que trust*, not a party to the deed and its covenants, has no remedy against the trustees at common law; and if there is no equitable jurisdiction to which he may apply, his rights under the deed are a naked moral right, and not a legal one. If then, the *cestui que trust* has acquired no right recognized by the law, there is no one really interested in the assigned property but the assignor himself; and the law of Massachusetts treats him in such a case, and as regards an attaching creditor, as still the real proprietor, and subjects the property accordingly.

"A debtor," says Chief Justice Parsons, "might, at common law, prefer any creditor, and might pledge his property and convey it in trust, &c.; but, in consequence of our statutes authorizing attachments, and of our want of a chancery jurisdiction, it has been several times settled, that a debtor cannot convey his estate in trust for his creditors generally, without their consent

given to such conveyance; but to creditors consenting, and parties to the conveyance, he may grant all his estate for the payment of their debts, or to secure them indemnities, if thereby he exercise only his right of preference, and do not defraud others. But when the conveyance is in trust for all the creditors generally, without their consent, a creditor is not bound, but may proceed by attachment; for, being no party to the conveyance in trust, he can have no remedy upon it at law, and there is no equitable jurisdiction to which he may apply."

To this purport are the Massachusetts decisions; and there, if they have assented, and have become parties, they are protected; but until then, the attaching creditor may step in. This subject is well explained in 11 Wendell, 249, in the case of *Cunningham* v. *Freeborn.*

" Neither is it now necessary for a *creditor* to be a party to, or to assent to such a conveyance to give effect to it, as has been held by some authorities; for it was so held only on the ground of supplying a consideration to support the deed." Roberts on Fraudulent Conv. 429, and cases there cited.

It has been held in Massachusetts, that all the creditors must assent, or be parties to the assignment, in order to give it validity; and that attachments levied before such assent bound the property. 5 Mass. 144. 6 Id. 339. 6 Pick. 350.

But it will be seen, on looking into the earlier cases there, upon this point, that the chief ground of such determination was, the want of a court of equity to enforce the execution of the trust, in behalf of the creditors and a doubt, or at least difficulty, as to the remedy at law.

Chief Justice Parsons, in *Widgery* v. *Haskell,* 5 Mass. 144, after an examination of the question, says; "It is, therefore, our opinion, that the policy of the law providing for attachments, and not providing any remedy in equity against the trustees, prohibits the establishment of a trust estate by an insolvent debtor for the benefit of his creditors not parties to it."

It is clear, both in England and in this State, that the assent of the creditors is not essential to give effect to these assignments. Roberts on Fraud. Conv. 434, 435. 4 Johns. Ch. Rep. 529, and and cases there cited.

" If the conveyance of the property is directly to the creditors, then, no doubt, it is material to show their assent to it, as it requires the agreement of two parties to make a contract; but where it is made to a trustee, for the benefit of creditors, the legal estate or title to the property may pass to him, without their assent, so as to prevent a judgment creditor from acquiring a lien, if real, by his judgment, or if personal, by his execution, unless upon the ground of fraud. There is no defect of legal title in

the assignee or trustee, and a court of equity will then enforce the execution of the trust. 2 Johns. Ch. R. 307, 308. 4 Id. 529. 6 Ves. 662. 18 Id. 99."

The case of *Brooks* v. *Marbury*, 11 Wheat. 78, is strongly in point. Ch. J. Marshall there says; (p. 97) " Deeds of trust are often made for the benefit of persons who are absent, and even for persons who are not in being. Whether they are for the payment of money, or for any other purpose, no expression of the assent of the persons for whose benefit they are made has ever been required, as preliminary to the vesting of the real estate in the trustee. Such trusts have always been executed in the idea that the deed was complete when executed by the parties to it."

In *Nicoll* v. *Mumford*, 4 Johns. Ch. Rep. 529, Kent, Chancellor, says; " The fact of the assent of the creditors to the assignment, prior to the taking possession of the property by the defendant, may make the case more impressive, but I do not consider any express avowal of that assent as necessary to the operation of the assignment.

" If the assignment was directly to the creditors, their assent would be necessary to give validity in law to the deed. But if the assignment (as in this case) be to trustees, for their use, the legal estate passes and vests in the trustees, and chancery will compel the execution of the trust, for the benefit of the creditors, although they be not, at the time, assenting and parties to the conveyance."

A reasonable distinction is found in the books, between those cases where some onerous condition is coupled with the benefit, as for instance, when a release of the debtor is stipulated, and those where the assignment is purely beneficial. In the latter cases the law presumes the assent.

Much stress has been laid by the plaintiffs upon the fact, that after the execution of the June trust, the creditors of the bank still instituted suits, and were pressing them to judgment. What does this prove? Not that they rejected the security already given; but that, being completely unrestrained by the June deed, as to the other property, they sought additional security by obtaining the liens of judgments and executions against the assets unassigned.

If, besides this, they had attempted to levy on the property assigned to the June trustees, or had taken any other steps to invalidate or disturb the June assignment, then a case of rejection would have been made out, and the implied acceptance of the *cestuis que trust* would have been, *pro tanto*, rebutted. But we have no such evidence, and in its absence, the court may well infer, that these judgment creditors have, with the exception of those who have sought this forum, acquiesced in the assignment.

Again ; it is objected, that the trusts are void, *because made with the intent to prevent the sacrifice* of the property of the bank.

In support of this assertion, the plaintiffs rely, among other things, upon the resolution of the 23d April, 1841, based upon the report of the committee of conference.

Let it be observed, that it was upon that very report and resolution for the reasons there assigned, and upon the authority then granted, that the May assignment was executed ; and that very assignment, though made in favor of the banks, was made in their favor as holders of post-notes; the same class of obligations as is protected by the June assignment.

Moreover, it is evident, that the only reason why the June assignment was not more speedily executed, was the necessity of legislative action on the subject of security. Its details, as we have seen, were entrusted to the same committee as was charged with the assignment for the banks. The above reason is distinctly stated in the report to the meeting of stockholders, held on the 4th May, 1841. They say, that for want of legislative action to grant power for creating the trust, without the securities now required by law, they have not yet succeeded in complying with the wishes of the stockholders, in reference to the circulation and deposits.

The May assignment was attacked in Pennsylvania, but was sustained by the Supreme Court of Pennsylvania. How, so far as the present objection is concerned, could the Pennsylvania court—how can this court—distinguish the June from the May assignment? Compelled by the same importunities ; prompted by the same motives; recommended by the same report; authorized by the same resolution, and consummated at a brief interval shall the one stand and the other fall?

Having thus endeavored to show, that this assignment is valid, and passes a good and effective title to this property, according to the laws of Pennsylvania, we now proceed to the consideration of the question, *what effect it should have in the State of Louisiana.*

The plaintiffs contend, that the laws of Louisiana consider the property of the debtor the common pledge of all his creditors; that a person in insolvent circumstances cannot, by the laws of Louisiana, give a preference ; that the property here in controversy, and which was transferred by this assignment for the benefit, not of all the creditors of the bank, but of a portion only, consists of debts due by residents of Louisiana ; that these debts are property situate here ; and that, under these combined circumstances, our courts should refuse to recognize the validity of the assignment.

The general principle, that the validity of a contract is to be determined by the law of the place where the contract is made, is

too well settled to require argument. It is not only recognized by our code, which declares that the form and *effect* of public and private written instruments are governed by the laws and usages of the places where they are passed, but is consecrated by the law of nations and the general assent of the civilized world. See 8 Mart. 134. 11 Mart. 731. 12 Mart. 481. 6 Ib. N. S. 77. 6 La. 616. 4 Mart. N. S. 1.

But this general rule is subject to certain modifications and exceptions, according to the nature of the subject of the contract.

Thus, the validity of a contract made in one country, with regard to real estate lying in a foreign country, is determinable by the law of the country where the land lies.

But with regard to moveables, the general doctrine is different. These, in contemplation of law, follow the person of the proprietor. *Mobilia sequuntur personam.*

The general doctrine is consecrated by the almost unanimous opinion of all the great lights of international jurisprudence. Fœlix has taken the trouble, in his treatise on the conflict of laws, to collect their names : " *Tel a toujours été le sentiment presque unanime des auteurs et des cours de justice. Témoins,* Dumoulin, Chopin, Bretonnier, d'Argentrée, Brodeau, Lebrun, Poullain du Parc, Burgundus, Rodenburg, Abraham à Wesel, Paul Voet, Jean Voet, Sande, Christin, Gail, Carpzov, Wernher, Mevius, Franzke, Boullenois, Pothier, Struve, Leyser, Huber, Hert, Hommel, Danz, Glück, Thibaut, Merlin, MM. Mittermaier, Hauss, Meier, Favard, Duranton, Story, Wheaton, Rocca, *et* Burge."

Our code expressly recognizes this principle in the case of wills made in a foreign country by a party domiciled there, whereby the testator disposes of moveables situated in this State, and gives the will effect, even though the distribution it should order be contrary to our laws. Civil Code, art. 10. Thus, a father domiciled in England, in distributing moveables existing in Louisiana, could entirely cut off his child from any participation in them ; though, had he been domiciled here, he would have been obliged to leave him one-third of them. Such, too, is the law of Pennsylvania, where the common law of England prevails. " Personal property," says Lord Loughborough, " has no visible locality ; but it is subject to that law, which governs the person of the owner, both with respect to the disposition of it, and with respect to the transmission of it, either by succession or *by the act of the party.* It follows the law of the person. The owner, in any country, may dispose of his personal property. If he does, it is not the law of the country where the property is, but the law of the country of which he was a subject, that will regulate the succession. This," says he, " is not only the law of England, but of every country in the world where law has the sem-

blance of science." "This part of the *lex gentium*," says Chief Justice Tilghman, in 1 Binney, 347, "is founded on the mutual courtesy of independent governments, looking forward to the common advantages and good harmony of civilized nations."

But what are the modifications to this general rule, that *moveables follow the person?*

. Several cases are to be found in our Reports, where the moveable was situated in Louisiana, at the time of the contract, and something necessary under our law for the *consummation* of the contract *as against third persons*, had not been done before the rights of third persons intervened. Thus, let us suppose that, by the law of the owner's domicil, a sale of goods is complete and perfect to pass the title, without any delivery. By the law of Louisiana, a sale is not complete against third persons without delivery. This court, then, has held in the case of corporeal moveables *actually here, that the contract was incomplete as against third persons, without delivery*, and did not bar an attaching creditor. *Olivier* v. *Tennes*, 2 Mart. N. S. 93. So, too, it has been held, that, inasmuch as by our law, notice of an assignment of a debt is necessary to consummate the assignment as against third persons, a debt due by a debtor in Louisiana, to a person residing abroad, is subject to attachment, if notice of the assignment has not reached the debtor. Let it also be remembered, that notice, in case of the assignment of a debt, is not of the essence and substance of the contract; nor is it even necessary, as between the parties, to operate the delivery, or in other words, the performance of the contract. "The delivery takes place between the transferror and transferree, by the delivery of the title." *Civil Code*, art. 2612. The notice is a formality prescribed for the protection of the debtor and of third persons.,

None of the earlier decisions of this court attempt to impugn the validity of the contract itself, where it was good and valid under the law of the foreign State where the contract was made. Cases have occurred, where they have considered the laws of the foreign State, to ascertain whether, under those laws, the title was good or bad; but if good there, the contract has not been disturbed here, except in the two classes of cases above stated, where, by our law, something was essential to consummate the contract, as against third persons. Where the contract wanted nothing under our law, for its completion as against third persons, they have sustained the contract, though tainted in its consideration between the parties, with what, under our system, would have been a fraud and a ground of nullity. This position is unequivocally supported by the case of *Thuret* v. *Jenkins*, 7 Mart. 318.

Under the authority of this and the earlier cases decided by

this court, and of the principle, *mobilia sequuntur personam*, we feel justified in saying, that if this assignment had transferred merchandize or other corporeal moveables, situate at the time in Louisiana, and delivered to the assignees before attachment, the transfer being valid under the laws of Pennsylvania, where it was made, would be held effectual here, provided the delivery was complete before attachment. But the present case is stronger ; for the assigned property, with some trifling exceptions, was in Philadelphia at the date of the assignment, and was there delivered to the assignees.

But it is objected, that it consisted almost entirely of promissory notes ; that these notes were merely evidences of debt ; that these debts were due by citizens and residents of Louisiana, and that a debt is to be considered as located at the domicil of the debtor.

Some of these notes were unmatured, and in such case it cannot be contended, that, for the purposes of transfer, the title and property in the debt is separable from the note. In the case of a negotiable note, the debt passes by the transfer of the note to the endorsee absolutely, and without any necessity whatever, under our law, of notice of the transfer to the debtor.

Conceding, however, for the purposes of argument, with regard to that portion of the notes which had matured, that the notes were the mere evidences of debt, and waiving for a moment that provision of our law, which attaches such importance to the title as to constitute the giving of the title the delivery, let us consider the question as though this had been a mere assignment of debts due to the Bank of the United States by debtors in Louisiana, not evidenced by any written instruments.

Where in contemplation of law, is a debt considered as situated ?

A debt must be considered in a double sense, or, as the civilians say, actively and passively ; there being two parties concerned, the debtor and the creditor. There is on the one hand, the *liability* of the debtor, on the other the *ownership* of the creditor. For all then that concerns the *remedy*, we may and indeed must necessarily look to the forum of the debtor. The remedy accompanies liability. But, on the contrary, as the ownership of the incorporeal thing called *a debt*, is with the creditor, the conclusion follows naturally, that what concerns a transfer or mutation of this ownership, should be tested by the law of the creditor's domicil. The nature of a debt, then, being considered, and the distinction being kept in view, of the liability which draws to itself the remedy, and of the ownership which draws to itself the control and disposition, common sense at once recognizes the correctness of the well established doctrine fixing the *situs* of the debt with the creditor. That such is now the received opinion no one can doubt.

Burgundus says: "Nomina et actiones loco non circumscribuntur, quia sunt incorporales; tamen et ibi per fictionem esse intelliguntur ubi creditor habet domicilium." Dumoulin is to the same effect: "Nomina et jura, et quæcunque incorporalia, non circumscribuntur loco; et sic non opus est accedere ad certum locum. Tum si hæc jura alicubi esse censerentur, non reputarentur esse in re pro illis hypotheca nec in debitoris persona, sed magis in persona creditoris, in quo active resident, et ejus ossibus inhærent." Casaregis says: "Debitorum nomina tanquam personæ coherentia, debent regulari secundum statuta loci, cui creditor est subjectus."

To the same effect is the case of *Grier* v. *O'Daniel*, reported in a note in 1 Binney, 349. So Lord Kaimes, considering a debt as a subject belonging to the creditor, says, the natural fiction would be, if any were admissible, to place it with the creditor as in his possession.

Thus, then, in the case of a debt not evidenced by a written instrument, the law would place its *situs* with the creditor. With what color of reason, then, can we refuse to assign the same *situs* to the debt when it is so evidenced, and the evidence is in the creditor's possession?

But it is said, that the assignees can derive no benefit from the transfer, without resorting to this forum to coerce payment, and when they come here, their title must be tried by our laws. We answer, that the law of the forum controls nothing but the remedy against the debtor. It operates only upon the liability of the debtor, and cannot touch the title of the creditor. The debtor may plead prescription, if by the law of the forum it has accrued; he may arrest the creditor's pursuit, by a *cessio bonorum;* he may claim exemption from imprisonment. But he cannot dispute a title of ownership, valid by that law by which it was acquired.

But may not others, who are creditors of the insolvent assignor, attach the debt, when the assignee comes here to prosecute it? Our law forbids preferences, stamps them with fraud, and gives to the creditor of the insolvent debtor a right to rescind them. But on what is the action of recision based? It is based upon a vice inherent in the substance of the contract. But in this contract there was no such inherent vice. The law of Pennsylvania, where the contract of assignment was made, knows no such vice. Our law, then, cannot disturb it. Take the case of an action of lesion, which, like the action to rescind a preference, has its root and basis in the contract itself. "Lorsque la loi du contrat accorde à l'acheteur, comme au vendeur, le droit de faire rescinder la vente pour cause de lesion, l'action de l'acheteur devra être accueillie en France, non obstant l'art. 1683 du code civil, (la rescision pour lesion n'a pas lieu en faveur de l'acheteur.)" Fœlix, Droit Internal, p. 151.

But, says the same author, in the same paragraph : " Le juge ne pourra admettre d'autres causes que celles autorisées par la loi du lieu du contrat, et il devra les admettre si elles sont fondées dans cette loi." Ibid.

But the *lex loci contractus*, say they, does not apply where the contract is to be *executed* in another country. " L'effet des actes passés pour être executés dans un autre pays, se régle par les lois du pays où ils ont leur exécution." What is the meaning of the expression, " to be executed in another country ?" It is where the thing contracted to be done or given is to be done or given, not at the place of contract, but in a foreign country. Fœlix, p. 135.

The contract in question was not only made in Pennsylvania, but it was closed and consummated there. If it were true that under our law, notice to the debtors was necessary, yet that, as we have shown, was not a part of the contract—the contract was complete between the parties without it. It was merely a formality requisite for the protection of the assignee against third persons.

But even if this be a case in which the comity of nations is to be disregarded, and the law of Pennsylvania must succumb to that of Louisiana, let us inquire, *what our law is*, and *what creditors can avail themselves of it ?*

The revocatory action, in case of preferences, is given by the art. 1965 of the Civil Code. " The law gives to every creditor, *when there is no cession of goods, as well as to the representative of all the creditors,* when there is any cession or other proceedings by which they are collectively represented, an action to annul any contract made in fraud of their rights." " Every contract shall be deemed to have been made in fraud of creditors, when the obligee knew that the obligor was in insolvent circumstances ; and when such contract gives to the obligee, if he be a creditor, any advantage over other creditors of the obligor." Art. 1799. Is *a corporation* to be included under this rule ?

There is no insolvent law in this State for corporations. A corporation, then, whether domestic or foreign, was utterly incapable of making, in this State, a *cessio bonorum* for the general benefit of its creditors, or of being coerced into legal insolvency by the proceeding of *forced surrender*. Considering, then, the purpose of the lawgiver, the limited nature of the existing insolvent laws, and the reference to them embodied in the text, we may well doubt the applicability of the code to the case of a body corporate.

If, at the time when the Bank of the United States made this assignment, the creditor who now attacks it, having originally contracted with the bank in Louisiana, was still a citizen and a

resident of Louisiana, there might be found, in the natural duty
of the sovereign to protect his own citizens, a plausible pretext
to disregard an assignment injurious to that citizen's rights, if
ever the assigned property came within her borders and the grasp
of her courts of justice.　But such is not the case here.　The
creditor who invokes her aid, is not her citizen ; the debt on
which his attachment is based was contracted in Pennsylvania,
with a debtor then and now domiciled in Pennsylvania.　The
attachment is levied here, after this debtor, under the sanction of
the laws of Pennsylvania, which also presided over the original
contract, has made a disposition of his property which Pennsylva-
nia deems just and meritorious.

　　The case of *Beirne & Burnside* v. *Patton*, 17 La. 591,
has been cited by the plaintiffs.　In this case, the property had
been shipped to a New Orleans house before the execution
of the assignment, and is described as so shipped on the deed ;
and although it did not clearly appear from the evidence, that it
was in New Orleans at the date of the deed, yet the court, in its
opinion, says it should conclude that it was here at the date of
the deed.　The plaintiffs were *citizens of Louisiana*, and doing
business in Louisiana, and the notes sued on *were executed and
payable here*.　Observe how the reasoning of the court points to
these circumstances : " Supposing, as it is asserted, that this con-
tract is perfectly valid in Tennessee, and binding on the *creditors
and property there*, it does not follow that it is to be received and
enforced in this State, to *the injury of creditors who are our own
citizens*."　In this case, moreover, the court doubts the validity
of the deed, under the laws of the country where it was made ;
for the assignment did "not purport to convey all the property
of the defendants, although they profess to make the transfer for
the discharge of all their debts."　There was a stipulation for re-
lease, while some property of the assignor was withheld ; the
same objectionable feature which overthrew the assignment in
Roy's case, to which the court expressly refers.　So, too, in the
Massachusetts case, which the court invokes, there was a stipula-
tion for release ; four months only were allowed for the creditors
to come in under it ; the trustees were consequently considered
as the agents of the assignor till the creditors signed the release ;
and the attacking creditor was a citizen of Massachusetts.　" It
does not follow," said the Massachusetts court, " that it is to be
received here, to the prejudice of *creditors who are our own citi-
zens*.　It is not required by the comity of nations."　The court,
too, doubted, in that case, whether the assignment was valid even
in Pennsylvania.　The law of Pennsylvania was not in evidence,
and the case of *Wilt* v. *Franklin*, 1 Binney, which was the only

case cited by the assignee's counsel, was not considered as sustaining the deed in question.

In the case of *Chartres* v. *Cairnes*, 4 Mart. N. S. 1, the court say; " The correctness of the judgment of the District Court depends on the validity of the deed of trust; and its validity depends on the law of the State of New York, as being *lex loci contractus*. Both parties, plaintiff and defendants, interested in the event of the suit, are citizens of that State; so that, whatever decision may be given, the citizens of our State will not be affected.

The case of *Andrews* v. *Creditors*, which the plaintiffs cite, is an authority against them. At page 476, Judge Bullard observes: " We find no difficulty in assenting to the proposition, that contracts entered into in other states, as it relates to their validity, and the capacity of the contracting parties, are to be tested here by the *lex loci contractus*. This court has often recognized that doctrine as well settled."

In the consideration of this subject of the conflict of laws, we have conceded for the purpose of argument, the necessity of notice with regard to the Louisiana claims. Even with that concession, we hope that the validity of our title would be apparent. But how much would the argument of the opposite counsel be weakened, especially as to the question of the *situs* of these debts, and the alleged consequent connexion of our law with the subject matter of this assignment, if we succeed in satisfying the court, that with regard to the mass of the assigned property, and with but a few trivial exceptions, no notice was necessary.

We expect to show, *first*, that notice was given; and *secondly*, that in the case of the transfer of debts, evidenced by promissory notes and bills of exchange, it is unnecessary.

The notices were established to the satisfaction of the inferior court, to which, we presume, this tribunal would be disposed to entrust the labor and the responsibility of these investigations of fact. It is believed that this court would find no reason to differ with the Commercial Court on this subject.

A short time after the assignment was executed, the trustees sent by mail, to the various debtors, a circular addressed to them at their various places of residence.

A large number of creditors who were garnisheed, set up the assignment in their answers, which were offered in evidence in this cause.

The testimony of Frazier shows the reiteration of the notices, on his arrival in Louisiana, to the Louisiana debtors.

The copies of the advertisements published in New Orleans, in the months of November and December, 1841, and of January, 1842, show the publicity which was given in Louisiana to this

assignment. These advertisements contain a reference to the copies of the deed and schedules filed at the office of McKay, a notary, and inform the public that they are to be found there.

The testimony shows that the assignment was a matter of public notoriety.

Again; the United States, as we have shown, were fully informed of this assignment, before their attachment.

Such being the evidence upon the point of notice, is this evidence sufficient in law to bar an attaching creditor?

" The transferree is only possessed, as it regards third persons, after notice has been given to the debtor of the transfer having taken place." Art. 2613. This article is the same as the art. 122, chap. vii. of the Code of 1808. The expression in the French text in both Codes, is "*par la signification du transport*," being the expression used in the Code Napoléon, and thus exhibiting a discrepancy between the English and French text.

As to the judicial interpretation of these provisions of the Code, the following principles seem to be settled:

1. No service of a copy of the assignment is necessary.

2. The notice may be verbal.

3. Notice may be proved, as in case of notice to an endorser, by proving it to have been mailed to the party's address.

4. Proof of knowledge of the transfer by the debtor is sufficient.

These principles appear from the following decisions of this court: " The notice necessary in the assignment of debts, *not regularly negotiable, according to law merchant,* may be fairly assimilated to the notice which must be given to endorsers of promissory notes and drawers of bills of exchange; and, although the same exactness and promptitude may not be required in the former case as in the latter, yet, to affect the rights of third persons, personal notice, or *something equivalent,* must be given, and proven, in the event of any contest on the subject." *Thomas* v. *Callihan's Heirs,* 5 Mart. N. S. 182.

Again; " The testimony shows that the assignee's agent (in New Orleans) gave notice of the assignment to the debtor, but did not give him a copy of the assignment.

" The plaintiff's counsel insists, that the property of the debt, notwithstanding this notice, remained in the defendant, did not pass to the assignee, and was consequently a proper object of attachment. He urges, that the service of a copy of the assignment is necessary to vest the debt in the assignee, as regards third persons. Civil Code, 369, art. 122.

" The difficulty results from the variance of the texts of the Code. The French, invoked by the plaintiff, requires a *signification du titre, i. e.* the legal service of a copy of the assignment;

while the English, resorted to by the assignee, is satisfied by a *notice* to the debtor of the transfer.

"These texts present two distinct ideas to the mind. In the case of *Gray* v. *Trafton et al.*, 12 Mart. 702, we thought, that a compliance with *either* requisite sufficed to vest the assignor's right in the assignee, as to third persons. A contrary decision would render our code a *decoy*, rather than a *beacon*. We see no reason to be dissatisfied with the former decision." *Touro* v. *Cushing*, 1 Mart. N. S. 427.

An inspection of the record in this case, for the reporter has given no statement of facts, will, we think, satisfy the court that the notice was verbal.

Again; in *Gillett* v. *Landis*, 17 La. 472, Simon, J. remarks as follows: "*We are not aware that any particular form is required in giving notice of a transfer ;* the principal object of the law appears to be, to prevent an improper payment after the debt has been transferred, and to protect and secure the rights of the transferree ; it matters not in what manner knowledge of the transfer is brought home to the debtor, provided it be clearly shown, that he knew that his former creditor was divested of all his rights to the debt assigned, and that such knowledge of the fact was derived from the transferree, or from his agent. 12 Mart. 702. 1 Mart. N. S. 425. 6 Id. 286."

But secondly—*Is any proof of notice necessary when a debt is evidenced by a promissory note ?*

Bills of exchange and promissory notes are not regulated by the Civil Code, but by the law merchant, as understood both in England and in the other States of this Union. That the Civil Code does not apply to them is evident by its own terms. Thus in article 1908 of the Code it is said, "Promissory notes and bills of exchange are not governed by this rule, but by those of commercial law." So in articles 3127 and 3128 of the Civil Code : "When the thing given in pledge consists of a credit not negotiable, to enable the creditors to enjoy the privilege above mentioned, it is necessary, not only that the proof of the pledge be made by an authentic act, or by act under private signature, duly recorded, as stated in the preceding article, but that a copy of this shall have been duly served on the debtor of the credit given in pledge, On the other hand, this notification of the act of pledge to the person owing the debt pledged, shall not be necessary, if the debt is evidenced by a note or other obligation, payable to the bearer or to order, because in that case it will suffice that the note or obligation shall have been endorsed by the persons pledging it to invest the creditor with the privilege above mentioned."

When the Civil Code was prepared, a *projet* of a Code of Commerce was also prepared and simultaneously printed, to wit,

in 1825. The one was adopted by the Legislature: the other, which, like the Civil Code, was mainly taken from the French Code on the same subject, was not adopted. Doubtless, the reason why the Commercial Code was not adopted was, that the commercial law of England and of the sister States of the Union was thought better adapted to the habits and commercial relations of our people.

To ascertain, therefore, the nature of the contract called a promissory note, we must look to the commercial law of England, as understood in her courts and those of the United States. By this law, an unmatured note or bill of exchange passes from hand to hand, without necessity or notice by the transferree to the debtor. Chitty on Bills. But does the negotiability of a note cease when it has passed its maturity? It does not cease, but is only qualified. Let us first show that it does not cease, and then ascertain the qualifications.

" A bill of exchange," says Chitty, " is negotiable *ad infinitum,* until it has been paid by the acceptor; and therefore, if the drawer pay it after it is due, he may, even a year and a half afterwards, endorse it to a fresh party, who may sue the acceptor thereon." Chitty on Bills, 249. It is only when paid by the acceptor that its vitality and negotiability are gone. " When a bill is once paid by the acceptor, it is *functus officio* at common law." Ibid. 247.

" In general, it may be stated, that a transfer may be made at any time while the bill remains a good, subsisting, unpaid bill, whether it be before or after it has arrived at maturity." Story on Bills, 243. " But there is a period when bills *cease to be negotiable,* in whosesoever hands they may then be, so far as respects the antecedent parties thereto, who would be discharged therefrom by the payment thereof. Thus, for example: when a bill has been once paid by the acceptor, after it has become due, it loses its vitality, and can no longer be negotiable." Ibid. 245.

To this effect is the case of *Hubbard* v. *Jackson,* 4 Bingham, 390.

The court thought the case of *Callow* v. *Lawrence,* 3 M. & S. 95, in point, and referred to the language of Lord Ellenborough, who said ; " A bill of exchange is negotiable *ad infinitum,* until it has been paid by or discharged on behalf of the acceptor."

What is the qualification of this negotiability which flows from the maturity of the bill or note? Simply this: it is subject, to a certain extent, to the equities existing between the transferror and the debtor at the time of the transfer. Chitty, 243, 246. Story, 243.

But are the United States entitled to a *priority* of payment at

the hands of the trustees, out of the funds conveyed by the assignment?

What must be the nature of the insolvency, then, and of the assignment, to give rise to the priority of the United States?

In 1 Peters, 439, Judge Story says : "Insolvency, in the sense of the statute, relates to such *a general* divestment of property as would in fact be equivalent to insolvency in its technical sense. It supposes *that all* the debtor's *property* has passed from him. This was the language of the decision in the case of *The United States* v. *Hooe*, 3 Cranch, 73, and it was consequently held, that an assignment of part of the debtor's property did not fall within the provision of the statute."

In 4 Wheaton's Reports, 116, Chief Justice Marshall says : "This being a case of which a court of chancery may take jurisdiction, we are next to inquire, whether it is one in which the United States are entitled to priority. This depends on the fact, whether the deed of assignment executed by Shoemaker & Travers was a conveyance *of all their property.*"

So, in the case of *The United States* v. *Clark*, 1 Paine, 629, Judge Thompson remarks as follows: "The Supreme Court of the United States have decided, that the assignment must be of *all* the debtor's property ; by which I understand, that it must be an assignment of *all*, as contradistinguished from a *partial* assignment, or professedly an assignment of part only of the debtor's property."

No doubt, if the assignment be professedly partial, but be in truth general ; or, if an insignificant portion be left out, *with the intent to elude the law,* the priority of the United States would attach, and so the Supreme Court of the United States has repeatedly held. See 3 Cranch, 91. 1 Paine, *ubi supra.*

Applying these decisions to the present case, we find an assignment *partial on its face,* and *partial in point of fact.* Not only was the *onus probandi* upon the United States, to prove that the assignment was general—and hence this well ascertained principle of evidence in such cases would have concluded them ; but we have here positive proof, that a large amount of the property of the bank was left uncovered.

But, convinced that the priority of the United States could not be sustained against the June assignment considered, *per se,* and standing alone, the counsel for the plaintiffs have endeavored to establish the position, that the assignment of June and the assignment of September are, in law, substantially one assignment ; that the September assignment, covering all the remaining property of the bank which was of any value, was a general assignment within the meaning of the statute ; and that the June assignment being coupled with it, the whole forms, in contempla-

tion of law, *one general assignment,* and the United States are therefore entitled to priority.

The June assignment being partial on its face and in fact, and being prior in date to the September assignment, and not simultaneous; being, in its form and in its nature, a separate instrument and conveyance, there is but one hypothesis by which it can be linked to, and associated with the September assignment; and that is, that the September assignment was *in contemplation* by the assignor when the June assignment was executed, and that the assignment of June was first and separately made, with the *intent* to evade and defeat the priority of the United States.

The principle is, that a party should not be permitted intentionally to do indirectly, what, if attempted directly, the law would repudiate.

"If," says Marshall, C. J. "a *trivial* portion of an estate should be left out for the purpose of evading the act, it would be considered as a fraud upon the law, and the parties would not be enabled to avail themselves of such a contrivance. But where a *bona fide* conveyance of a part is made, not to avoid the law, but to secure a fair creditor, the case is not within the letter or the intention of the act." This principle is affirmed by Judge Thompson, in Clark's case. See, also, as to the point of contemplation, the case of *Downing* v. *Kintzing,* quoted above.

A very recent case, *The United States* v. *McLellan,* 3 Sumner's Rep. 355, is pertinent to the present inquiry; it discusses the subject of *intention,* and explains also the rule of *connexion.*

Was there *mala fides* towards the government when the bank made the June assignment? Clearly not, upon the plaintiff's own testimony. Jaudon tells us, that a large amount of property remained with the bank, and that the bank expected to be able to make arrangements with its other creditors. Was the September assignment in contemplation when that of June was executed? Certainly not, according to the testimony of the same witness, and from a candid and fair consideration of the minutes and proceedings of the board. Three months afterwards, when the hopes of the directory proved fallacious, and the creditors of the bank, though provided for by the June assignment, yet desiring further security, brought suits, and were pressing them to judgment, the September assignment was resolved upon.

But if the government is really entitled to priority, its proceedings in this case are utterly unjustifiable.

What is the nature of this priority? Is it a lien? Is it a right which supersedes and overrules the assignment of the debtor, as to any property which the United States may afterwards elect to take in execution, so as to prevent such property from passing

by virtue of the assignment to these assignees? Or, is it a mere right of prior payment out of the general funds of the debtor in the hands of the assignees? These questions are considered by Judge Story, in the case in 1 Peters, 439. "The language employed is that which naturally would be employed to express such an intent; and it must be strained from its ordinary import to speak any other. Assuming that the words 'in all cases of insolvency' indicate an entire class of cases, and that the other member of the sentence 'or when an estate,' &c., is to be read distributively, as has been contended for on behalf of the United States, it does not, in the slightest degree, vary the construction of the statute. It will then read, that, 'in all cases of insolvency, the debt or debts due to the United States, &c.,"shall be first satisfied.'

"But how are they to be satisfied? Plainly, as the succeeding clause demonstrates, by the assignees, who are rendered personally liable, if they omit to discharge such debt or debts. To enable the assignees to pay the United States, it is indispensable that the fund should pass to them; and if the mere priority of the United States intercepted it, or gave a right to defeat it, the object of the statute would not be accomplished. If the Legislature had intended to defeat the passing of the property to the assignees, as against debts due to the United States, the natural language in which such an intention would be clothed, would be to declare, that so far, such assignments should be void."

"When the debtor," says Judge McKinley, in 12 Peters, 133, "is thus divested of his property, the person who becomes invested with the title is thereby made a trustee for the United States, and is bound to pay their debt first, out of the proceeds of the debtor's property." See, also, 3 Peters's Digest, title Priority.

If, therefore, the United States are entitled to this priority at the hands of the trustees, the seizure of this property was lawless, and the enormous costs of this attachment must be borne, not by the trust fund, but by the United States. The costs must be deducted from the government's claim, and the trustees must respond to them for the balance only.

Lastly. The judgment should, in any event, be limited to the property within this jurisdiction and covered by the attachment; and not be extended to the trust funds out of this State. As it now stands, it concludes the trustees as to the entire property assigned, whether here or elsewhere, and subjects the whole to the priority of the United States.

It is objected to the September trust, that it is invalid for the want of proper parties. This objection is founded on the fact, that one of the assignees did not sign the deed at the time of its execution; and that one of the assignees was the president and a director of the bank, another a director, a third the cashier and a

fourth the assistant cashier. As to the cashier and assistant cashier, they were neither directors nor stockholders, and had no interest whatever in the bank. They cannot be considered, in any sense, as grantors. They were undoubtedly capable as trustees. As to the objections raised to the trustees, who were directors and stockholders, see the decision of the Supreme Court of Arkansas, in the case of *Conway et al. Assignees of the Real Estate Bank.* The assignee, who did not sign at the time of the execution of the deed, did so subsequently.

*Grymes,* on the same side.

*P. Anderson,* for the plaintiffs, in reply. The plaintiffs claim a privilege on the property attached, which the court below refused to grant. This refusal constitutes the error which the plaintiffs seek to have corrected. The intervenors contend, that the assignments set forth in their petition, being in existence at the time of the attachment, afford sufficient reason to uphold the decree. Regarding the petition as the history of the origin and extent of the intervenors' rights, it asserts, that the plaintiffs caused to be attached certain bills, promissory notes, securities and evidences of debt and property, which *are the true and lawful* property of petitioners, by virtue of *good and lawful* assignments, and delivery thereof for a valuable consideration and for *just and lawful uses and purposes :* and that the bank, at the time of the attachment, *had no interest in the property,* nor was the property *liable* to be attached or seized.

The evidence offered under this petition, by no means sustains the claim set forth ; for in looking to the deeds of assignment, we find, that so far from being the absolute owners, it is declared, that they are to "have and to hold" the property, but in trust, nevertheless, for the following uses and purposes, and for no other use and purpose whatsoever, viz., for the payment of certain of the creditors ; and, on certain contingencies, to reconvey to the granor. The allegation that the bank had no interest in the property, is therefore clearly incorrect, as one of the trusts was to reconvey it ; and equally clear is it, that the intervenors' claim, according to their own showing, instead of being that of an absolute owner, is of *just such rights* as those creditors might assert under the deed, who come within the provisions of the deed.

The rights of the trustee cannot be greater than those of the *cestui que trust.* Story's Equity Jurisprudence, 977. Fonblanque, 166. 2 Johns. Ch. Rep. 238. *Kirk* v. *Clark,* Prec. in Ch. 275 ; and *Adams* v. *St. Leger,* 1 Ball & Beatty, 181.

From these authorities we are fully warranted in the conclusion, that the trustees who have intervened have not greater rights than the *cestui que trust.*

What are the rights of the *cestui que trust* under the deed?

The recital in the deed of June sets forth, that the bank is indebted to sundry persons—depositors, note holders, and post-note holders, and has resolved to provide an *adequate security* for the payment of said deposits, notes and post-notes, and the interest to accrue thereon. In pursuance thereof, the deed directs the trustees, as often as they shall have moneys on hand sufficient to make a dividend, to divide the same rateably and equally in and towards the payment of the said deposits, notes, post-notes and interest, until the same be fully paid off—" Provided, nevertheless, and it is expressly declared *as a condition of this indenture, and of the trusts therein and* hereby created, that before the trustees shall proceed to make any dividend, they shall give thirty days notice, calling upon *the claimants* to come forward and prove their debts, *and no creditor shall be entitled to claim or receive such dividend, who shall not have brought forward and proved his debt before the time appointed for making the dividend,*"

The grant, then, is made for no person designated by name, but for all persons who, at its date, sustained the character of creditor, by note, post-note, or deposit ; *but upon condition,* that within a period of time therein named, they shall assent to the deed, *by bringing forward and proving their claims.* Although, therefore, all creditors by note, post-note, or deposit, had the power to become *cestuis que trust,* yet those only do in fact become *cestuis que trust,* who perform that condition. The deed, it is true, conveys the legal title to the trustees ; but until the notice required be given by the trustees, and until the creditors perform the prescribed condition on which the trusts are declared, the property in the hands of the trustees is under the control of the grantor. The bank, although it parted with the legal estate, yet parted with it on a condition which was to be performed by those for whose benefit it was created, which condition was so interposed as to prevent the trusts from arising ; and, therefore, until they did arise, the deed was subject to revocation, and the uses did not vest in the *cestuis que trust.* This view of the case I shall endeavor to illustrate and confirm by authority. Its importance to the present inquiry is obvious, for, if it be correct, it ends the controversy.

Does, then, a deed to uses vest an interest in a *cestui que trust* when it expressly declares, that the use is to arise on a condition, and when such condition has not been performed? Let us look into the history of uses and trusts. The common law originally admitted of no immediate estate in lands which was not clothed with seisin and possession. But in process of time, owners conveyed with livery of seisin to some friend, with a secret agree-

ment, that he should hold it *for the use of the grantor or some third person.* The person to whom the use was limited, called the *cestui que use*, depended entirely on the good faith of the grantee or feoffee to uses. His rights, therefore, were precarious, and, in many cases, failed for want of a remedy. As these conveyances, if not devised, were at least greatly encouraged by the ecclesiastics, as a means of evading the restraints of the mortmain acts, the clerical chancellors, who were learned in the civil law, devised a remedy in their courts. They considered the limitation of a use as similar to a *fidei-commissum*, and binding in conscience. They, therefore, extended to those cases the same remedy that the Emperor Augustus directs the consuls to afford to compel the *hæres fiduciarius*, to perform the trust on which property may have been bequeathed to him.

These trusts were a source of fraud; and the statute of 27 Hen. VIII. called the Statute of Uses, was enacted for the purpose of putting an end to such conveyances, and to subject uses to the rules of the common law. They are declared, in the preamble to the act, to be subtle inventions devised for the purposes of fraud. That statute enacts, that persons seised to uses should be deemed, for all purposes, to have the same estate in the land, that by the conveyance they had in the use. Thus was restored the simple form of conveyance known to the common law. The use was declared to be united to the seisin, and the *cestui que use*, by force of the statute, became the owner in law as well as in equity. The intention of this statute was, no doubt, to destroy uses, but this intention was subverted by the judiciary. It was held that a use upon a use was void; therefore, a conveyance to the use of B. for the use of C. was a trust for C. The statute executed the use in B. so as to give a legal estate, but the subsequent limitation to the use of C., not being executed by the statute, remained a trust, which a court of equity would enforce.

It will be observed, that the statute of uses affected only conveyances of land, because it was that only of which a person could be seised. Chattel interest, says Chancellor Kent, was held not to be within the statute, for it applied only to those who were seised. A chattel interest in lands as well as personal property, not being within the statute of uses, a conveyance of them to a use was the same before as after the statute. That is, they might be conveyed to uses, and the legal title would not be executed to the use.

Now a use before the statute, and a trust after the statute, is defined to be "Neither *jus in re* nor *ad rem;* that is, neither an estate, nor a demand ; so that it is nothing for which a remedy is given by the course of the common law, being a species of property wholly unknown to it, and for which, therefore, it is im-

possible that it should have made any provision." "It is an ownership in trust, *usus est dominium fiduciarium*—so that *usus et status, sive possessio potius differunt secundum rationem fori quam secundum naturam rei*,—for that one of them is in a court of law, the other in a court of conscience." Bacon on Statute of Uses. 1 Cruise, 265. In courts of law, the limitation to uses was void as to the use. In courts of chancery, the use came to be regarded as the real title, and as the *cestui que use* was treated as a stranger in courts of law, so the trustee was treated as a stranger in courts of equity.

When courts of chancery assumed jurisdiction of uses, they regarded them as powers to control the legal estate. If the *cestui que use* before the statute, or the *cestui que trust* after the statute, was, by the conveyance, owner in trust, those courts would compel the trustees, on application, to convey the title. But if the conveyance, as in the case before the court, contemplated that the *cestui que trust* should only have a security for a debt, then his rights of control were governed thereby, and he could call for no disposition of the legal title inconsistent therewith. So, if the grantor annexed a condition to the use, and required a performance of it before the interest could vest in the *cestui que trust*, a court of chancery could no more dispense with its performance, than could a court of law dispense with a similar condition annexed to an estate at law. What then was the force of a condition at law?

At law, a condition was the only qualification that could be annexed to a title. "It is," says Cruise, vol. 2, p. 4, "a provision, that in case the grantor or grantee does or omits to do a particular act, the estate shall commence, be enlarged or defeated." Conditions, then, providing for the commencement of an estate, are conditions precedent, and those that provide for the enlargement or defeasance of the estate, are conditions subsequent. The former can never be dispensed with, and, unless they be performed, the estate entirely fails,—nay, even if the non-performance of them becomes impossible by the act of God. In cases of conditions subsequent, an estate will not be divested by their non-performance, if reparation can be made for the delay, but when the estate has not commenced, it will never arise, without performance.

Fonblanque, vol. 1, p. 397, says; "*At law*, that which is granted or reserved under a certain form is never drawn to a valuation or compensation, and he shall make his own grant void rather than the certain form of it should be wrested to an equivalent. For the law allows every man to part with his own interest, and to qualify his own grant as he pleases, and, therefore, will not suffer any satisfaction or recompense to be given in lieu of it, if the

thing is not taken as it is granted. *So in equity,* if a creditor agrees to take a sum of money less than his debt, if paid at such a day, he cannot be relieved, if the money is not paid. And," he continues, " we must agree that men's deeds and wills, by which they settle their estates, are the laws that private men are allowed to make ; and they are not to be altered even by the king in his courts of law or conscience. So that, in case of *conditions subsequent,* if the condition becomes impossible by the act of God, the estate shall not be defeated, because conditions that defeat an estate are not favored in law, yet a court of equity cannot (in *conditions precedent*) relieve, by giving an estate that never vested. And if the party himself, who was master of the estate, and might have disposed of it as he pleased, is to be tied down to the terms and circumstances he has imposed on himself and on those that claim or derive under him, those, to whom he gives an estate upon terms and conditions, must stand much more obliged to the performance of the conditions and circumstances on which it is given ; and if the condition becomes impossible, even by the act of God, the estate will never arise."

" No creditor," says the conveyance in question, " shall be entitled to claim or receive a dividend, who shall not have brought forward and proved his debt before the time appointed for making the dividend ;" and this is declared to be an *express condition to the trusts thereby created.* The trusts, therefore, shall not commence until this act be performed. The condition consists of two things, an act to be done by the trustees, and an act to be done by the creditors. The former to give notice, the latter to prove their debts. The authority before quoted, says, that the condition may be a *particular act to be done or omitted by the grantor or the grantee,* on the doing or omitting of which the estate is to commence or be defeated.

This condition is no part of the grant ; it is a clause distinct and separate. It in no manner frustrates it, but only points out who shall receive the benefit of the grant. If there be no such person, or if the person intended does not perform the condition, and until the condition is performed, there is a resulting trust to the grantor. He may revoke the deed—he may require a conveyance—his creditors have the same rights over it that they would have had if the legal estate had never been divided from the use, but both had remained in him as at first. The effect of conditions at common law, being to suspend the vesting of the estate where the condition was precedent, courts of chancery, after the invention of trusts, considering them as the legal estate, adopted, in construing them, like rules ; and a condition annexed to a use or trust, came to be considered in those courts, as, suspending the use or trust to which it was attached ; as in a court

of law, a condition annexed to the estate suspended the vesting thereof until the condition was performed.

"Limitations of estates," says Fonblanque, "whether by way of trust or by estate executed at common law, are to be governed by the same rules." "Trusts," says Judge Story, "which are exclusively cognizable in chancery, are now, in many respects, governed by the same rules as the like estates at law, and afford a like illustration of the maxim, *æquitas sequitur legem.* In point of construction and duration, they are affected by the *same incidents, properties* and consequences, as would, under like circumstances, apply to similar estates at law." In the passage before quoted from Fonblanque, he adopts the same rule. He declares the similarity of construction of a use and a legal estate. He says; "that *at law,* the owner of property may qualify his grant as he pleases, so *also in equity ;* if the estate does not vest, by reason of a condition precedent, there can be no relief, for equity cannot decree an estate to commence." Now, when he speaks of cases in equity, he means trust estates, for those are the only estates in land that come under the jurisdiction of those courts. He declares the construction of them to be the same as is given to estates at law.

In further illustration of this doctrine, and also to show the nature and effect of conditions precedent, the court is referred to the cases of *Bertie* v. *Faulkland,* 3 Ch. Ca. 139, and a case reported by Ch. J. Willes, Rep. 83. And that the cases may be liable to no cavil, I select those where the condition was in restraint of marriage. These conditions were always regarded with great dislike. The Roman law considered them to be contrary to public good, and therefore void. For the same reason, the ecclesiastical courts of England, under whose jurisdiction the personal estate of deceased persons was administered, held them to be void. And the English court of chancery, adopting these decisions, pronounced the same rule as to personal property: but in real estate, as a different rule prevailed at common law, the court, when it obtained jurisdiction through the medium of trusts and uses, held the same rule as at law, and pronounced these conditions to be valid. They are not, however, as I before observed, favorably regarded, and courts lean against them, and take every means, by construction, to prevent their effect.

Cruise says, that a condition may be some act to be performed by the grantor himself. If such a condition be not performed, it must always be the fault of the grantor, and yet, the condition is a good one. The inquiry is not, in any case, who is in fault, but what has been granted, and on what condition. That the creditors had it not in their power to perform the condition, would not dispense with its performance. In cases of devise and bequest

*by will,* the intent of the devisee governs the construction; but in the case of deeds the *intent legally expressed* governs. Wills are supposed to be made *in extremis,* and without the aid of counsel.

Whatever, therefore, may have been the intent of the bank, the court can only look to the intent as expressed; and when the deeds declare, that the proof of the *debts shall be a condition,* it is not competent for the court to say, that the grantor intended that an interest should vest in all the creditors, and that the proof of debts required are only directory to the trustees. This condition declares, in effect, that no trust shall arise in favor of any creditor, until he shall have *brought forward and proved* his debt. This clause has been commented on by the gentleman who opened the case of the intervenors. His object appears to have been to show, that this requirement is no evidence of a fraudulent intent in the grantor. He observes, " the deed does not designate *what sort of proof* shall be required, and, therefore, we must consider it as requiring *reasonable proof.*" There are not two kinds of proof, the one reasonable—the other unreasonable. Proof is the effect of evidence. It is a conviction of truth produced by evidence; and evidence is a declaration under oath by persons legally competent to testify, and addressed to a tribunal legally competent to decide.

The deeds say, that the claims are to be brought forward and proved. Before what tribunal they are to be brought is not designated; but taken literally, the tribunal must be competent to *receive evidence,* and that evidence must be such as to produce conviction on the mind of that tribunal. The trustees are not such a tribunal. *Testimony* taken before them would not be *evidence.* The deed has not constituted them a tribunal for that purpose, but, on the contrary, by requiring *proof,* the deeds impliedly require that the debts shall be established before a legal tribunal. It seems to be thought, that the trustees can admit to a dividend any claim that they think genuine. Now, this would be true if the deed vested an interest in the *cestui que trust,* and and only required, *as directory to the trustees,* that they should be satisfied of the justice of the claims. But where the deed vests it only on condition, no creditor becomes a *cestui que trust* until the condition is performed; and, if the trustees admit any creditor on the fund, without proof, they commit a breach of trust—they enlarge the operation of the deed; and those creditors, who comply with the condition, by making proof, may complain, and make the trustees liable for any amount they so pay to such creditors; for such creditors are not within the contemplation of the deed. If proving the debt was only *directory to the*

*trustees,*—prescribing the manner in which they should execute the trust, it would be different. They then might assume the responsibility of a debt being genuine, for if it be genuine, no one can complain—but when proof is prescribed as a condition, no matter whether the debt be genuine or not, the trustees cannot dispense with proof—nor can the court dispense with proof. A creditor not proving is no more within the provisions of the deed than he would have been, had he been expressly excluded.

The learned gentleman continues ; " Though the trustee might know, and *was* bound to recognize a debt on deposit account, yet if an executor or assignee presented the claim, would there be," he asks, " any *hardship* in requiring the production of the instrument of assignment or letters testamentary ?"    Again ; " If the trustees reject *proof*, reasonable according to the circumstances of the case, they reject it not under the sanction of the deed, but in violation of it, and the rejected creditor may have judicial redress."

The above quotations will show the entirely erroneous views that are entertained on this subject. Undoubtedly it was competent for the grantors to vest an interest in the *cestuis que trust*, without any condition, because the property was theirs. It was also competent, for the same reason, to qualify the grant by condition. The grantors, in exercising their rights of ownership, did not see fit to vest in the creditors an interest, without condition, and direct their trustees as to the manner of executing the trusts ; but they chose rather to declare expressly, that the grant was on a condition, without compliance with which, no interest should vest. To say, then, that the trustees could dispense with the performance of this condition, is to say, that they had rights not conferred by the deed ; and that they might enlarge the operation of the deed, so as to embrace within its provisions, those that the grantor had excluded, and thus materially change the interest of those who had, by complying with the condition, made themselves *cestuis que trust*.

When, therefore, it is said, that the trustees would be bound to recognize a deposit account ; and that there would be no *hardship* in other cases of requiring proof, there is a total misconception of the powers and duties of the trustees ; not less obvious than when it is declared that the creditors would have judicial rights of redress, should the trustees reject reasonable *proof*,—as if the trustees were constituted a tribunal to settle a controverted claim, and had a right, without proof, to admit a claim, or as if proof—a conclusion of the mind, was in its nature capable of being rejected !

I have said, that the trustees are not clothed with power to ad-

mit any claim without proof, and that proof is not the conviction of their own minds, but of some legal tribunal ; and if it should be urged against this position, that it is unreasonable to suppose that the grantor intended that each claim should be legally established, yet the unreasonableness of the condition is no proof that it does not exist. For if there be no doubt in the words of the grant, then no doubts can be raised from any supposed unreasonableness ; the grantor being bound because of his promise, is only bound in the mode and qualification of the promise ; and, as he had a right to exclude any creditor from the benefit of the trust, so he may exercise the lesser right of excluding all those who do not perform the conditions attached to the grant. If it were the duty of courts to make the deeds and grants of men reasonable, without regard to what they stipulate between each other to be reasonable, judicial duties would be onerous indeed.

In a matter, however, about which two opinions may possibly exist, I choose to take a view of both sides. And in the present, I have no choice, but leave it entirely to the intervenors to say, whether the trustees are constituted the proper tribunal to admit claims or not. If they be, then two things are certain ; 1st. The deeds, by requiring debts to be proved, cannot mean to require *evidence* of facts ; for evidence can only be before a legal tribunal ; 2d. By proof, can only be meant a conviction of the minds of the trustees by anything *that they may choose* to permit to influence them.

This hypothesis taken as true, does, in no respect, change the application of the reasoning ; for it only changes the manner of performing the condition, and does not do away with the condition itself. The condition is the proving of the claim. Now, whether it be proved before one tribunal or another, is very immaterial. It still remains a condition, and the estate does not vest until it is fully performed.

Judge Story says, (2 Equity Juris. 957,) "If creditors are named in the assignment and required to execute it before they can take under its provisions, they must signify their *assent in that mode* otherwise they cannot take under the instrument." The reason of this is, that the grantor has made this a condition precedent, and no power on earth can dispense with it, without usurping the rights of ownership and making a grant under pretence of construing it. In such a case it will be perceived, the estate passes to the trustees, but as will be presently seen, does not pass out of the power of the grantor. In such a case, as in the present, a *power is given* to those persons to obtain a vested interest, but until such trusts arise, they result to the grantor, who retains sole control of the estate. Nor can there be a presumption of assent so as to enable them to take ; for, where the party who has the

right prescribes the mode, a court can indulge no presumption. See the case of *Garrard* v. *Lord Lauderdale*, (3 Sim. 1,) decided in 1830 by Sir Launcelot Shadwell on the authority of Lord Eldon in the case of *Walwyn* v. *Coutts*.

Judge Story, (2 Equity Juris. 353,) after commenting on deeds made for the benefit of creditors, observes, "It is proper to add, that in all cases of voluntary assignments, made by the debtor for the benefit of creditors, if such creditors are not parties thereto, *and have not executed the same*, the assignment is deemed in equity as well as at law, to be revocable by the debtor." Now, the commentator has in view two kinds or forms of deeds. The one where, as in the above quoted case, the creditors were required to sign the deed; the other where they are only named by general description, and not required to sign, but are required to signify their assent. In the first case, no interest vests in the creditor before signing; in the other, no interest vests until their assent be signified. This is obviously the meaning; for in the preceding paragraph, he observes, " When a specific time is prescribed for the creditors to come in and assent to the arrangement, *as parties thereto or otherwise*, then they must comply strictly with the condition, or they will be excluded from the benefit of the trust." The deed then, that requires the creditors to sign, gives no interest to the creditors before signing. The deed that prescribes assent by the creditors, *within a certain time*, and in a certain mode, vests no interest unless the assent be given within the time and mode prescribed. If the deed does not prescribe assent or mode, the creditor may claim within a reasonable time; and if the deed be clearly for his benefit, as if it was a donation, his assent to the deed, so far as will enable him to take from the trustee, will be presumed, until the presumption is rebutted.

It is of the last mentioned deeds, and none other, that Judge Story observes, "In order to entitle the creditors to take under the deed, it is not necessary that they should be technical parties thereto. It will be sufficient if they assent to it; and if there be no stipulation for a release, *or any other condition* in it that may not be for their benefit, their assent will be presumed." Whatever condition, therefore, is prescribed by the grantor, even though not a reasonable one, must be complied with; and as the court cannot dispense with it, so can they not indulge in any presumption that would give an interest to a creditor, on any other terms than the grantor has given it.

The deeds now before the court, required as a condition to any interest vesting in the creditor, that he should signify his assent in a particular mode, viz: by producing and proving his demand, and that too within a particular time prescribed by the deed.

Now surely the court cannot dispense with this condition any more than could the court dispense with a creditor's signing the deed, when the grantor had required him to sign. Nor can the court enable the creditor to attain an interest in the deed, by presuming an assent which would be proper enough, when the deed was for the creditor's benefit, and contained no conditions of any kind whatever.

I now propose to examine two cases that have been quoted in the brief of the intervenors. They do not, nor were they intended to assert the doctrine, that an assent of a *cestui qui trust* would be presumed when there was a condition, or where the deed required the assent to be made in any particular mode.

The case I shall first offer to notice is the case of *Halsey* v. *Whitney*, 4 Mason's Rep. 204. The judge, in his opinion, says, " Previous to the present attachment, the deed had been executed by creditors whose demands and claims are sufficient to absorb the fund." It is quite evident, therefore, that the point did not arise as to the effect of creditors not assenting to the deed in the mode prescribed, for they had assented. What falls from the judge concerning a presumed assent, was not necessary to the decision of the case.

In this deed the title conveyed to the trustees vested an interest in the *cestui que trust* immediately, because the signing of the deed is not made a a *condition to the vesting of the trust*, but is only a covenant with the trustees as to the mode in which they shall execute the trust. The words are, " it is agreed," that is, the trustee covenanted to use certain precautions in executing his duty. The grantor prescribes a rule. His obedience to this rule is the test of his faith. Had the grantor prescribed a condition that the creditors should sign, the uses would arise only for those who had complied with such condition. It will be observed, that the condition of making oath to the debt does not apply to the scheduled creditors, but only to those who might, from inadvertence, have been omitted, and as regarded them, the trustees have the power to dispense with the oath ; it is plain, therefore, that an interest was intended to vest in all the creditors, and the covenant is only directory to the trustee.

It is then, of a deed like this, where no condition is prescribed, that the judge says an assent, if clearly for the benefit of the creditor, will be presumed. But he does not mean that a condition, had there been one, would not have to be performed, or that the trustee or the court, could dispense with its performance. It is clearly not in accordance with the subsequent opinions laid down in his work on Equity Juris. 380, 381, 544. " As to trusts created for the benefit of creditors," says the judge, " and to which they are not technically parties, if *bona fide* made, they are valid

by the laws of England, and pass a legal estate to the trustee." This is no doubt true ; and it is a result from the doctrine of uses and trusts. For, as has already been observed, the use or trust is no part of the deed, and, independently of the statute of frauds, might have been declared by parol without writing, at the time of executing the deed. But, as has already been shown, it is competent for the grantor to annex a condition to the trust, as it was at law to annex a condition to the estate. "I freely admit," says the judge, "that where there are conditions in the assignment, the presumption does not arise."

The other case which I shall examine is that of *Marbury* v. *Brookes*. It was twice before the court, and will be found reported 7 Wheat. 346, and 11 Wheat. 78. The leading principle of the decision is not important to the view with which I offer the case to the attention of the court. My object is embraced in the response of the judge to the charge demanded by the counsel, "that if the creditors had not assented to the deed, then the deed was fraudulent and void." "Deeds of trust," says Marshall, C. J. "are often made for the benefit of persons absent, and even for persons not in being. Whether they are for the payment of money or for any other purpose, no expression of assent of the person for whose benefit they are made has ever been required, *as preliminary to the vesting of the legal estate in the trustee.*" Now all this is very true; but I submit whether his Honor did or could mean, that a trust created on a condition, would vest an interest before the condition was performed. This language is used in reference to the deed before him. It vested an immediate and unconditional interest in the *cestuis que trust*. Had the deed required them to become parties, or had it prescribed any other act as precedent to the vesting of the trust, sure I am, that the proper distinction would have been made by his Honor, who too well knew the rights of the grantor, and held them too sacred to dispense with any condition he might have attached to them.

But it may be said, the title passes to the trustee. The assent of the beneficiary is not necessary to the completeness of his title. In whom, then, are the uses, if not in the creditor ? To this I reply, that the uses and trusts, in case of a condition precedent, result to the grantor until the condition be performed. Suppose a conveyance in trust, and no trusts are declared ; in such case there is a resulting trust to the grantor. Suppose a debtor deliver money to a third person to pay his creditor—this is a trust. "But even here," says Judge Story, "the trust is not, under all circumstances, absolute ; it may be revoked ; and then arises an implied trust, which results in favor of the party granting it." The result of this reasoning is, that the uses and trusts under this deed resulted to the grantor until the condition was per-

formed; and as that has not been performed, the attachment of the government, seizing all rights of the grantor, at the time his rights were entire over the property, has obtained for the plaintiffs a right to the privilege refused by the court below, notwithstanding the deeds.

But to return to the proposed examination of the deeds for the proof of intent. I shall attempt to show, that it was the intent of the grantor to create a condition to the grant, so as to prevent the trusts vesting before its performance; and that if we were at liberty to disregard *the intent executed*, and seek the intent from *the general scope of the deed*, we should come to that conclusion. My remarks apply to all the deeds executed after that of the 1st May.

The recital of the deed declares a purpose of providing an adequate security for the payment of all, save as therein excepted. Without again calling the attention of the court to the declaration of the trusts which limit, by express condition, the general declaration of the recital, I proceed to a subsequent part of the deed, which declares; "That the trustees shall from time to time make dividends to creditors who shall come in and prove, *until a final dividend be made*." Now, the deed requires a final dividend to be made on either of two events taking place; 1st. Whenever, the moneys arising from the property granted shall be exhausted. 2d. "Or where all the creditors *who have brought forward and proved their claims* be paid in full, principal and interest." It is obvious, therefore, that this second contingency may happen long before the moneys arising from the granted property is exhausted. Suppose the trustees give notice that a dividend will be made, and let it be supposed that they have $100,000 to divide; if the claims that come in amount to a sum exceeding $100,000, then it must be declared equally on such claims, postponing the interest on all. But suppose the claims that come in do not amount to more than $50,000; then has happened the second contingency, by a sufficiency being realized to pay principal and interest to "all who have come in and proved their claims."

The trusts from thenceforth cease, and the deed declares, "that no creditor shall have any claim on the *remaining fund or upon the trustees*, or the trusts hereby created; but the same, except the trust for reconveying to the grantor, shall determine and be at an end." The deed therefore, clearly and in express language contemplates, by its *intended* operation, a right to close the trusts before the payment of all the notes, post-notes and deposits, which the recital in the deed declares it is the object of the deed to provide for.

I shall presently show, that the recital is no necessary part of the deed, and therefore cannot qualify the grant. At present, I

call the attention of the court to the fact, that if the deed was intended to vest an interest in all the creditors without bringing forward their claims, no subsequent act could divest them of their interest. Their omission to do so would not prejudice them. Suppose, after a final dividend as contemplated by the second contingency, a creditor were to come upon the trust. It would be in vain for him to urge, that the deed gave him a vested interest, and that the bringing forward his claim was only directory to the trustee. The reply would be, that the deed never contemplated vesting an interest until the claims were produced and proved, and that not being done before a final dividend, the trusts never arose for his benefit.

Again; the deed provides in the same clause, that if the grantors pay off and discharge the said *deposits, notes and post-notes,* then and thenceforth the trusts, or *so much of them as shall then remain* unexecuted, shall cease, and the trust property be reconveyed. Now the deposits, notes and post-notes, on the payment of which the trusts are to cease, are such as shall at any time be brought forward and proved. If the payment of all were contemplated, then the words " so much of the trusts as shall then remain unexecuted," would not have been used, as there would, on the payment of the whole, be no further trusts remaining unexecuted.

The requirement of the trustees to close the trusts, on paying all who may at any time come forward, and the power reserved to the grantor to put an end to the trusts by making payment to such as may at any one time have come forward, sheds light on the motives of the grantors. When I come to consider the effect of these clauses in connexion with the rights which a debtor, by the common law, has to devote his property to the payment of certain of his creditors in preference to others, I trust I shall clearly show, that these clauses are wholly inconsistent with its doctrine and precepts, and plainly violate the spirit of the 13th of Elizabeth. But at present I advert to those clauses only to show, that the grantors, so far from intending that the words used in the deed, which expressly create a condition, should not so operate, did really intend that they should have no other operation; and that to have invested all the creditors with an interest, would have disabled the bank from closing the trusts, which they clearly intended to keep within their power.

The recital in the deed would lead us to believe, that an interest was to vest in all the creditors; but such a view is inconsistent with the deed of which the recital forms no essential part.

" The recital," says Cruise, " is a narrative of facts to explain the grantor's will, and *the motives and reasons* on which the deed is founded. They are not necessary; and a misrecital will not invalidate a deed." It is laid down by Lord Coke, (Co. Litt.

352 *b*,) "that a recital does not *conclude*, because it is no *direct affirmation*." It does not create an estoppel when the recital is a general one. It is, therefore, obvious that, in testing the effect of a deed, no reliance can be had on the recital, and when the premises, or the *hàbendum*, or the declared trusts contradict the recital, the latter is of no avail.

That the grantors intended to retain as much power over the trust, as a specious security of the granted property would permit, is also evident from their own declarations and acts. After the creation of the trust of June, and between the time of its creation and the deed of the 4th of September, the bank, *not the trustees*, had paid off and reduced the debts secured by the June trust more than three hundred thousand dollars, *as appears by the books of the bank*. So say the witnesses. Now I submit, whether a candid examination of this fact does not show, that the grantors, as well as the trustees, considered that no interest vested by the deed in all the creditors by note, post-note and deposit. If such an interest did vest, and the bank had devoted irrevocably so much property to secure the payment of those debts, would the bank, without communicating with the trustees, have discharged a portion of those debts? Suppose, as is probable, that the debts thus taken in by the bank were notes of ordinary circulation,—what was to prevent a re-issue of those very notes? When this consideration shall be urged as proof of constructive fraud, it cannot, I conceive, be resisted : but as to the present argument, does it not persuade every candid examiner, that the deed was intended only to vest an interest in those creditors who should come forward ; that it was never intended to be executed ; but only to protect the property, and to give time to the bank, by delaying the creditors, to make their assets more available to themselves ?

The intended operation of the deed was to protect the property, and at the same time, not devote it to the creditors beyond recall. It may be asked, how the condition to the grant would effect this ; for if the uses resulted to the grantor, and he was as effectually owner as before, the conveyance, the deed, could give no protection. The reply is obvious. The estate in the hands of the trustees with a resulting trust to the grantor, is no longer *legal assets*, and cannot be sold under an execution at common law. It cannot be sold in England, nor in any state in this Union governed by the principles of the common law. In many states, the interest of the *mortgagor in possession* is sold under execution, because possession is a constituent of legal ownership ; and therefore, being a legal right, is subject to sale. In some states of the Union, the statute governing executions provides, as does our Code of Practice, for the sale on execution, of *all rights,*

as well as all property of the debtor.  In such states, the equity of redemption is often sold.  But can it be sold in the State of Pennsylvania ?  To prove that it may, the counsel for the intervenors cites the case of *Taylor* v. *Rodgers*, 3 Watts, 259.  In this case, the steam-boat seized and sold had been, and was at the time of seizure, under lease to Woods & Beer.  Now it is plain, that notwithstanding the lease, Taylor and Rodgers were the owners of *the legal estate*.  The right of Taylor and Rodgers is not like the rights of a grantor in whom there is a resulting trust.  The first is a *legal right*—the last is an *equitable right ;* and although the latter may be as efficient in the control of the property, yet it is a right that the common law does not recognize.

Let us suppose a creditor of the bank taking counsel as to the course he ought to pursue, even supposing that an execution could sell the *residuum.*  In the first place, he applies to the trustees to know how many creditors of the bank are entitled to an interest.  They, reply, that they do not know.  If he then makes a purchase, he confirms thereby, the rights of all those who may have claims under the grant.  And as to the purchaser, what are his rights ?  In a court of equity, if he can find such a court in Pennsylvania, he may set up his purchase and call for a conveyance to himself from the trustees.  Now, I apprehend, that no one would buy such a *residuum* if it could be sold—and no creditor, with any hope of success, even if he had an appropriate remedy, would think it prudent to encounter so much litigation as assailing the deed would give rise to.  " An equity of redemption," says Sir Matthew Hale, " is an equitable right."  So Lord Nottingham says, " An equity of redemption cannot be sold on execution—for it is nothing that the law can recognize, and has made no provision for."

I have then, I think, established, that by the deed, giving it the full effect that the grantors contemplated, and the full legal effect as executed — the trustees have not greater rights than the *cestui que trust ;* that the rights of the *cestui que trust* never became vested, by reason that a condition annexed to the grant was never performed, and therefore the trusts resulted to the grantors, and were in the bank at the time the attachments were levied ; and, as the plaintiff is entitled to all the rights of his debtor, it results, that the plaintiff hass hown a right to a decree for a privilege on the property which was refused by the court below.

Proceeding to another point; let us take for granted that the trusts vested immediately on the execution of the deed ; that no condition was interposed; that no assent to the deed was required; that the *cestuis que trust* are presumed to have assented to the deed,

and to all the consequences of such assent—and then let us inquire, what are the rights of such *cestuis que trust*, for we have already established that the measure of *their rights* is the measure of the *rights of the trustees.* The court will not fail to observe, that I have all along taken for granted, that the deed is *bona fide*, and that it may operate as the grantor intended. What then, on the supposition that the interest vested, are the rights of the creditors? This question is easily answered. If the interest vested in all the creditors unconditionally, then the trustees held the legal title for their benefit, and also for the benefit of the grantors, to the extent of all the rights that the grantors had secured to themselves. The creditors' rights are the rights of a mortgagee, and are identical with the rights that grow out of an act of pledge by our law. A mortgage at common law may be of real or personal property, and usually is a conveyance of the legal title by the mortgagor to the mortgagee, with a clause that the conveyance is to be defeated on the payment of the debt intended to be secured. The mortgagee becomes at law the owner of the property; but equity, considering the debt as the principal thing, regards the right of redemption as the *estate*, and gives such relief against the conveyance, as is consistent with what that court regarded as the real intent of the parties; viz., securing the payment of a debt. This equity of redemption could not be destroyed, without resorting to that court and calling on the debtor to pay. This produced vexatious delay; for the court not only enlarged the period of redemption from time to time, but, as all persons interested were required to be made parties to the bill, it was often difficult to obtain adequate relief. To obviate these evils, it became usual to insert powers of sale in mortgage deeds. These were granted to the mortgagee himself, who was authorized to sell the property conveyed without resorting to a court of equity. From this, the step is easy and obvious to the practice of conveying the property in trust to some third person. Lord Eldon considered the power of sale in a mortgage deed as extraordinary and dangerous, and unknown to his early practice, and was of opinion, that the power ought, for greater safety, to be placed in a third person as trustee for both parties. See 4 Kent, 140.

It appears then, from this slight review of the origin of trust deeds, that the interest of the *cestui que trust* in the deed is the same as was the interest of the mortgagee before the trust deed was resorted to—that is, he has a right to control the legal estate in the hands of the trustee, *so long as he can show that his debt is unsatisfied, and no longer.* As equity would, in the case of a mortgage, compel the mortgagee to reconvey on the payment of his debt, so equity will compel the trustee, on a like event, to reconvey to the grantor. Now such being the rights of a *cestui que trust*, let

us inquire, what were his remedies for enforcing those rights. At law, he, by his trustee, was entitled to sue for and obtain the possession of the property, without regard to the trusts; for a court of law would not notice the trusts. If however, the trustee proceeded at law, and sought to recover possession against equity, the debt being paid, the grantor, or any claiming under him, might have an injunction in chancery, and the possession would be decreed to the grantor, or those who claimed through him. If the trustee proceeded in equity to establish the trust by a decree, a court of equity, as I have already shown, would not proceed unless the *cestui que trust* was made a party, and it was shown to the court affirmatively, that the trusts remained unperformed, and *then* such a decree would be made *as the equity of the case might require.*

Such then, being the remedies afforded by the common law, we are led to the inquiry, what are the remedies which our courts afford. It will not be denied, that our courts are competent to do justice in all cases that come before them; nor can it be questioned, that they will do justice *according to the mode which our laws prescribe.* It has been too often decided to admit of a doubt, that the remedy must be according to the law of the forum. Admitting then for the argument, that an interest vested in all the creditors, and admitting that in a court of law, the trustees could recover and obtain possession of the property without showing that the debts were unpaid, it by no means follows, that our courts will proceed to enforce those rights in the same mode. We will protect the rights of the *cestui que trust*, when those rights are made to appear, and we will protect them in a way that our laws prescribe. The intervenors, by appealing to our courts, assent to receive justice in the mode that our law requires it to be given, and not in a mode that the courts of Pennsylvania may give it in her courts. In Pennsylvania, it may probably be given by directing the possession of the property to be restored to the trustees; but such is not the mode adopted in the courts of Louisiana.

The Code of Practice from art. 389 to 403, points out the mode of proceeding to secure the rights of persons who are the absolute owners of property in their own right, and also the rights of persons who claim an interest in property for the security of debts. In the latter case, the property is directed to be sold, and all persons having liens on the property may, by establishing their claims, come in on the proceeds. This, then, is the mode in which our courts afford a remedy to the present intervenors. The property must be sold, as it has been; and then, if the *cestuis que trust*, or the trustees on their behalf, can establish the existence of debts having a lien prior to that created by the attachment, they will be entitled to prior payment. It has been shown—

nay, it seems admitted by the intervenors, that the interests they represent are those that a pledgee of property has in the thing pledged, and that the mode in which that interest is secured, is by the legal title being placed in their hands. Is it not obvious, that the mode of securing the right is a thing distinct from the right itself? A court of equity, as we have seen, disregards the mode, and would pay no attention to the title of the trustee, any further than the *ascertained* interests of the *cestui que trust* would demand. With what propriety then, can the trustees, intervenors in this case, require the court to disregard the rights which the attachment gives, at least to the *residuum*—refuse to ascertain the *residuum* by a sale—decree the possession to them without proof that any *cestui que trust* ever has or even will claim under the deed, and with strong proof on the record that many, if not all of them, have repudiated the deed !

It is said, that the legal title vests in the trustees. But this does not give any other rights than if a pledge had been executed. Such was the decision of this court in a case entirely similar to the present. An absolute sale had been made, but the object was to secure a debt. The court directed the property to be sold, treating the absolute sale, not as transferring the property, but as giving priority of payment out of the proceeds. Such was the decision in the case of *Williams* v. *Stephens*, 1 Mart. N. S. 417. 2 Ib. N. S. 22. Why then should the property be decreed to the possession of the trustees, when ample justice can be done to all by a sale of the property, and a distribution according to claims established between creditors in common ? If restored to them, how, when and where is the present plaintiff to obtain a knowledge of the extent and value of the *residuum* ? He may sell it *cum onere*, say the intervenors. It might be sold, say they in Pennsylvania. Can any reason be assigned why some judgment creditor there has not sold it? Or can any reason be given, why the property itself should not be sold according to our own law, which is the mode of procedure adopted and presented by our law?

Let us now proceed to examine, whether the deeds set up by the intervenors made in the State of Pennsylvania, were valid according to the laws of that State. If they were not valid there, the conclusion is irresistible, that they are not valid here or anywhere. The laws of that State are those known as the common law of England. These laws will be found in all essential respects, to resemble our own. In looking into our own code, we find it laid down, " that there is a right implied in all obligations, that the property of the debtor shall be liable for the consequences attending their non-performance," and as a consequence flowing from this principle, " that every act done by a debtor *with the intent* of depriving his

creditor of the eventual right he has on the property of such debtor, is void as respects such creditor." This announces the general principle of law flowing from the relation of debtor and creditor. Extensive as it is, it is not more unlimited than the principles of the common law.

In order to illustrate the different modes by which our own law and the common law arrive at the same end, I refer the court to art. 1975 of the Code, where it says ; " If the contract be purely gra-tuitous, it shall be presumed to have been made in fraud of credi-tors, unless," &c. Now the presumption here mentioned, is a pre-sumption *juris et de jure*. The statute specifies one state of the case in which the presumption does not arise. But with that excep-tion, in all other cases, the presumption of fraud attaches. Should a contract thus deemed fraudulent be presented to the court, would it waste time in hearing evidence of the intent of the contracting parties ? Would not the presumption adhere to the contract, and produce its legal effect, even though the contracting parties were as pure as angels, and the court were possessed of full evidence of their purity ? It is thus, by prescribing a positive rule, that our law has guarded against voluntary conveyances.

The statute of the 13th of Elizabeth has effected it in a diffe-rent mode. It declares all acts done with a view *to delay or de-feat a creditor* void ; and courts of law and equity, under this statute, without a positive enactment, decide voluntary deeds to be made with that view, and *therefore*, void within the purview of the statute; whether the motive that induced the conveyance was a corrupt one or not. It would be taking a very inadequate view of this great statute, to suppose that those conveyances only came within its influence, in which the contracting parties were actuated by corrupt motives. The statute only announces a gene-ral principle, as do articles 1963 and 1964 of our Code ; but it is to the decisions under this statute that we must look, if we wish to become acquainted with the pure morality it inculcates. In them we shall find evidences of practical wisdom, looking to the object to be attained by an honest and direct appropriation of pro-perty to the obligations contracted by its possessor, and condem-ning all colorable pretexts and appearances. No presumed purity of intention—no plausibly devised motive of preserving the pro-perty from sacrifice—no ambiguous morality, disarms the vigi-lance of this statute. If the grantor's circumstances be embar-rassed, suspicion is awakened—if all his property is granted to some, in exclusion of other creditors, suspicion is heightened—for in such a conveyance is seen a departure from equity. If an interest be reserved to the grantor—if he retains directly or indi-rectly the power to recall the property granted, or to change bene-ficiaries of the grant, or to lessen or impair their interest—if coer-

cion is used with the creditor, inciting his hopes or fears by uncertain clauses, by discretionary powers, by protracted settlement—in short, if there be any ambiguity or indirection, however plausibly it may be accounted for, the conveyance is blighted by the pure spirit of the statute ; and whatever may be the motives of the contracting parties, it becomes utterly void.

Let us investigate more minutely the statute of Elizabeth, and ascertain from decisions under it, some general principles by which we may test the deed in question.

There are two statutes, one denominated the 13th, the other the 27th of Elizabeth, which were enacted in the reign of that sovereign, and made to suppress frauds. The first relates to frauds on creditors, the last to frauds on purchasers. Those statutes, so kindred in principle, are treated in conjunction by most writers. With the latter, however, we have nothing to do. The former, which by a provision of law is re-enacted in the State of Pennsylvania, contains substantially the following clauses.

"For the avoiding of fraudulent grants both of lands and goods, which in those days are more commonly used than hath heretofore been heard of, and which have been and are contrived of covin, collusion and guile, to the end, purpose and intent to delay, hinder and defraud creditors and others of their lawful suits, not only to the hindrance of the due course and execution of law, but to the overthrow of all plain dealing between man and man without which no civil society can be maintained or continued, therefore be it declared and enacted, that all grants of lands or goods made to or for any intent or purpose above declared and expressed, shall be void against all persons whose actions, suits or debts, are, shall or might be in any wise disturbed, hindered, delayed or defrauded."

The *intent to hinder or delay* is an intent which this statute declares to be fraudulent ; and if a deed be made with *a view to effect* a hindrance or delay, such deed is void, whether it produces its contemplated effect or not ; and it is void, not only as to the creditor whose rights are designed to be delayed and hindered, but also as to all other creditors, whether they were such before or after the conveyance.

" The fraud," says Roberts, page 35, " does not consist in the *actual deception of the creditor*, but in making a conveyance with a *view* to deceive him. It is not the accomplishment of the deceit that constitutes the fraud, but the deceitful intention manifested by the conveyance."

Now it is said truly, that this statute did not intend to avoid deeds made *bona fide*, and on good consideration. But the ques-

tion whether any particular deed was *bona fide*, was quite a different question after the statute, from what it was before the enactment. The last quoted author, speaking of the first expounders of the statutes of Elizabeth, says; " They resolved on such a construction of them as might extract from them an operative and beneficial law, and, as they seemed purposely written in general language to give room for a more extended judicial interpretation, they considered largely their spirit and purview, and framed upon them certain rules of evidence for the suppression of fraud, which as they are the result of strong sense, and founded on general utility, ought not to be lightly departed from for the sake of obviating particular hardships. The luxuriant intricacy of the legal modes of transfer and forms of technical proceeding, as they multiply the means of fraud, so they call for the increased vigilance of the law against colorable and equivocal transactions. Legal artificial presumptions are resorted to in aid of this vigilance, and where experience has pointed out a successful engine of fraud, the very use of that engine is made to supersede inquiry into intention, by being itself turned into a strong presumptive indication of fraudulent design."

Let us turn to the case of Twyne, (3 Co. 81.) " Pierce was indebted to Twyne £400, and to C. £200. C. brought suit, and pending the writ, Pierce being possessed of goods to the value of £300, made a deed thereof to Twyne, *in satisfaction of his debt*, but remained in the possession of the goods." This deed was declared to be fraudulent and void, within the statute.

Let us examine the particular badges of fraud enumerated by the court, and endeavor to lay hold of *the general principle* that guided the judges to their conclusion. I lay it down to be this ; that if a deed, from its terms, or the situation of the parties, or from any cause, creates a well founded belief that the *grantor may*, notwithstanding his grant, possess the power, either directly, without the consent of the grantee, or indirectly by his connivance and assent, to control the property granted, then such deed, as regards creditors, is colorable and void. The proposition is, that a well founded belief *that the grantor may control the property granted*, avoids the deed. That he has the power, either express or implied, is sufficient ; it is not required that he should use it. That *there be cause for a well founded belief* that he has such *power* is sufficient ; it is not required that, he should in fact possess it. If it be required under the statute as before, to prove a fraudulent intent by facts that admitted of no doubt, and also, that such fraudulent intent, put into action, has operated to the injury of the complainant, then the statute has been useless. But such proof is not required. " The burthen of vindication is thrown on the contract," and the fraudulent intent

is presumed from any fact of an ambiguous character unusual or mysterious. "When experience has pointed out a successful engine of fraud, the very use of that engine is made to supersede an inquiry into intention."

The deed, says the court, in Twyne's case, hath these badges of fraud. First; it is general, conveying all his property without exception : *dolosus versatur in generalibus.* Second ; the grantor continueth in possession. Third; it was made in secret. Fourth ; it was made pending the writ. Fifth; there was trust between the parties, and fraud is always apparelled with trust, and trust is the cover of fraud. Sixth ; it declares that it was honestly and truly made ; *clausulæ inconsuetæ semper indicant suspicionem.* For this reason it was resolved, that although there was a debt due to Twyne, and a good consideration for the deed, yet it was not within the proviso of the act of 13th Elizabeth, by which is provided, that said act doth not extend to a deed made on good consideration and *bona fide,* for although it was on good consideration, it was not *bona fide.*

The time and manner in which the deeds in question were made, afford as strong suspicion of their honesty, as the enumerated circumstances that were held to be fraudulent in Twyne's case. The assignment of June, it is true, was not of *all* the property of the grantor, but then the conveyance was not as specific in its terms as it might have been ; and it is this generality and want of definiteness, that the court reprobates. It reprobates and treats as a suspicious circumstance, the fact of a general conveyance without valuation, and without communicating those facts, that parties dealing fairly, and for no ulterior view, would have disclosed. All the facts which will enable other creditors to see to what extent their debtor's property is affected, should be disclosed. It is on account of other creditors that any disclosure at all is necessary. Why then did not the bank disclose by the deed (which the law requires to be recorded for the purpose of notice,) a fact clearly within their knowledge, and which was essential to the creditors who might accept, and to those who might reject the trust?

I accuse the grantors in this assignment with the illegal intent of keeping under their own control, notwithstanding the grant, the property that they colorably parted with. I contend, that there are grounds to believe that the assignment of June was made with a view to that control ; and I contend, that the proof thereof is infinitely stronger than the proof of a secret trust in the case of Twyne. The first fact from which it is inferable is, that the grantors, knowing the nature and amount of debts, did not disclose it in the assignment. The suppression of this information authorizes the inference, that they did intend to reap an advan-

tage from its suppression. If no schedule of creditors, or nature and amount of debts were made known, what prevented the bank from substituting others in the place of those who appeared to be, at the date of the deed, the beneficiaries of the trust? What prevented the bank, when she received, as it appears she did, after the creation of the trust, more than three hundred thousand dollars of the circulation secured by it, from re-issuing those very notes, as is the custom of all banks except the Bank of England, and thereby creating a new debt; and thus, even without the knowledge of their friendly trustees, creating new beneficiaries? But this was not the only power secured to the grantors by this suppression of facts within their knowledge. Had names and amounts been specified, *and the clause of condition omitted*, the creditors named for the amounts named, would have taken under the deed, not a power to attain an interest, but an actually vested interest, which would have precluded the grantors from closing the trusts before they were entirely paid. This the bank carefully avoided. The names and amounts, made part of the deed, would have taken from her the right to close the trust by paying off *those creditors who at the time she chose to exercise the right, had come in and proved their debts.* It would also have taken away the power of closing the trusts through the aid of the friendly trustees, by so directing the publication of notice to creditors, and their power to reject for want of proof of the claims offered, that the sum to be distributed at any given time, might have exceeded or fallen short of the *amount of the claims brought forward and allowed,* as might, on a view of the condition of the institution, be thought most for her interest.

But the counsel says, that there is authority, by decided cases, that authorizes *the withholding information of the amount and nature of the debts to be secured;* and he calls the attention of the court to the case of *Pearpoint* v. *Graham,* 4 Wash. C. C. Rep. 237. In that case the judge observes; "I do not understand the counsel to object to the validity of the assignment upon the ground of its giving a preference to the creditors who should release, or *for the want of a schedule.*" This case, therefore, can be no authority on the want of schedules; for that, the court say, was not a point raised in the case.

The case of *Stevens* v. *Bell,* 6 Mass. 344, also quoted by the intervenors, affords no favorable authority. Ch. J. Parsons, who delivered the opinion, held, that the not furnishing schedules *at the time of the grant* was *prima facie* evidence of fraud: but that the presumption was rebutted in that case by a provision made in the deed that schedules were to be made out as soon as might be, and the debts, if disputed, were to be arbitrated. If the simple omission of schedules *at the time of the grant,* furnishes evi-

dence of fraud that requires such a provision in the deed to re-
pel, what is to be said of a conveyance that makes no such pro-
vision, and which, from its nature and from its other provisions
and its attendant circumstances, gave to the grantor, by this very
omission, an almost unlimited power over the trust property !

All authorities agree, that the omission is not fraudulent, *per se,*
and that where the omission does not give the grantor a power
over the trust, *which he may exercise,* the omission, if the deed
provides for supplying the deficiency, will be excused.    Again, it
seems to be the result of many cases; and amongst others of the
case of *Wilt* v. *Franklin,* that where the conveyance is of *all*
the property for the equal benefit of *all the creditors,* schedules
may with safety be omitted.    " Schedules," says the judge, " are
a check on the fraud of the debtor, but are more necessary where
part of a man's property is conveyed to a *particular creditor,*
than when the whole is conveyed *for the benefit of all.*"    " I can-
not find," says another of the judges, " *any positive rule of law*
that imperiously demands a schedule to make valid *a general
assignment.*"    " Even supposing," says the dissenting judge,
" even supposing the debtor had a remaining interest after the
assignment, yet *as he selected his own trustee, and the property
remained in his hand for a time,* the want of an inventory gave
him *the power,* without detection, to make use of the property
after the assignment, and before it came to the hands of the trus-
tee."

We here perceive the want of schedules connected by the two
first mentioned judges, with the fact that the assignment was of
*all,* for the equal benefit *of all,* and that provision was made by
the deed, for an eventual conveyance of the property to such per-
sons as the creditors might designate; for that was made one of
the trusts of the deed.    The dissenting judge we find, connected
the want of schedules with the fact that the *grantor named his
own trustees*—and that the property *must needs remain a short
time in his hands.*    He therefore was of opinion that these, taken
together, gave *him a power over the trust property.*    Now is it
not obvious, that all the judges concur in the general principle,
that where such omission *may confer* a power of altering the
trusts, or closing them, or in any wise diminishing the operation
of the grant, that the deed becomes void by such omission?    It
is not the omission of the schedules that, *per se,* is fraudulent,
if it appear from other circumstances that no creditors can be af-
fected or incommoded by the omission ; but where that does
not appear, and especially where it appears that creditors are, by
the omission, deprived of information which they are entitled to,
then the omission vitiates the deed.

A debtor in failing circumstances has a right to convey his property and to prefer one creditor over another; and he may, without vitiating the deed, occasion a delay of the legal remedies of other creditors *to an extent necessary to effect his purpose;* but if he delay them a moment beyond what is necessary, then the delay is fraudulent, and the deed producing it is void. The delayed creditors are not driven to judicial process to urge forward the trustees; they cannot be sent to a court of equity to ascertain a *residuum,* or told that they may sell this unascertained *residuum;* the statute cuts the Gordian knot, and declares the conveyance to be void. The creditors in such a case are not compelled to resort to a court of equity, even if equity could afford relief; and, as was said by Judge Van Ness in *Hyslop* v. *Clarke,* (14 Johns. Rep. 464,) " Whether they could obtain relief there or not, is quite immaterial in this case. An insolvent debtor has no right to place his property in such a situation as to prevent his creditors taking it *under the process of a court of law,* and to drive them into a court of equity, where they must encounter great expense and delay, *unless it be under very special circumstances, and for the purpose of honestly giving a preference to some of his creditors or to cause a just distribution to be made amongst them all."* According, therefore, to the opinion of this learned judge, the only excuse for that delay which a resort to equity occasions, is a necessity to effect *some legal object* that could not be accomplished without so construing the deed that a resort to such tribunal becomes necessary.

What then is the complaint made, which a court of equity can as is said, remedy?

The first is; that the grantor, by not designating the particular debts secured by the deed, has made the interest granted uncertain; because other beneficiaries may be let in on the trust at the pleasure of the grantor. In reply it is said, that a court of equity will prevent it. I see not how that tribunal can prevent it. Suppose a creditor who has come in and proved, demands of the trustees an account of the trust; and, on the rendition of an account of the number and nature of the debts, the creditor should believe that it included notes and post-notes re-issued, and, therefore, not a proper charge on the trust; how is he to disprove the account? Whither is he to resort for information? How is he to prevent in any court, the appropriation of a dividend to those debts so improperly admitted? No creditor in his senses would undertake the task, for the litigation would be hopeless, and the trust, probably, brought to a close long before the close of his suit. But if there be a remedy for this, it is, as the judge said, wholly immaterial. No debtor has a right, *unless it be necessary to effect some legal object,* so to dispose of his property as to deprive

his debtor of his legal remedy and turn him over to the delay and expense of a court of equity.

But in what way could a creditor, a party to the trust, or a creditor rejecting the trust, ever make proper parties for an account of the fund? It is idle to say, that the trustees, themselves ignorant of the beneficiaries,-would be parties to settle an account. No man's interest can be adjudged in any matter, who is not a party to the suit. It will be borne in mind, that the same reasons that, as Ch. J. Parsons tells us, determined the courts of Massachusetts to refuse to uphold trusts unless the *cestui que trust* was party to the deed, exist in the State of Pennsylvania. In that State, there are no courts of equity. "There is," says Ch. J. Tilghman, "no court of equity in this State, *even to compel the execution of a trust.*" (See Wharton's Digest, 621.) Statutes have from time to time been passed on the subject of trusts, but those statutes provide only for cases directly within their purview. In the case of June's estate, it was held, that the act of 1836 gave no jurisdiction of trusts created by will; and the parties had to resort to the legislature for relief. 4 Whart. 178.

But let us examine the act of 1836, which the counsel for the intervenors thinks possesses such ample powers. It requires only a moment's attention to the provisions of this statute to perceive, that no one, not a party to the deed, can have any relief under it, and that those entitled to relief can only have the specific relief given.

The six first sections contain provisions for making certain the property conveyed by the deed. They require a schedule—an appraisement, oath and bond.

For whose benefit is this? Is it for the benefit of one not claiming under the deed? What is the meaning of the clause that says *the bond shall be for the faithful performance of the trusts,* and that it shall enure to *the use of all persons interested in the property assigned?* Does it mean that a creditor who rejects the trust, may sue on the bond, and if it does not, what becomes of the argument of the counsel drawn from the words of the act, "*any person interested,*" may have citation against the trustees. If those general terms, when used in reference to the bond, would give rights only to those interested in the deed, by the terms of the deed, with what reason can it be urged, that the same words used in reference to the citation, would include persons who had come in and proved under the deed? I deny that any creditor wishing to avail himself of the *residuum* under the trust, would be entitled to cite the trustee for any purpose under this statute. If there were any doubt, that doubt would be removed by the eighth section of the act, that provides, that "no

such citation shall be issued until after the expiration of one year from the date of the deed or appointment of such trustee."

I cannot forbear to notice what the intervenors' counsel say of the power given by the statute in the twenty-eighth section, to make all necessary *orders and to carry the trust into effect.* They would have the court believe, that this clause gave the power to make all orders and decrees, in favor of those who assail the trust, and that too, *not for carrying it into effect,* but for the purpose of overthrowing it entirely. If the present plaintiffs had adopted the trust, what could this statute do for them? Could the court prevent the letting in of newly created debts on the trusts, which the grantor might have done in the mode which has been pointed out, or could the court prevent a closing of the trust or the numerous abuses and delays that the deed enables the grantor and the trustees to effect?

In the case of *Hyslop* v. *Clarke,* 14 Johns. Rep. 459, the court says; " The deed contains provisions that render the whole, in the judgment of law, fraudulent and void. It does not actually give a preference, but is in effect an attempt on the part of the debtors to place their property out of the reach of their creditors; and to retain the power to give such a preference at a future time. One object is to coerce the creditors to acquiesce in the terms offered to them." The power to change the trust as created, was the ground on which this deed was avoided. No inquiry was ever instituted as to whether the power was actually used, or whether the character of the parties was too pure to be suspected of fraud. It was sufficient that the deed did not devote the property to the payment of debts beyond recall, but left to the grantor the power to change the trusts. And is there, I ask, any difference in principle between that case and the present? In that deed, the power to change the trust was expressly reserved; in the present case, it is secured by a suppression of information that an honest purpose would have led the makers of the deed to disclose.

The counsel for the intervenors are mistaken in supposing that under this statute, proper parties could be made to a decree settling the proportion which, on a final closing of the trust, each creditor has been entitled to.

In all legal controversies, the first question is, who are the parties? Now, if a creditor should to-day file a bill to ascertain his interest in the trust, it would be material for him to know who are interested with him. If it be those who have come in and proved, then there is no difficulty in the case ; but if it be those who may at any time, hereafter choose to come in, then the difficulties are insurmountable. It in no respect aids him that the trustees represent *the creditors,* for the question occurs—what credi-

tors? The trustees themselves cannot tell, for their names are not given, and all information approaching to certainty must be gathered from the grantors who may give such as suits them.

But I deny that the trustees do or can represent creditors, *cestuis que trust*, in any controversy *between each other* to settle the rights of each under the deed. All interested must be made parties, and if the aggregate of the creditors are interested, then there is no court under heaven, that can finally determine the interest that any one may have in the fund. The authorities show, that the trustees represent the creditors in suits brought by them *to support the legal title*, and also in suits brought against them wherein that legal title is defended, but not so when a controversy arises as to the interests of the *cestuis que trust*. Then all must be made parties either plaintiff or defendant. This may be done, says Judge Story, *in some cases*, by a creditor bringing his bill in behalf of himself and all the other creditors who may choose to come in and take the benefit of the decree. The principle, however, is correct, that all having claims under the deed, must in some way be made parties.

Now, let us suppose a creditor to file a bill for himself and others, what decree could be made by the chancellor? If he supported the deed, he must establish all the rights created by it, and one of those rights would be a trust of all the property for the benefit of the grantor, on the payment of all who at any time might come in. This single creditor therefore, suing for himself and others who might choose to come in, would bring the trusts to a close, and the chancellor, without making a new deed, and changing the rights of the parties, could not let in any other creditor under the decree, for the deed is express in its terms, " that from thenceforth no creditor shall have any rights on the remaining property conveyed, but the same shall be held by the trustees for the grantor." The condition of the creditor who rejected the trust would be equally deplorable. He could not file a bill without making all claimants under the deed parties by name. He could not file a bill for himself and others, for there are no others standing in his situation. The rule, says Judge Story, Eq. Plead. 104, " is to be understood with this limitation—that the bill is not filed for some particular interest of the plaintiff; but it is one where all the creditors have *a common interest with him in all the objects of the bill.*" Again, p. 151; " Where priorities are to be ascertained, asserted by those *claiming paramount to, and not in virtue of the assignment*, all the creditors, entitled under the assignment, should be made parties by name to the suit, however numerous they may be, since each is or may be interested in ascertaining or repelling the claims and charges of all others." I shall, however, close this part of the case by re-

minding the court, that the question is, not whether a remedy is afforded the creditors, but whether, *to effect a legal object,* the creditor has been put to delay, trouble and expense.

And now I think I have established—

First ; that the statute of Elizabeth and the decisions under it form a system of rules for the suppression of frauds, and that the inquiry in any given case is not so much the priority of interest, as whether the conveyance has those evidences of fairness that fraud cannot assume.

Second ; that a conveyance *with a view* to delay the *legal remedy* of creditors, ascertainable from the want of those badges, or containing limitations unusual and mysterious, is fraudulent.

Third ; that a deed which, either from omission or other causes, gives the grantor the power to delay the legal remedy, vitiates the deed, even though the power be not used. And,

Fourth ; as examples of deeds fraudulent within the act are those where the grantor either directly by the deed, or indirectly through the trustees, may change the beneficiaries or has the power to close the trusts, or in any way recall, on any contingency, the property devoted to the payment of debts,—and also such deeds as do not enable the parties, both those who accept and those who reject their provisions, to ascertain their respective rights, or which, without sufficient cause, withhold information essential to be known, and which was in the power of the grantor to communicate.

I shall not again advert to the deeds. It requires but a slight survey to perceive that they are obnoxious to all the objections above laid down. No one, who attentively considers their provisions and what might be their operation, can escape the conviction, that the deed of June was never intended to be executed. In the language of one of the witnesses, " we thought the creditors would be satisfied." We thought that under its specious cover we could quiet the solicitude of our creditors, and be permitted to manage our business in our own way for our own benefit.

I turn to the case of *Wilt* v. *Franklin,* on which, the counsel for the intervenors tells us, he relies with undoubting faith. This case, although the dissenting opinion of Brackenridge, J. is probably the law of it, and although it has been in some points overruled by a decision of late date, (see 5 Whart. Rep. 345,) yet, when examined, is found to contain nothing that sustains a principle that would uphold deeds like the present,—that places property on interminable, uncertain and shifting trusts. Keely, finding that a judgment was about to be entered up against him, executed a deed of all his property for the benefit of all his creditors. In this object we see a meritorious motive. He was unable to pay all, and therefore, determined to distribute what he had equal-

ly amongst them. Had he been actuated by any other motive—had he attempted to create a preference—even though the doing so was a legal right, the deed would have been void. It required all the merit of this motive to save the deed from the imputation of fraud; for although none doubted the purity of his purpose, yet the means by which he carried it into effect cast suspicion on the deed. The principal cause of suspicion was the fact that the property remained in his possession for a time; and the deed contained no schedules. This, as was said, gave him power to appropriate the property or a portion of it. It was replied, that the deed provided for making the schedules without delay—those schedules were without delay executed, and the trustee took possession without delay, and transferred it, as directed, to a trustee chosen by the creditors. Here then, we have a case where the strongly marked purpose of creating equality amongst creditors excused the delay of the legal remedy on the judgment. Had the grantor created preferences—had he assigned part of his property—had he encumbered the deed with discretionary powers to the trustees, and contingent powers to himself, it would not have stood the test of a moment's examination.

The counsel for the intervenors contends that a debtor, in failing circumstances, has a right so to dispose of his property towards payment of his debts *as to have in view* the preventing of a sacrifice, and that this is the peculiar duty of corporations, as the lives of these institutions perish with their credit. No assertion could be made more directly in hostility with the principle of the statute of the 13th Elizabeth, and more directly at war with every principle of honesty and justice. The duty of making payment when the debt is due is an immediate duty, and cannot be postponed on any consideration; and it was to prevent those delays, that this statute was passed, to give greater efficacy to the common law, which, before the statute, pronounced, as does our law, such delays to be fraudulent.

Whether the debtor be solvent or insolvent, is immaterial; if the deed be made with a view to gain time in order to preserve the property from sacrifice, it is wholly void. The counsel seems to think, there can be no *delay to a creditor* unless there be an interest in the grantor. This is a great mistake. An interest in a grantor is evidence of an *intent* to delay; and it is only because evidence of such intent, that it vitiates the deed. For the statute does not declare that such reservation shall make the deed fraudulent. So, in like manner, any omission from the deed or any clause in it, that appears to be designed to *delay creditors*, will vitiate the deed, for that is what the statute inhibits.

In the cases of *Ward* v. *Traller*, 3 Monroe's Rep. 1, and *Vernon* v. *Martin*, 8 Dana's Rep. 247, the intent to hinder and delay

creditors was derived from declarations in the recital of the deeds, viz: "that being in embarrassed circumstances the grantor, *to prevent a sacrifice of his property*, assigns it for the benefit of his creditors." Now, in these cases, there was no interest resulting to the grantor; for his embarrassments were such, that he declares the property will only be sufficient to pay his debts by being preserved from sacrifice.

The intervenors' counsel, speaking of the suits brought by creditors after the June trust, asks—what does it prove? And then replies: "not that they rejected the security already given, but that being completely unrestrained by the June deed, as to the other property, they sought additional security by obtaining the liens of judgments and executions against the assets unassigned." Now what greater proof can there be of the rejection of a deed by a beneficiary, than his voluntarily placing himself in a *situation* that, after the act is done, he can by no possibility have any claim under the deed? This is the condition of every creditor who has sued his claim to judgment. The debt, by deposit, note and post-note, merges in the judgment, and becomes a demand, of which the trustees can take no notice.

The facts in this case are, that the property attached was debts owing to the Bank of the United States by debtors residing in this State, which were evidenced by written obligations made payable here; which written obligations always remained in this State, except for a period of time, and for a purpose that is fully shown by the record. This removal of the obligations was made after the bank was in failing circumstances, and was for the avowed purpose of taking measures to prevent the effect of the laws of Louisiana. The question then arises, whether the creditors of the bank, who claim a lien on this property through the the trustees, *by virtue of assignments they made*, or the creditors who claim a lien by virtue of the attachment, have the better right. For the claimants under the assignments, it is contended, that they are elder in point of time; and therefore, better in point of right; that the law of the place where the assignment was made ought, by comity, to govern the case, and mete out the extent of the rights of those who claim under it. The attaching creditors, on the other hand, contend, that the owner of property situated in Louisiana, residing abroad, cannot exercise acts of ownership over it to a greater extent than he could if he were a resident of the State; that this results from the positive precepts of our code; that comity will in no case adopt the principles of foreign laws in the regulation of property within our jurisdiction, contrary to the principles of the law by which it is protected.

Let us examine our code, and see whether the rights of an owner of property of any kind, situated in this State, is not con-

trolled by our laws, wherever the owner may chance to reside; "Ownership," says our Code, art. 480, "is the *right* by which a thing belongs to some one in particular, to the exclusion of all others." Art. 483—"*It* gives *the right to enjoy and dispose of one's property*, in the most unlimited manner, provided it is not used in a way prohibited by laws and ordinances." The same article then adds—"*Persons who reside out of the State cannot dispose of the property they possess here, in a manner different from that prescribed by its laws.*" The words "*in a manner different*" apply not to the *mode* but to the effect of the disposition made of the property. This is in perfect coincidence with art. 10. The form and effect of instruments are governed by the laws and usages of the places where they are executed. As to the *form*—in all cases; and as to the *effect*—in all cases except where they are to have effect in *another country ;* then their *effect* is to be regulated by the laws of the *country where they are to have effect.* Then follows an exception to the rule that the law of the country where the contract is to have effect governs; and that is, where a foreigner or citizen of another state *disposes of moveable property situate in this State, by will,* if at the time of making the will, and at the time of his death, the testator was domiciliated out of this State. No owner of property situated within this State can, by residing out of the State, exercise a greater control over it, or convert it to other purposes, than he could if he resided within the State, with one single exception, and that is when permanently residing out of the State, he makes a bequest of personal property. The ninth article of our Code declares, that the laws are obligatory upon all the inhabitants of the State indiscriminately ; the foreigner residing here, *and his property within our limits.*

This plain and perspicuous legislation relieves us of the embarrassment of an inquiry which no jurist of modern times has entered upon, without declaring an inability to reconcile conflicting authorities, or to adopt any general principle to give system or symmetry to the confusion that everywhere prevails. The inquiry is this ; whether the law, which declares that the property of an embarrassed debtor shall be a pledge for the equal payment of all his creditors, is a real or personal statute. The rights of ownership exercised by the bank in making these assignments, are not such as could have been exercised by any person residing under our laws and owning property here. By our law, no debtor, whatever be his circumstances, can, without the consent of his creditors, create a trust that will bind his property. Arts. 1963, 1964, 1979, 3149, 3150, 3125 of the Louisiana Code in substance declare, that all the property of the debtor is bound for his obligations, and that in case of his inability to pay, all of it shall

be a general pledge for the benefit of his creditors; and to insure this, all acts done or omitted which divert property from these objects, are declared to be fraudulent. The same intention is manifested in subsequent legislation. The laws relating to the surrender of insolvent estates, deprive the debtor of the benefit of those acts if he has attempted by any act to give a preference to one creditor over another. See Digest, 241, 251. 13 La. 554. If the position, that the rights of an owner residing abroad, over property situated in this State, are not greater or different from the rights of an owner residing here and having property here, be a correct position, and if it be true, that no owner of property residing in the State could exercise his right of ownership so to dispose of his property as these assignments endeavor to effect, then, if it be established that the property conveyed was, at the time of the conveyance, situated within this State, the conclusion cannot be resisted, that the assignments are void.

It is said, that jurists have generally assented to the doctrine that moveable or personal property has no *situs*, that it attaches to the person of the debtor and is regulated by the law of his domicil. This proposition can never be sustained in the State of Louisiana. If the property be here our laws must govern the *jus disponendi*, because the ownership is declared expressly to be subject to our laws, and to this there is but one exception; and that is, in the case of a mortuary bequest of personal property. This has been so repeatedly decided by our courts, that it is matter of astonishment that it should be doubted.

In the case of *Olivier* v. *Townes*, this court decided that personal property within this State is governed, not by the laws that regulate the person of the owner, but by the laws of Louisiana, where the property was at the time of the sale. The counsel for the intervenors inform us, that our Code, art. 10, expressly recognizes the principle, *mobilia sequuntur personam*, and enables a father, residing in England, to distribute his moveables within this State, without regard to the rights of his children, which could not be done by the law of the place of their *situs*. This allusion to art. 10 is very unfortunate. When examined, it is found to be, *not a rule, but an exception, which proves the general rule to be exactly the reverse.* A person owning moveable property in this State, may dispose of it according to the law of his domicil, *by will, and in no other way.* He must, at the time of making the will, and at the time of his death, not only reside, but be domiciliated abroad. In no other event can he dispose of his personal property here, except as directed by the laws of our State. Under all other circumstances, the general rule, to which this is an exception, must prevail, and that general rule is laid down to be, that his ownership, and all

contracts to have effect on the property, shall be governed by our laws.

Several cases, says the counsel, are to be found in our reports, where a sale of moveables, *being within our State* at the time of the sale, has been held not to transfer the property, although the transfer was complete by the law of the domicil of the owner : " but the reason was, that our laws required something more to to be done, than was done, to consummate the contract as to third persons. On the other hand, where the contract requires nothing more to be done to consummate it as to third persons, the contract will be enforced, even though tainted with a fraud that, by our law, would be a ground of nullity." Now, is it not evident, that if a contract of sale made according to the laws of the owner's domicil, is not permitted, by reason of our law, no matter for what purpose, to transfer the property, our law, by not permitting it to do so, refuses to recognize the principle—*mobilia sequuntur personam?* Is it not obvious, that in such case, the property is governed by our law, and not by the law of the owner's domicil ?

But it is said, that the court has given effect to a contract of sale of property made out of the State, which, if judged by the laws of our own State, would be entirely void. This is true ; but a material fact is not disclosed ; *It was a sale of property not within the jurisdiction of our State at the time of the sale.* This omission makes all the difference between the case of *Olivier* v. *Townes*, and the case of *Thuret* v. *Jenkins*, which the intervenors' counsel cites. The property sold was not at the time of the sale within this State. This is the great and decisive fact. Judge Martin understood it to be so, when he declared " that the *chattel being afterwards brought into this country would not affect it.*"

The case of *Norris* v. *Mumford* again lays down the rule, that property within this State is governed in its transmission by the laws of this State, and not the laws of the domicil of the owner. The case of *Ramsay* v. *Stephenson*, which affirms the same principle, denies expressly that our courts can or will, in applying the law, be governed by the fact that our own citizens alone are concerned in its application.

In that case the court held, that the property being in this State, those laws would be applied for the benefit of any who invoked them. That this is the principle, and no other, is evident from the case cited by the intervenors' counsel, *Thuret* v. *Jenkins*. The controlling fact in that case was, that the property at the time of the sale was not in the State. The parties were all of them citizens of New York.

The case of *Chartres* v. *Cairnes* is relied on by the counsel

for the intervenors, as overturning the long train of anterior and subsequent cases that assert the jurisdiction of our laws over all property within our limits.   The case is not satisfactorily reported.   The question of law appears not to have been argued.

The fact is not made certain that the property conveyed was here at the date of the conveyance.   But I submit to the court, whether a case can be considered authority on a point when it does not show that that point was made by counsel, and deliberated on by the court.   The opinion discloses to us, that the only point of deliberation was, whether the assignment was good according to the laws of New York.   It can only be an authority for that and nothing else ; and what degree of weight it ought to have, even on the point decided, it is not difficult to estimate. However this may be, the case can be no anthority for what it does not pretend to decide; and I think the court will agree in believing, that it has little weight as to what it does decide.   For on a question of foreign law, it disregards *the authority of every decision* that was ever made in the State of New York, the laws of which are said to govern the case ; and also disregards a direct decision on the very assignment made by the Chancellor of that State !   The court of chancery is denominated an *inferior court.*   It is true, there is an appeal to the Senate of the State, sitting as a court for the correction of errors,—but in that sense, the Supreme Court of that State is also an inferior court, as are also the Queen's Bench and the High Court of Chancery in England.

The case of *Layson* v. *Rowan* is not, as the counsel supposes, a case where the property conveyed was within this State at the time of the conveyance.

I say, therefore, that there is no well attested case—no case of any authority that goes to establish as law, the proposition that personal property within our State, will, by a fiction of law, be presumed to be where its owner may chance to reside, and subject to the law that controls him.   Was it by accident or mistake that the court declared in the case of *Barns* v. *Patten,* " that as relates to the rights and remedies of creditors, personal property has a *situs* or location, and is governed by the laws of the country where it is situated, when there arises a conflict between the latter and the former ?"   Did they really mean nothing by it ?   The counsel says, that the plaintiffs were citizens of Louisiana.   They were so in truth, but I cannot comprehend how this fact could change or alter the proposition, that personal property has a *situs* for payment of debts.   If it be true at all, it must be true wherever parties litigant may reside, or whether there be any litigation about it or not.   There is no authority for the opinion, that the *court* can determine that the property has or not a *situs,*

wherever the residence of the plaintiff may happen to be. It is a law of the code.

The counsel for the intervenors being driven to admit, that the law of the domicil of the owner is not permitted by our law, to affect property within our jurisdiction, when brought in conflict with rights created by our laws, contend, that although the law of the code, *which prescribes delivery as essential* to the contract of sale where the interests of third persons are concerned, *will be enforced*, so as to prevent the operation of the contract, where such interests exist; yet, that it does not follow, that the law of the code which *prescribes equality of payment* amongst the creditors of an insolvent debtor, and to that end prescribes that his property shall be for them *a common pledge, will also be enforced* so as to prevent the operation of any contract, the force and effect of which, if left unchecked, would overthrow their provisions. He offers no reasoning in support of this proposition. He relies, it is true, on a case, but that case I have shown, does not support the proposition, for the sale in that case *was of property not within the State.*

Now, if it be true, that our law which prescribes delivery, is enforced against contracts made elsewhere, so as to limit the effect they would otherwise have, *for the reason that the property affected by them is within this State*, it seems to me, that any other law affecting contracts generally, or prescribing generally what rights an owner may exercise over property, will in like manner be enforced against contracts elsewhere, so as to limit and control their effect, if the property affected be within the limits of the State. Courts have not a discretion to say that some laws shall be enforced and others not. It is said that the law of delivery was made for the protection of our citizens against fraud, (how erroneously has been shown;) if so, were not those various precepts of the code, regulating the duty of appropriating property to debts, also made for the purpose of protecting the citizen? Weigh the two laws together, and what can be found in the one, not in the other, which should entitle it to be enforced to limit the effect of foreign contracts, and the other to be disregarded, on the principle of comity? I can perceive nothing. The reasons on which both are founded are similar. The utility and moral results of the latter appear to me far greater than the former. That the laws against preferences are not of a local nature, and to be restricted to our own citizens, is evident, from the case of Andrews. He was refused the benefits granted to insolvents, because he had given preferences even in a State where it was lawful to do so. These acts of his in regard to his property were regarded as *against a vital principle of our system;* and although

justified by the law of the place where they were done, yet created a forfeiture of rights that our laws otherwise gave him.

It seems to me, that no lawyer at all acquainted with the principles of our legislation, could so far mistake them as to assert, that a conveyance of property situated in this State, could be made by a non-resident, giving fraudulent preferences, or that our laws would carry such act into effect. To permit this to be done, would give to the non-resident, rights of ownership more extensive than are the rights of resident owners. It would be permitting him to do effectively, that which is in contravention of a *prohibitory* law. It would be declaring that property within our jurisdiction is not subject to our laws. It would finally be deciding, that our own laws should carry into effect a contract which was intended to have its effect here, which contract, our laws, that render it effective, stigmatize as a fraud on one of the vital principles of a system regulating property in regard to debtor and creditor!

"The rule that personal property has no *situs*" says Judge Story, "determines, as a consequence flowing from it, that the laws of the owner's domicil shall in all cases determine the validity of every transfer, alienation or disposition made by the owner." The reason of this rule, says the commentator, is, that if the law *rei sitæ* were *generally to prevail*, owners, *in many cases* would not know in *what manner* to dispose of their property during their lives, or to distribute it at their death; from the uncertainty of its situation, and ignorance of the law of transfer and succession in different countries. Now, when the commentator declares that the *validity of* every transfer shall be determined by the law of the owner's domicil, he evidently does not mean that the *operation of the contract* shall be determined by that law. This is not the meaning; but only that the constructive *situs* shall enable him to convey his ownership in the mode allowed by the law of his domicil to persons and to uses permitted by the laws of his domicil: but to what extent those uses may be abridged by counteracting rights, must be determined by the law where the property may happen to be.

This principle is illustrated in the distribution of personal property. It is to be distributed according to the laws of the State where the testator dies, on the ground of its being the presumed will of the deceased, that his estate shall descend to the person whom the law of his own country calls to the succession. The title of the distributee is as *valid* as that of a purchaser, but the extent to which his title *operates* is subject to the law of the place where the property is. He cannot be permitted to assert his title in any way to get clear of the duties that the law which protects the property, has imposed upon it. If there be debts,

those debts must be paid, and their nature, extent and priority will be determined by the law of the *situs* and not by the law of the deceased debtor's domicil. Let us suppose that the deceased resided in the State of New York, and that he died intestate as to his personal property, having made a will of his real estate, and imposed on it the entire burthen of the payment of his debts, and let us suppose that those debts were prescribed by the statutes of New York, but not so by the statutes of Louisiana. The distributee, whose legal title is unquestionably *valid*, seeks to assert that title on the moveable property here. To what extent would this *valid title operate* by our laws? We would not give it the same operation—the same force and effect that would be given to it by the laws of New York. There, the distributee would demand of the executor the entire personal property, because not only the debts were beyond recovery by suit, but because, the real estate in the hands of the instituted heir was exclusively charged with their payment. Not such would be the effect of his title here. Our law, which declares that the debtor's property is liable for his obligations, would take care to enforce the duty, and no matter if they were beyond recovery by the law of the decedent's domicil, and no matter that the decedent had provided funds for their payment, the distributee would not be permitted to remove the property from the State, until all the debts were paid that were existing debts according to our law, and that, not only to our own citizens, but to all who being citizens of the United States, asked the aid of our laws.

The law of the domicil, therefore, that determines the *validity* of the transfer, does not necessarily determine its operation or direct effect. The manner of the transfer is *usually* determined by the law of the domicil, but the *effect* it shall have—the extent of the rights conveyed, must be taken subject to the law of the *situs*. In all countries where the law does not declare that the rights of a non-resident owner shall not be greater than that of a resident; and in all countries where the law is silent, as to the effect of *situs*, foreign contracts are to be governed by those rules of comity which have been generally sanctioned, and which will be noticed hereafter. Judge Story, in the very paragraph that lays down the rule of domicil, states also in general terms the exception, viz: "unless there be some positive or customary law of the country where the property is situated providing for particular cases." Here again he is evidently speaking of the *effect*. Unless, he says, there be some law providing a particular mode. He admits that such prescribed mode must prevail. Every country has the right to regulate the transfer of property within its dominions, and it is only when no positive regulation exists, that the owner transfers it at his pleasure. So it is equally true, that the

sovereign may declare the force and effect of the rights growing out of the transfer, and on what conditions those rights may be exercised. This has been done by the State of Louisiana. *She has declared, that the ownership of property within her dominion* shall never be so exercised as to withdraw it from the duty imposed on it by law, of paying the debts of its owner equally, no matter where the owner may reside. The fiction of the law of the domicil cannot abrogate or impair this law. Nor does this rule operate harshly, nor induce any of the consequences that the origin of this fiction was intended to prevent; for she has also provided, that the *form of all contracts* shall be governed by the laws where they are made, and that the *effect*, with one exception, shall be governed by the law of the place where they are to have effect.

The counsel for the intervenors argue, that the property attached, being incorporeal, must be considered to be property in the possession of the owner, and not where the debtor resides, for reasons peculiar to that species of property. These reasons are there set forth, and may, I presume, be reduced to the following propositions:

First. A debt is property in possession of the creditor; because, in case of sale, the delivery of the title is, *by law*, made equivalent to a delivery of the debt.

Second. It is *property in possession* of the creditor; *because it can only be sued for where the debtor is found; and can only be transferred where the owner is found.*

A debt, *considered as property*, can, independently of any fiction, be no where else than in that place where the debtor resides; because it is neither more nor less than an amount of property which the creditor has placed in the hands of the debtor, which the debtor, on a given day, has agreed to return *in numero*. It is said to be property *in action*, not in possession; because the possession being given up for a time, the creditor, whilst he awaits the time he has given for its return, has only a demand, and that not one he can insist on until the time for return arrives. The evidence which the debtor gives to the creditor of his right to have a return of his property, is as different a thing from the right itself, as is any other evidence of right different from the right it evidences. To confound, the one with the other is confounding things entirely separate; and although laws may declare that the parting with this evidence of right, under a contract of sale, shall be evidence of a delivery of the right itself, yet that does not make them the same thing, but proceeds altogether on the idea that they are different, and that it requires a law to make them one for a particular purpose. Were a law to declare that a delivery of a bill of sale of a horse should amount to a de-

livery of the horse, it would not be a correct conclusion that the bill of sale was a *horse*, or that its owner, having the bill of sale only, could be said to be in possession of one.

Civilians place debts in the same condition as other moveable property,—that is, they consider them as following the person of the owner, and as a *general rule*, governed by the law of his domicil. I am not aware that any distinction is made, founded on a duality of sense in which it is said that they may be considered, nor do I see any reason for this *active and passive* view of their nature; for if they are personal property, as confessedly they are, then they are embraced in the fiction that they have no locality; and the counsel ought to have remained satisfied with placing them in that category. Whilst I admit, therefore, that there is the same reason for their being considered under the law of the domicil of the owner, as there is for placing any other moveable property under that law, I at the same time contend, that there is not *greater reason*, and that if the fiction does not, in our State, apply to tangible moveable property, it does not apply to incorporeal property.

That debts are the creditor's property *in the place where the debtor resides* is, as has been said, evident from the law governing attachments and executions. It is also evident from all laws that give rights or create duties, depending on the fact of a person owning property in a particular place. For example, the fiftieth article of the Code says, that where a person residing abroad, having property within this State, moveable or immoveable, and no person here to represent him, *the judge of the place where the property is, shall appoint a curator*. Now, suppose the absentee has no other than debts due him, and that he has in his possession the evidences of the debts, would it for a moment be contended that no curator could be appointed? Would any lawyer say there was no property here, because by fiction of law all property followed the person of its owner? Or that the absentee, having the evidences of the debt, must be presumed to have in possession the debt also? The law that requires a surety to possess property in the parish where he offers to become bound, is complied with by his having demands against persons residing in the parish. And on the other hand, his possessing demands against persons residing elsewhere, is no more a compliance with such law than would be his owning property in France or England.

The following propositions, then, I believe to be established:

Debts are property in the place where the debtor resides. They are no more subject to the fiction of having no *situs*, than any other species of moveable property.

Moveable property of all kinds has, by the laws of Louisiana,

a *situs* for the payment of debts. It is subject to our laws, if within our jurisdiction. The rights that its owner may exercise over it are not greater than the rights which a resident owner may exercise over his property. That as a resident owner could not convey away his property in disregard of ·the duty of equal distribution amongst his creditors, so, in like manner, a non-resident cannot make such a conveyance.

This closes all that is necessary to the present point in this case, which is the only point I intend to discuss. But before closing, I shall offer a few observations on the maxim that the *lex loci contractus* governs the validity, obligation and construction of the contract. This rule seems to have been confounded by the counsel of the intervenors, with the maxim that personal property has no *situs*. Whereas the latter, in those countries that adopt it, had its origin in the convenience of a known rule in the transmission of titles, whilst the former is a rule of construction and interpretation of contracts that come before our courts for adjudication arising in some other country, without regard to the *situs* of the subject matter.

It would be giving to the fiction of domicil an influence not heretofore claimed for it, to say that it emancipated moveables entirely from the legal control of the law of the place where they may happen to be. We have seen, that the law requiring deli-very in contracts of sales, although a law in general terms, and not expressly declared to be applicable to property owned by foreigners, has, nevertheless, been applied to them ; and it has been shown, satisfactorily I think, that the law, requiring equality of payment, a law of infinitely more importance, cannot fail to be made applicable to foreign owners, as well as to our own citizens.

To what length of injustice might we not be driven, if all the moveable property here, owned by foreign residents, should be considered at once, and by force of a fiction of law, removed beyond the ordinary laws that regulate the rights and uses of personal property ? A better illustration of absurdity and injustice cannot be given than this case presents. The bank, by permission of our laws, comes into this State and deals with our citizens, contracts debts to an immense amount, and becomes the owner of property to an immense amount. Being unable to pay, she, by an officious and unauthorized agent, in order to elude the duties which insolvent circumstances had impressed upon her property, secretly carries away the *evidences* of it ; and when they are brought back, in the custody and control of the same person as before, they are, as is said, sacred from execution. Such is the influence of a few months of absence ; such the effect of a short excursion to the north ! The creditors are told, it is in vain

to strive; our property is shielded by the protection of foreign laws. Your actions are paralysed; and to use the language of the counsel, placed under the panoply of *a stay of proceedings.*

It seems that if this can be done at all, it might have been done without carrying away the evidences of the debts. They were not necessary to effect a conveyance of them at common law; and if the principle contended for be correct, that the law of the domicil of the owner governs all conveyances made of property owned here by those whose domicil is elsewhere, what prevented a conveyance, without taking away the bills and bonds from the place where they were made payable? Nay, what prevents the thousands of traders who throng our city, and whose domicil is at the north, from conveying away their property so as to create an inequality? If the principle contended for be correct, they may do it at any time; and will be justified by the fiction, that moveable property is governed by the law of the domicil where such conveyances are permitted.

No court would hesitate at once to condemn such evasion. What cannot be done in a direct way cannot be accomplished by indirection. If it were necessary, innumerable authorities might be adduced. Questions arose in the courts of New York as to the effect of divorces obtained by the citizens of that State in the State of Vermont. By the laws of the latter State, a very short residence entitled any person to sue in their courts for a divorce, and such was the liberality with which they were granted, that no one sued in vain. Thither resorted, from neighboring states, and especially from New York, pilgrims of both sexes, to obtain relief from domestic afflictions; they came in grief and departed in gladness. The courts of New York, however, when those cases came before them, arising on questions of property affected by such divorces, pronounced them to be frauds on the laws of the State of New York; and in all cases where the citizens of that State had gone to Vermont to reside, *with the intent to obtain the relief of their laws*, the divorce was held to be entirely void. This was upholding a proper principle. It was vindicating their laws in a proper manner. It administered a proper rebuke to the artifice by which they were attempted to be eluded.

The validity of a contract includes the capacity of the parties to make it; the voluntariness of the assent between the parties, and the lawfulness of the effects to be produced by it. " *Generally speaking,*" says Story, " the validity of the contract is to be determined by the place where it is made." All those qualities, therefore, included in the term " validity," must, *generally speaking*, be governed by that law.

The court will perceive, that the *lawfulness of the effects to*

*be produced by the contract*, is the point to which attention should be directed. This quality, if I may so call it, of the contract, is distinguishable from all others I have named and is also distinguishable from the nature, the obligation, and the interpretation, which this author says are also, *generally speaking*, *to be determined by the lex loci*. Whether a contract be personal or real, conditional or absolute, are questions concerning its nature. Whether a contract confers a right to performance, and on the other hand a duty to perform, are questions touching the obligation. For example; if a contract, by law, when made, can only be recovered on condition that payment is first sought of some other; the obligation of such contract would be accessorial, and such law qualifies *the obligation of the contract*. Whether a contract shall be considered as having one meaning or some other is a question touching the construction of contracts.

The lawfulness of the effect sought to be produced by the contract, is that quality of it to which attention should be directed. The intervenors say, we have become the grantees of the property attached, and the effect which we seek to produce by that contract is to effect an unequivocal distribution of the property conveyed amongst creditors; that effect is lawful by the laws of Pennsylvania, and as the *lawfulness* of the effect to be produced by the contract is to be judged of by those laws, it must be held lawful in Louisiana.

Now the answer to this is obvious. *The lawfulness* of the effect to be produced by the contract is not called in question, when its effects are limited and held to be subject to the rights which our own law gives to creditors. The *lawfulness* of an effect, and its *extent*, are quite different things. Effects which result from the *nature* of the contract ought not to be confounded with those circumstances purely *accidents*, which limit their operation. The former, generally speaking, are governed by the *lex loci*, the latter by the *situs* or locality of the thing. The heir, or distributee, who demands property by the title of succession, has not the *lawfulness* of its effect called in question, when the property so claimed is held subject to the payment of debts. *Boulenois*, as reported by Story, informs us "that errors arise from confounding *the effects* that result from the nature of the acts on the one side, with those which belong to the charges or liens which spring up after the acts, purely as accidents on the other side." "And another error is the omission in a proper case to have due regard or deference to the law of the *situs* or locality of the thing."

Mævius, as reported by the same author, also distinguishes between the effects of the contract and accidental extrinsic circumstances not in the contract. *Cave autem hac materia, confundas actuum et contractuum solemnia, nec non effectus ac ip-*

*sis causatos cum eorum onere, et accidenti extrenseco quod contractus subsequitur, sed ex non ipsis contractibus est. Id, dum multi ignorant, aut non discernunt, forenses maxime laedunt, et gravantur."* His opinion therefore is, that the place of the contract is to govern the solemnities of the contract—the effects caused by it; but as to the charges on it, and the extensive circumstances that may limit these effects, they are to be governed by the law of the *situs* or the law of the place where the contract is to have its execution and effect.

But another answer is to be found in a well recognized exception to the rule that the place of celebrating the contract governs *all the effects sought to be effected by the contract*; and that exception is, that where the contract is made to have effect in another country, it is to be governed by the laws of the latter country. I need quote no authority to prove this exception. It is not only recognized by civilians generally, but is one of the precepts of our code, and has been recognized by decisions of this court. Indeed, it seems not to be controverted by the counsel for the intervenors, but on the other hand, an attempt has been made to show that these arrangements were not to have effect here.

The counsel says, that the assignments were not only made in Pennsylvania, but were entirely closed and consummated there; that their execution was simultaneous with their existence. Now in this he is entirely mistaken. If he would look at the nature of the arrangements, he will find them to be *executory trusts,* and so denominated in all the books. That the effect they were to have was secured by executory covenants some of which were expressed, others implied. They could be executed so far as property here was concerned by having effect here. The trust to hold and preserve the property, and collect it, were effects of the contract, directly contemplated by the contract; and these could take place only in Louisiana. It is not, as the counsel supposes, the completeness or the incompleteness of the contract that is the test, but where it is to have effect.

A bill of exchange drawn here, payable in New York, is complete—it wants none of the parts of a contract, and yet the laws of New York, not of this State, will govern. Wherein does this case differ from that of *Beirne & Burnside* v. *Patten?* The property claimed by the trustees was here at the time of the assignment, and the garnishees had received notice of the assignment. Might it not have been said, that, by fiction of law, the property was at the debtor's domicil when the arrangement was made, and that, as the assignment transferred the property and was complete at the instant it was made, therefore, it was not to have effect here? Yet the court say, in a case where all this might have been urged with as much force as in this, the proper-

ty being here, the contract in relation to it was to have effect here. "It is a well settled rule that where a contract is, either expressly or impliedly, to be performed in another place than that in which it is made, its validity is to be governed by the law of the place of performance."

But another answer may be given to the claim set up by the intervenors, *that all the effects sought to be obtained by the assignments* should be governed by the laws of Pennsylvania, and that is, that the effect sought to be produced of an unequal distribution of the property of the bank amongst creditors, is contrary to the express laws of the State of Louisiana, and, therefore, to carry into effect the preference created by the assignments, would be giving effect to a foreign law against the express laws of our own State, and against the policy on which those laws are founded.

The rule laid down by this court in the case of *Saul* v. *His Creditors*, is so entirely conformable with justice and authority, that it cannot fail to claim the assent of all ; "that, in a conflict of laws, it must often be a matter of doubt, which should prevail ; and that whenever that doubt exists, the court which decides will prefer the law of its own country to that of the stranger. Or if positive laws of a State prohibit particular contracts from having effect according to the rules of the country where they are made, the former must prevail." Now, the positive laws of Louisiana prohibit the contracts of insolvents from having the effect of producing inequality of distribution. Our legislation would not be more explicit on this point, if it had declared in express terms, that no contract *made by residents or non-residents* shall produce that effect. Laws, where they declare a rule, declare it not only for one citizen but also for those who come within our State, or bring their property here.

What more then can be wanting ? The law requiring delivery in contracts of sale was a general law, regulating the effects of that contract. It was made, says the court, to protect the citizen against fraud, and therefore it is applicable to all, or its purpose would not be effected. In like manner, the law forbidding preferences, is emphatically to protect the citizen from fraud. It is to insure a speedy and direct application of property to the payment of debts. It is, in fact, a *regulation of property,* and in every respect a *real statute* which no nation permits to give place to the statutes of other states. The leading positions maintained by jurists are, that laws which concern persons ought to be deemed of universal obligation ; that laws which concern property ought to be deemed purely local ; and that laws concerning both person and property, ought to be deemed local or universal, according to their predominant character. See Story's Confl. Laws, § 26.

There is much truth in the observations made by the court in the case of *Saul* v. *His Creditors*, that no attempt to reduce this subject to fixed rules has ever been successful, and from its nature, no attempt can succeed ; that no nation will suffer the laws of another nation to interfere with her own, to the injury of her citizens ; and that the extent to which they will adopt a foreign rule must depend on the condition of the country in which such rule is sought to be enforced, the peculiar nature of her legislation, her policy, and the character of her institutions.

" Personal statutes," says Merlin, " are those which have principally for their object the person, and treat only of property incidentally. Real statutes are those that have principally for their object property, and which do not speak of persons, except in relation to property. Such," he adds, " are those which concern the disposition which one may make of his property ; either while he is living, or by testament." Story, § 13.

But when may a statute be said to have persons principally for the subject ? Le Brun, as cited by Story, says : " It is necessary to examine whether it *universally governs the state of the person*, independently of property. *If it governs only particular acts of the person, then it is not personal*." D'Aguesseau says : " If the statute has property directly for its *object or its destination to certain persons*, whose rights or acts are examined, *but the interests of others are the cause of the law*—if, on the contrary, it is directed to the person to provide, *in general, for his qualifications or his general absolute capacity*—in the first case it is real, in the second personal."

These rules have been adopted by this court in the case of *Saul* v. *His Creditors*. " The true principle in this matter," says the court, " is to examine whether the statute has property *directly for its object*, or its destination to certain persons, so that it is not their interest whose rights and acts are examined, but the interest of others to whom it is intended to assure the property. Or, on the contrary, the law is directed to the person to provide in general for his qualifications."

Now, the laws to be submitted to the test of these rules are those articles of the Code that declare that the debtor's property, he being insolvent, shall be devoted to a *pro rata* distribution ; and to that end, they declare that his property shall be a common pledge. It cannot be denied that this law has property principally for its object. In the language of Merlin, " it concerns the disposition one may make of one's property." It only speaks of persons in relation to property. Again, in the language of D'Aguesseau and of this court, " it has property directly for its object, and the destination to certain persons, whose rights and acts are examined, *but the interests of others are the cause of the law*." On the other hand, the law treats of per-

sons only incidentally, and certainly not to provide for the *general capacity of persons.* The clear object of the law is the destination of property, under particular circumstances, to creditors, and it is ordered *as a regulation of property,* on the same principles of morality that direct a portion of the estate, on the death of a father, to go to his child.

It has, therefore, I think, been established, that the subjecting the property to the rights of creditors here, does not call in question the legal effect of the assignments; that the legal effect is rightfully to be judged by our laws, because the contract was to take effect here; and that the law of Pennsylvania, giving preferences, cannot prevail in our State, over the positive legislation that condemns the practice as immoral and unjust.

But all this, says the counsel for the intervenors, may be so— the laws of Louisiana may be the proper laws to govern the case—they may declare, as they do, and as our courts have decided, that such conveyances are fraudulent; yet, the *bank being a corporation, is not subject to the rule that annuls a fraudulent conveyance!* And why? Because a bank is not capable of making a *cessio bonorum,* or of being forced to make a surrender of its property. The proposition is, that a foreign corporation coming here has a right to make fraudulent conveyances, because our laws do not enable them to make some conveyances that our citizens and other persons are enabled to make. Such a proposition need only be stated.

Again, the counsel for the intervenors asks, whether the United States is such a creditor as to avoid the fraud? Most assuredly she is such a creditor. But she is not, it is said, a citizen of Louisiana. Was Kimball a citizen of Louisiana? His residence in New York did not prevent his subjecting the property of the debtor, also a citizen of New York, to the payment of his debt, even against an assignment good by the laws of New York, where both resided. In 14 La. 11, the court asserted, that they were compelled to give the benefit of our laws to all who had a right to invoke them, and that the measure of justice was the same to our citizens and to those who, being citizens of other States, are, by the constitution, entitled to equal rights and privileges. The government of the United States is certainly not a citizen of any one State in the Union; but there is no right enjoyed by any citizen, and which from its nature it can enjoy, that it is not entitled to.

GARLAND, J. In this court the case has not only been fully and ably argued by the counsel for the United States, and the assignees, but we have been furnished with a very ingenious and well considered argument in writing, from a gentleman under-

stood to represent a number of other attaching creditors, not now before us, but whose interests are the same with the United States, except in the question of priority or preference claimed. Our attention has been directed not only to the law and decisions of the courts in England and in the various States of the Union, but to our own jurisprudence in relation to assignments or transfers of property in trust for the payment of debts, and conveyances made to defraud, delay, or hinder creditors in collecting debts. The decisions in different courts have been various and sometimes apparently contradictory, and the attempt to reconcile them, together with the extent of the ground covered by the discussion, and the points actually necessary to be decided, has made the investigation of the case tedious and protracted. To state all the decisions in detail, and to point out their coincidences, and their occasional apparent contradictions, the consequence generally, of a change in circumstances, would be a task more laborious and tedious than useful or necessary, in coming to a proper conclusion in this case; and the work of condensing and adapting the proper principles on which to place it, would be but little less so.

In every civilized nation, and particularly in those of a commercial character, the laws and the decisions of the judicial tribunals have uniformly been directed against every act of a debtor, fraudulent in itself, or calculated to injure or improperly delay a creditor in collecting his just demands. In England previous to the enactment of 13 Eliz. chap. 5, commonly called the statute of frauds, the courts, acting upon the principles of the common law, always went as far as they could in extending their jurisdiction, and the remedies they were authorized to apply, for the suppression of all frauds and conveyances, by which creditors would be injured, and the property of debtors protected. Since that statute has been made, the courts in England, with the same view, have always given it a liberal construction. In all the States of the Union, in which the common law forms the basis of their jurisprudence, and in those in which statutes nearly similar have been adopted, the same liberal construction has been given. Before, and ever since the well known case of Twyne, (3 Coke's Rep. 87,) this principle has been well understood. *Cadogan* v. *Kennett*, Cowper's Rep. 434. But it was not the object of the statute of

13th Eliz. to invalidate a fair and *bona fide* transaction, (1 Binney's Rep. 514;) and it is not every conveyance that has the effect of delaying or hindering creditors, that is in itself fraudulent. In some degree, it is the effect of every assignment of a debtor's property for the benefit of creditors, to produce hinderance and delay; but the Supreme Court of the United States, in the case of *Sexton* v. *Wheaton*, (8 Wheat. Rep. 229,) said, that the assignment must be devised of "malice, fraud, covin, collusion, or guile" to bring it within the statute; and, in England, the same doctrine is established. 4 East, 13.

In this State, where our legislation and courts are particularly vigilant in guarding against all manner of devices by which creditors are to be defrauded or seriously injured, and the debtor benefited at their expense, or his property protected, the doctrine is well settled, that fraud is not to be presumed; that the law has established certain *indicia* or marks, by which it shall be known; and that every case must depend upon its own circumstances. 10 Mart. 436. 2 La. 309. 14 La. 184.

Roberts in his Treatise on Frauds, says, with respect to such conveyances or assignments as are taken by a creditor or creditors from a debtor, by way of security or satisfaction, that there can be no doubt, that they are *prima facie* good within the statute of 13th Eliz. (pp. 189, 436;) and Chancellor Kent says, a conveyance to pay debts is valid; and that that purpose forms a good consideration. 2 Johns. Ch. Rep. 182.

In England, the instances of assignments by debtors, for the benefit of creditors, of a part or the whole of their property, are comparatively rare, as in so commercial a country it might be supposed they would frequently be made; but as there is a bankrupt law in force, these assignments are not regarded with much favor when they establish a mode of payment different from it, or give preferences in violation of the general law. The courts consider such acts more as a fraud upon the law than upon individual creditors, and frequently disregard them; but when the assignments are general of all the property, for the benefit of all the creditors, and possession is taken by the trustees or assignees, the courts manifest a strong disposition to support them. In the case of *Pickstock* v. *Lyster*, (3 Maule & Selwyn, 371,) the object

of the conveyance was to prevent a creditor about to obtain a judgment, from satisfying it on execution. The debtor was insolvent, and pending the suit, executed an assignment to trustees of all his effects, for the benefit of all his creditors, and they took possession. Lord Ellenborough said, that the assignment was more an act of duty than of fraud, and that it arose out of the moral duties of the debtor, to make the fund available for all the creditors. Justice Bailey said, he assented fully to the doctrine, and that the conveyance, so far from being fraudulent was the most honest act the party could perform; and there was nothing new in this doctrine. 5 Term Rep. 235, 420. 8 Term Rep. 528. 4 East, 1. Opinion of Judge Story, in 4 Mason's Rep. 206. In this State, our citizens and tribunals, acting upon the broad principle laid down in that article of the Code which declares all the property of the debtor the common pledge of his creditors, have always been jealous of every conveyance or transaction calculated to defraud creditors, or give an unjust preference to one class over another; yet there are cases in which our Legislature seems to regard a particular kind of obligation, or engagements of a chirographic nature, as entitled to some favor, such as endorsements, for the security of which, both present and future, a mortgage may be given, although no actual obligation has been incurred; and also, payments made on the eve of insolvency in the ordinary course of business. Our laws in relation to the cession of property, afford to debtors such facilities in giving up their property for the benefit of creditors, that there is little or no inducement to make assignments; and it is not probable that we shall often be called on to act on any but those made in other States.

The general power to assign property to trustees for the benefit of creditors, has, in various States of the confederacy, been recognized and approved in the fullest manner, by both State and Federal tribunals. The Supreme Court of the United States in the case of *Brashear* v. *West*, 7 Peters' Rep. 608, declared that an assignment of all the property of a debtor, is not, *per se*, fraudulent, and that the right to make it results from the absolute ownership which every man claims over that to which he has a title, and of which he has possession. *Choses in action* can be

assigned as well as property susceptible of, and actually reduced to possession; and courts of equity, in a commercial country, will, in consideration of the amount of property necessarily lying in contracts, protect the assignment, as much as courts of law will that of a *chose* in possession. 1 Maddock's Chancery, 546. There need not be any actual consideration given by the trustee, as the debts constitute a consideration; and the obligation of the trustee to perform the trust, is a sufficient consideration as to him. 4 Mason's C. C. Rep. 206. 10 Pick. Rep. 413. 7 Wheaton, 556. 11 Ibid. 78.

The principle is also well settled, that when the trust gives no authority to the trustee to give a preference, he cannot do it; but it is equally well settled, that a debtor, whether in failing circumstances or not, may dispose of his property for the use of his creditors, and may prefer one to another in the assignment. Hopkins' Ch. Rep. 373. 7 Modern Rep. 139. 5 Term Rep. 235, 420. 7 Taunton's Rep. 149. In the United States it is a very common practice; and the authorities are very numerous in Massachusetts, New York, Pennsylvania and other states. 5 Mass. Rep. 42, 144. 12 Ibid. 140. 15 Ibid. 233. 16 Ibid. 275. 11 Pick. Rep. 829. 5 Johns. Rep. 412, 335. 2 Johns. Ch. Rep. 283. 1 Binney's Rep. 414. 17 Serg. & Rawle, 250. Wallace's (Penn.) Rep. 21. 6 Cowen's Rep. 233. 7 Greenleaf, 241. 5 New Hamp. Rep. 113. And there are many other cases. For decisions of the Supreme Court of the United States, see 7 Wheaton's Rep. 565; 11 Ibid. 78; 4 Dallas, 76; 7 Peters' Rep. 608.

It is not denied in the argument that, in Pennsylvania, where the deeds under consideration were executed, both partial and general assignments may be executed for the benefit of creditors, and preferences given; and we see from a copy of a statute given in evidence, that there is a law in that State, the purpose of which is, not so much to regulate the manner of making these assignments or creating these trusts, as to provide for the proper execution or administration of them. The power seems to have been admitted by the Legislature, and the object of legislation was to prevent any abuses by the trustees, in carrying the powers conferred into effect.

By art. 10 of the Civil Code, and by art. 13 of the Code of

Practice, we are expressly told, that contracts are to be governed by the law of the place where they are entered into; but that the form and effect of the actions instituted to enforce them, must be governed by the law of the place where they are instituted. Our jurisprudence has been in conformity to these principles, and is too well established to need the citation of authorities. It results from these articles, that if the deeds of assignment relied on by the intervenors are good and valid in Pennsylvania, and convey the property included in them in that State, then they will convey it here, unless there is something in our attachment laws to prevent it, or unless some preference has been acquired by the non-delivery of the property.

We will now proceed to examine into the validity of the deeds of the 7th of June, and 4th and 6th of September, 1841, according to the laws of Pennsylvania. That the assignment made on the 1st of May of that year to Dundas and others, of a large amount of the assets and property belonging to the bank, is good and valid, has been settled by the highest judicial tribunal of the State, in the case of *Dana* v. *Bank of the United States*, 5 Watts & Serg. 223. The opinion of the court in that case, is based on the powers granted by the charter to the corporation, and on the general laws of the State; from which it would follow, that the subsequent assignments are also legal and valid, unless the charter has in some manner been violated, or the other laws of the State infringed by the proceedings of the stockholders, or the action of the directors of the corporation. It has been decided by the highest judicial tribunal in the State of Connecticut, that a corporate body is as competent to make an assignment for the benefit of creditors, as a natural person, and to give a preference to one creditor over another, even after insolvency. It may, like individuals, discriminate, and stipulate in favor of a meritorious creditor. 6 Conn. Rep. 233. 8 Ibid. 505. The same principle has been recognized in two cases in Maryland. 6 Gill & Johns. 363, 206. It was there held, in the first of these cases, that the directors of the Bank of Maryland had full power to provide for the payment of the debts of the institution, by executing a deed conveying all the property of the bank in trust for that purpose. In the second case it was held, than an individual in

failing circumstances might prefer one creditor to another, by a transfer of property made in good faith, and that a corporation might do the same. These cases are quoted with approbation by the Supreme Court of Pennsylvania, in the case of *Dana* v. *The Bank of the United States*. After stating the principles established in the cases in Connecticut and Maryland, the court, in the case of Dana, proceed to say, " All that is said here in respect to what a corporation may do, is peculiarly applicable to a corporation created for the purposes of trading and banking, where the business consists chiefly of buying and selling bills of exchange, and drafts or checks, and in discounting bills or notes, by means whereof, it either becomes a creditor or debtor, which makes it necessary for it to attend to the payment and receipt of all debts created in the course of such dealing as they shall fall due. Hence the very object and design for which such a corporation is established, renders it indispensably necessary that it should have as complete and absolute a right, at all times to dispose of and transfer its property and effects, for the purpose of paying, or securing the payment of its debts; or of giving, as has been done in this instance, a part of its property and effects to secure the payment of certain debts only, as any individual or mercantile company has or have.' Hence the Bank of the United States, in this case, if it had not had any express power granted to it by the act of its incorporation, to dispose of and assign its property for the purpose of securing and making payment of its debts, either in part or in whole, as the occasion might seem to require, in the judgment of the board of directors, would have had such power, by necessary implication, from the very nature of its business, unless it were expressly restrained by its act of incorporation, which is not alleged or pretended.

" Seeing, then, that the Bank of the United States was invested with full power to do all that was done, or intended to be done in this case, and that it necessarily appertained to the management of the affairs of the bank, it follows as an inevitable consequence, as has been clearly shown, that it belonged to the president and directors, and to them alone, to do it, as also to determine on the propriety of its being done."

This language is plain and does not need comment, as to the

power to make the assignment, or trust, of the 1st of May, 1841 ; and, in another part of the opinion, the court say, that the assent of the stockholders was not necessary, as the directors could assign without it, or in opposition to their will. If this be true, and we do not feel authorized to decide otherwise, is not the doctrine as applicable to the last trusts as to the first? It certainly is ; and we must look further for some violation of the laws of Pennsylvania, which will invalidate the deeds before us.

The counsel urge the want of assent of the stockholders to the trust, and that the directors had no right to dispose of all the property, so as to dissolve the corporation. As to the legal part of this argument, it is met by the reasoning in the case of Dana ; and as to the matter of fact, we think it is sufficiently shown, that the stockholders did assent. The resolutions passed at the meetings in April, 1841, and on the 4th of May following, in our opinion, fully expressed their assent to making assignments for the purpose of protecting and paying the post-notes, circulation and deposits of the bank ; but if there remained a doubt, it was removed by the resolution passed on the 18th May, 1841, authorizing the board of directors to act as they might think most discreet, and most beneficial for the institution.

But say the counsel for the appellees, the board of directors had no power to dissolve the corporation, by transferring all the property. Admitting that such would be the effect of an assignment of all the property, which it is not necessary to decide, what difference does it make, under the circumstances of the case? The bank, it is said, was hopelessly insolvent ; numerous suits were pending against it ; on the judgments rendered, or about to be given, executions would have issued, and the whole property would probably have been sacrificed, and the corporation left without a dollar, and thereby dissolved. The result of either measure, according to the counsel for the plaintiffs, would be the same. Had the directors remained quiet, and permitted all the property and assets of the bank to be seized and sold, the charter would have ceased to exist, according to the argument; and the assignment has no other effect.

The counsel for the plaintiffs further urge, that the assignments of June 7th, and of the 4th and 6th of September, are not made

in conformity to the laws of Pennsylvania, and that the intervenors have not complied with the provisions of those laws, by filing an inventory of the assets conveyed, and by giving security as required. As to the general power to make an assignment, it is needless to repeat what has been said in Dana's case; we shall, therefore, only look to the statutes of Pennsylvania, to see what else was necessary to be done in the premises, that has been omitted, and what may lawfully be dispensed with. The general law in relation to assignees for the benefit of creditors, passed in 1836, requires in every case of a voluntary assignment of real or personal property, whether general or partial, that an inventory of the property so assigned shall be filed by the assignee or assignees, within thirty days after the execution thereof, in the Court of Common Pleas of the county, together with the affidavit of such assignees, that the same is a full and fair inventory of such estate and effects ; and the said court is authorized to appoint appraisers to make said inventory, &c., who shall be sworn to discharge their duties faithfully, &c. The assignees, as soon, as said appraisement and inventory are made, are also bound to give bond and security for their faithful administration of said estate. These various requisites are fully set forth in the extracts we have made in the previous part of this opinion. It will be recollected, that with the assignment of the 7th of June, an inventory of the assets assigned was made and formed a part of it. With the other two assignments no inventory was ever made ; nor, in either case, were bond and security given, as required by the law of 1836. The counsel for the intervenors contend, that the acts of the Legislature of the 4th and 5th of May, 1841, dispensed them from the necessity of making this inventory, and of giving the bond and security ; and this brings us to an examination of those acts. They are fully set forth in the statement made of this case, and it will be seen are somewhat confused, and bear marks of that hasty legislation, which not unfrequently occurs near the close of a session. By reference to the proceedings of the board of directors of the bank, which are in evidence, it appears that it was not their purpose, in applying to the Legislature, to obtain the passage of such a law as was enacted. Their object was simply, in case of any assignment made, to dispense the

assignees from the obligation of making and filing an inventory and giving security as required by the law of 1836. But the Legislature seem disposed to go further, and provide for another contingency, which it was supposed might occur, in consequence of the provisions contained in the seventeenth section of the act of the 4th of May, 1841, being rejected; and, therefore, provided a mode by which the bank might go into liquidation, if the stockholders should decide it advisable, and, if not, then the original prayer of the board of directors was intended to be granted. The eighteenth section of the act only speaks of a general assignment, and of what is to be done in case it is ordered; and the first part of the nineteenth section, relates to the same subject; but when we come to the latter part of the section, it is evident, that the Legislature intended to do something else, and to provide for something else, otherwise it would have been unnecessary to have dispensed with the inventory and security " in case of any assignment or deed of trust, or other conveyance, which may be made by the President, Directors and Company of the Bank of the United States, for securing the payment of any portion of its liabilities." These words, with a repetition of them in the twentieth section of the act, clearly show, that a dispensation was meant as well in a particular assignment as in a general one. This construction of the law is sanctioned by the opinions of legal men of high standing, whose evidence has been taken, and opinions asked. The directors of the bank, after the passage of these laws, asked the advice of counsel as to their meaning, and were assured that they dispensed with the inventory and security. To us these provisions appear either to do that, or to mean nothing, which we cannot suppose. We are not at liberty to presume that the Legislature of Pennsylvania intended to do an idle and unnecessary thing, nor to limit the dispensation to a case of general assignment, when they say it shall apply to any that may be made " for securing the payment of any portion" of the liabilities of the bank. If our views of these statutes be correct, and we believe they are sound, then all the objections of the plaintiffs to the deeds, arising from a non-compliance with the provisions of the general law, are disposed of; and also some of those which go to establish a legal fraud, as the proposed assign-

ments were made known to the Legislature, and in some degree received their sanction.

As to any fraud, in the moral acceptation of the term, we see none in the making of these assignments. The bank was insolvent, or at least very much embarrassed ; its creditors were pressing for the payment of their debts ; some of them, the managers of the institution felt, were more entitled to consideration than others, and the law of their State authorized them to think so ; and we do not see anything wrong, in the bank's first providing security for those who were willing to aid it in its abortive attempt to resume specie payments, and in securing those who held its notes as money or currency, or who, relying upon its good faith, deposited their funds in their vaults. Our own Legislature have shown that they consider debts of that nature entitled to some favor. See Acts of 1843, p. 56, *et seq.* Nor do we believe, these assignments void, under the statute of the 13 Elizabeth, ch. 5, which it is said is in force in Pennsylvania, as being calculated to hinder or defraud the creditors in collecting their debts. The laws of that State sanction acts of this kind, and have provided means to have such assignments enforced by the courts, and process to compel the assignees to execute the trusts confided to them. Preferences among creditors are allowed ; and when the directors of the bank saw it was ruined, and its property and assets about to be sacrificed, we think, with Lord Ellenborough, that the assignment was more an act of duty than a fraud. The notes of the bank were scattered over the whole country, in the hands of the rich and the poor ; they circulated as money, and the directors were bound to protect them from depreciation, if possible. It was the " most honest act the party could do."

In the course of the argument, it has been urged with great zeal, by all the counsel for the plaintiffs, that too much authority has been given to the assignees, and that they are irresponsible to the creditors for whose benefit the assignment is made. This does not appear to us a serious objection, as we are of opinion, that all the laws of Pennsylvania are in full force, to compel the assignees to do their duty, and to distribute the funds among those entitled to them. No part of the act of 1836, relative to assignees, is repealed or dispensed with, except as to the inventory

and security; and if any assignee abuses the trust confided to him, he is liable to be removed, and condemned to pay over all he has in his hands.

Another fertile source of complaint is, that clause of the June assignment which directs that the trustees, before making a dividend, shall give at least thirty days notice of their intention to do so in two newspapers in Philadelphia, and requiring the party to prove his debt before he is entitled to a dividend; and further, the fact that no time is fixed when the trust shall terminate. It seems to us, that the counsel have very much mistaken this clause of the deed. We see nothing unreasonable, in requiring thirty days notice of an intended dividend to be given, and a call to be made upon all entitled to receive it to come forward and present their demands for approval and payment. It is possible that the time may not be long enough, to enable all to present themselves at once; but any delay in doing so does the party no injury, as he is entitled to a full share out of a subsequent dividend, being first paid a full proportion of the first sum divided, nor do we see any hardship in requiring the creditors of the bank to prove their demands, if required. It is what all creditors are bound to do, whether their demands be against a bank or an individual. If the evidence is not satisfactory to the assignees, the courts of the State are open to the parties aggrieved. As to the time the trust is to close, the deed says, that when the final dividend is made it shall terminate; but if any one then remains unpaid, the bank, by the last clause of the deed, is still liable.

Another objection is, that the creditors have not accepted these trusts or assignments made for their benefit. It is apparent that they have not done so, on the face of the deeds; but it may be done in other modes: *first*, by claiming the benefit of them; and *secondly*, it is presumed, when it is shown that the assignment is for the benefit of the creditors, and that there is a competent grantor and trustee. The title to the property passes by such a conveyance, and vests in the trustee subject to the purposes for which it was conveyed. 4 Mason's Rep. 206. 11 Wend. 248. 4 Johns. Ch. Rep. 529. 4 Mason's Rep. 183. 2 Gallison's Rep. 557. 2 Conn. Rep. 579, 633. There are no conditions in the

assignment that the creditors shall release their debts, nor any thing calculated to delay them unreasonably.

It is urged, that there was no delivery of the property and assets assigned, and that, therefore, it was subject to attachment. As to the property in this State, the evidence of delivery is most satisfactory. It consists principally of debts owing by various persons, and the evidences of those debts were in the hands of Frazier, an agent, in the spring or summer of 1841. He carried all those papers to Philadelphia; they were delivered to the assignees by the bank, and again by them delivered to the witness, Frazier, as their agent, who returned with them to this State, in the autumn of that year, and took possession of such other evidences of debt as remained; and, when the attachment was levied, all the property was in the hands of the agents of the intervenors. We do not know of a more conclusive mode of giving possession of a debt, than by delivering the evidence of it. In some cases notice to the debtor is required to be given, but not always. In cases of transfer of bills of exchange and notes payable to order, no notice is necessary previous to maturity; nor is it afterwards, except for the purpose of preventing the parties bound from acquiring equities against the holder, to which they might be entitled if not notified. In stating the evidence in relation to delivery and notice of transfer, the manner is set forth, and we repeat, it is satisfactory to us. It is not pretended that the Bank of the United States remained in possession of any of the property conveyed, after the assignment, nor has it exercised any control over the assignees, or their agents, so far as we are informed. There are none of the badges of fraud attending this transaction, which, according to the best authorities, indicate it. In Pennsylvania it appears clear that the delivery was sufficient. See Dana's case and 1 Binney's Rep. 502.

It is next maintained, that assignments, or transfers, made in Pennsylvania, so as to affect creditors, of property in this State, can only be made according to the laws of this State, and subject to the restrictions prescribed by those laws. In considering this proposition, it is first to be understood, that this is a Pennsylvania contract, made in that State; and, as between the bank and the assignees, and the latter and the creditors for whose benefit it was intended, to

be executed there.   None of the funds are to be distributed here ;
our laws have nothing to do with them ; nor is any citizen of our
State, so far as we know, a party to the contract, or in any way
to be injured or benefited as · a creditor.   Our people are the
debtors ; and, as to them, it is immaterial who gets the money,
when their debts are discharged.   The parties complaining have
all, we believe, abandoned the courts of Pennsylvania, where
they commenced the prosecution of their demands, and where
their debtor resided, and have come to claim of our citizens the
debts they owe, and as soon as they can be collected the amount
will be withdrawn from among us.

   As a general rule, we believe it may now be considered as
settled in the United States, that an assignment under a bankrupt
law of a foreign country, does not operate as a transfer of a bank-
rupt's property in them.   Story's Confl. of Laws, §§ 410, 411.
2 Kent's Com. 404–408, 3d edit. ; and the authorities cited by
those writers.   But there is a distinction between an assign-
ment under a bankrupt law, and a voluntary assignment made
by the owner residing in a foreign country.   In one case, the
transfer is by the operation of the law of a foreign country ; in
the other, it is the act of the party.   6 Pick. Rep. 286.   Story's
Confl. of Laws, §§ 410, 411.   2 Mart. N. S. 93, 97.   6 Binney's
Rep. 353.

   The law is otherwise in England, and, we believe, on some
portions of the continent of Europe ; but the doctrine is well
established in this country.   In a few of the States it has been
held, that a transfer by assignment does not protect the property
from attachment, subsequently to the bankruptcy or insolvency ;
but that, we think, a harsh interpretation of the law, and we
shall certainly not extend it to any one not a citizen of our own
State.

   We consider the doctrine as well settled now, that personal
property has no locality, and that the laws of the owner's domi-
cil should, in all cases, determine the validity of the transfer or
alienation, unless there is some positive or customary law of this
country to the contrary.   Story's Confl. of Laws, § 383, et seq.

   This being the case, and considering the transfer and assign-
ment made in Pennsylvania legal, and sufficient to transfer the

property situated here, we are of opinion, that it should be decreed to belong to the intervenors.

The counsel for the appellees have called our attention to a variety of decisions made by this court, in opposition to assignments made in other States. The first is that of *Fellowes* v. *The Commercial and Railroad Bank of Vicksburg*, 6 Robinson, 246, in which we held the assignment as null, against an attaching non-resident creditor. The reasons for that decision are fully stated in it. The assignment, under which the intervenors claimed, was not shown to have been valid under the laws of Mississippi; and besides, the principal object of the pretended assignment was, not for the benefit of creditors, but first to complete the rail-road, which was not assigned at all, although it appeared to be the most valuable property owned by the corporation.

The next case is that of *Beirne & Burnside* v. *Patten and others*, 17 La. 589. The plaintiffs were citizens of this State, and the debts contracted in it. Under those circumstances, and it not being shown that the assignment to Vaulx & Butler was good in Tennessee, where it was made, and it being doubtful whether the property was in the State at the time of the assignment, this court followed a decision made in the case of *Ingraham* v. *Geyer*, in Massachusetts, (13 Mass. Rep. 146,) in which it was held, that, as it was not certain whether the property had been delivered to the assignee, the attachment was good. The case of *Olivier* v. *Townes*, in this court, (2 Mart. N. S. 93,) turned upon the same point; the delivery of the ship attached not being considered perfect. That has always been considered, in our tribunals, the pivot on which these cases turn.

The last question is, as to the preference or priority claimed by the United States, under the acts of Congress, which, in cases of insolvency, and where a general assignment of all the property has been made, give a right of priority to debts due them. 2 Laws U. S. 595, § 5. 3 Ib. 197. The Supreme Court of the United States, in various cases, have passed on these provisions, and have said, that there must be an actual insolvency, though not a declared one, and that the assignment must be general; but that a party by assigning all his property by different acts,

cannot thus, under the pretext of the assignments being partial, defeat this right of priority. 3 Cranch, 61.

In this case, the judge of the Commercial Court, thought that the bank was insolvent at the time the assignments in question were made, and that all of them should be considered as one, and that the priority existed. In this, we think the judge did not err. The evidence shows, that the bank was insolvent at the time the deeds in question were passed; and we also think, that it establishes an intention to make further assignments, if those already made should not be sufficient to satisfy the creditors intended to be secured.

Besides, this view of the case is sustained by the conditions upon which the defendants accepted the transfer of the property and assets from the old Bank of the United States. It was a trust on the part of the new bank, and we cannot permit them to defeat it, by making an assignment of their property.

*Judgment affirmed.*